## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Worldwide Machinery Group, Inc., *et al.*,[1] | ) | Case No. 25-90379 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket Nos. 18, 45, 101, 102, 177, 186, 188** |

## DEBTORS' OMNIBUS REPLY IN SUPPORT OF THE (I) CASH COLLATERAL MOTION, (II) SALE MOTION, AND (III) TERMINATION FEE MOTION

The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") submit this omnibus reply (the "**Reply**") in further support of, and in response to the objections[2] to: (a) the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection for the Use of Cash Collateral, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 18] (the "**Cash Collateral Motion**"), (b) the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (III) Authorizing the Disposal of Any Burdensome Assets* [Docket No. 101] (the "**Sale Motion**"), and (c) the *Debtors' Emergency*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Worldwide Machinery Group, Inc. (8029), Worldwide Machinery, Ltd. (3666), Worldwide Operating, Inc. (7023), and Worldwide Machinery GP, LLC (5399). The location of Debtor Worldwide Machinery Group, Inc.'s corporate headquarters is 2200 Post Oak Boulevard, Suite 1000, Houston, Texas 77056.

[2] The objections include: (i) the ABL Lenders' initial objection to the Cash Collateral Motion [Docket No. 45] (the "**Initial Cash Collateral Motion**"), (ii) the ABL Lenders' supplemental objection to the Cash Collateral Motion [Docket No. 102] (the "**Supplemental Cash Collateral Objection**"), (iii) the ABL Lenders' objection to the Sale Motion [Docket No. 188] (the "**Sale Objection**"), (iv) the ABL Lenders' objection to the Termination Fee Motion [Docket No. 189] (the "**Termination Fee Objection**"), and (v) the Committee's objection to the Cash Collateral Motion [Docket No. 186] (the "**Committee Objection**" and, together with the foregoing objections, the "**Objections**").

*Motion for Entry of an Order (I) Authorizing and Approving the Termination Fee and (II) Granting Related Relief* [Docket No. 177] (the "**Termination Fee Motion**" and, together with the Sale Motion and the Cash Collateral Motion, the "**Motions**"),[3] and state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors filed these chapter 11 cases to complete a sale process that began in March of 2025 and effectuate a value-maximizing transaction.  The process has been overseen by the independent Restructuring Committee of the Debtors' Board and their independent CRO, who have been advised by the Debtors' independent and experienced restructuring professionals.  The process has been broad and open to all-comers.  As of now, the Going-Concern Transaction is the best available option for the Debtors and their estates.  It delivers the most value to the Debtors' estates, provides for the assumption of millions of dollars in claims, and preserves approximately one hundred jobs.[4]

2.      The ABL Lenders ignore these attributes, which epitomize the purpose of chapter 11, and object to the Going-Concern Transaction, largely because it includes some of the Debtors' prepetition equity holders.  Initially, the ABL Lenders argued that the Going-Concern Transaction was too speculative for the Debtors to pursue and now, with the bidders having signed binding purchase agreements, it appears that it is too real.  The Court should overrule the ABL Lenders' objections (and any other objection to the proposed sale).

3.      The ABL Lenders' displeasure with one of the purchasers is no basis to forsake the best transaction available to the Debtors.  The ABL Lenders themselves demanded that the Debtors

---

[3]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration, Sale Motion, the Cash Collateral Motion, or the Termination Fee Motion, as applicable.

[4]      The Debtors have considered, and will continue to consider, all alternatives, and the Debtors reserve the right to seek approval of any superior proposal they may receive at or prior to the hearing to consider the Sale Motion in lieu of the Going-Concern Transaction.

pursue the sale process.  The Debtors consulted with the ABL Lenders regularly throughout the process.  That was in fact a condition to the parties' forbearance agreement, as was the ABL Lenders' input on the Debtors' financial advisor and CRO and coordination with bidders.  The ABL Lenders' support for this process only shifted when it became clear that the highest and best bid included an entity supported by the Debtors' equity holders at which point the ABL Lenders sought to sell their claim to a liquidating bidder who had submitted the *lowest* bid for the Debtors' assets, entered into an exclusivity and breakup fee arrangement with that bidder (in violation of that bidder's NDA with the Debtors), and conditioned any further forbearance on the Debtors' consent to a sale of the claim without *any* understanding of how the proposed transaction would impact upon the Debtors or their estates.  As fiduciaries for their estates, the Debtors could not agree to compromise their ability to maximize value and instead determined that it was in the best interests of all stakeholders to seek chapter 11 protection in order to pursue the best possible outcome for their estates and stakeholders.

4.     The Going-Concern Transaction is a sound exercise of the Debtors' business judgment.  It provides the greatest value to the Debtors and their stakeholders, including the ABL Lenders, trade counterparties, and employees.  The Debtors' decision to pursue the highest and best deal available after a comprehensive process is entitled to deference.  As the evidence will show, the Debtors ran a fair and robust sale process overseen by independent decisionmakers, and the resulting proposed transaction was reached through arms'-length, good-faith negotiations and is the highest and best available to the Debtors.  The Court should approve it.

5.     The ABL Lenders' position is baffling.  They have not identified a higher or better bid.  Although the ABL Lenders finally filed notice of their intent to credit bid earlier today (despite the Debtors asking for weeks), their indicated credit bid provides facially less value than

the aggregate purchase price under the Going-Concern Transaction and raises many questions that the Debtors intend to bring to the Court's attention in a statement and limited objection to be filed as soon as practicable.  At this time, it is unclear if the ABL Lenders' bid is serious and would likely introduce significant closing risks and delay to the sale process.  Moreover, the Debtors believe that there is cause to preclude or limit the ABL Lenders' credit bid.  Thus, notwithstanding their placeholder credit bid, the ABL Lenders have not offered a viable alternative to the value-maximizing Going-Concern Transaction.

6.      In any event, the ABL Lenders' arguments are entirely without merit.  They complain about the absence of bid procedures and a stalking horse, but ignore their own repeated objections to the use of the Debtors' cash to fund any portion of the chapter 11 cases, let alone a prolonged postpetition marketing process.  They allege that the process was run for the sole benefit of the Greenberg family, but ignore that the process was open to all bidders and run by independent directors and advisors, in consultation with the lenders themselves.  They argue that the transaction is designed to allow existing equity to retain value free of secured debt, but ignore that the secured debt will be extinguished in any scenario, and this option provides the highest and best value to the Debtors' estates.  They fault the Debtors for not letting them sell their claims to Gordon Brothers, but ignore that such a sale to a party that had submitted the lowest liquidation bid to the Debtors would have undermined the sale process and resulted in significantly lower value to the Debtors and their estates.

7.      The ABL Lenders' objection also fails because it offers no realistic alternative to the best option available to the estates after a comprehensive process: the Going-Concern Transaction.  The Court should therefore approve that transaction.  Doing so will also provide

ample adequate protection to the ABL Lenders for the use of their cash collateral to complete the sale.

**REPLY**

**I.       The Going-Concern Transaction Satisfies Any Applicable Standard of Review**

8.       The ABL Lenders ask the Court not to give any deference to the Debtors' decision to approve the Going-Concern Transaction, arguing that the involvement of Diversified compels review under the heightened "entire fairness" standard.  Sale Obj. ¶¶ 46-50.  The ABL Lenders ignore dispositive facts about the relevant decisionmakers and the Debtors' affiliation with the purchaser, set forth below to clarify the record.  The ABL Lenders are aware of these facts, having been involved in the Debtors' sale process from the beginning.  In any case, the ABL Lenders' effort to confuse is meritless, as the proposed sale satisfies any applicable standard of review.

**A.       The Debtors Commenced a Restructuring Process at the ABL Lenders' Request and Implemented Independent Governance to Oversee That Process**

9.       Starting in the summer of 2024, at the ABL Lenders' request, the Debtors commenced a restructuring process to maximize value for all of their stakeholders.  In August of 2024, the Debtors added Mr. John T. Young, Jr., an independent and seasoned restructuring professional, to the Board.[5]  In October of 2024, the Debtors added Mr. Robert Warshauer as the second independent director,[6] established the Restructuring Committee, and retained Mr. Scott Avila (also independent) to serve as the CRO.[7]  The ABL Lenders consented to the identities and scope of authority of both the CRO and the Restructuring Committee.[8]

---

[5]       *See Debtors' Witness and Exhibit List for Hearing Scheduled for October 22, 2025, at 10:00 a.m. (Prevailing Central Time)* [Docket Nos. 198, 203, 205, and 208] (hereinafter, the "**Exhibit List**"), Ex. 33 at WWM0001114

[6]       *Id.*, Ex. 35 at WWM0001125.

[7]       *Id.*, Ex. 34 at WWM0001123.

[8]       *See id.*

5

10.     On October 7, 2024, the Board formed the Restructuring Committee consisting of Mr. Young and Mr. Warshauer to oversee all restructuring matters.[9]  The Board also authorized the CRO to operate the Debtors and to "identify and implement business performance improvement initiatives, including new business opportunities and cost optimization opportunities."[10]  The Restructuring Committee oversaw the CRO's activities.[11]  The CRO and Paladin, with the oversight of the Restructuring Committee, immediately commenced work analyzing the Debtors' business.

11.     In early 2025, the ABL Lenders insisted that each of the three Greenberg directors (Adam, Alan and Evan) resign from the Board as a condition of any further forbearances.[12]  On January 9, 2025, the Greenbergs resigned from the Board.[13]  The Greenbergs also agreed to "take no action to fill Board vacancies" resulting from their resignation and to "not consent to any other stockholder of the Company filling such vacancies."[14]

12.     As of January 9, 2025, the Board consisted of Mr. Young and Mr. Warshauer, each with no equity stake in the Debtors, and Joe McInnis, who was appointed by the Caspian Lenders, the second lien lenders and minority shareholders of the Debtors.[15]  Since that time, no member of the Greenberg family has been on the Board or exercised any control over the Debtors.

---

[9]      *Id.*

[10]     *Id.*, Ex. 34 at WWM0001122.

[11]     *Id.*, Ex. 34 at WWM0001123.

[12]     *Id.*, Ex. 37 at WWM0001799.

[13]     *Id.*, Ex. 38 at WWM0001796.

[14]     *Id.*, Ex. 38 at WWM0001797.

[15]     *See id.*, Ex. 35 at WWM00011257, Ex. 34 at WWM0001124, Ex. 38 at WWM0001797.

B.    **The Debtors' Independent Decisionmakers and Independent Advisors, with Constant Oversight from the ABL Lenders, Conducted a Robust Prepetition Sales and Marketing Process**

13.    As part of the continuing forbearance agreement with the ABL Lenders, the Debtors agreed to, and did, provide the ABL Lenders with an orderly liquidation plan and a restructuring plan, in each case approved by the Greenberg-free Board.[16]  The restructuring plan envisioned a sale process where the Debtors would attempt to sell their assets through a going concern sale.[17]

14.    On February 24, 2025, the Restructuring Committee and the Board adopted a resolution authorizing the CRO to implement a dual going-concern sale process and liquidation sale process.[18]  With the consent of the ABL Lenders, the CRO and the Restructuring Committee commenced the dual process.[19]  The CRO and the Restructuring Committee interviewed various investment banks.  The ABL Lenders attended certain interviews.   The ABL Lenders concurred in the Restructuring Committee's decision to hire PSC, and the ABL Lenders participated in the negotiation of PSC's engagement letter along with the Debtors.[20]

15.    The Restructuring Committee launched the sales process on or about April 30, 2025.[21]  PSC contacted over 200 potential transaction parties, including strategic and financial buyers, consulted with the ABL Lenders about the parties to be contacted, signed approximately 40 NDAs with interested parties, sent approximately 40 Confidential Information Memoranda, and

---

[16]    Exhibit List, Ex. 41 at WWM0000560, Ex. 104 at WWM00012941.

[17]    *Id.*, Ex. 41 at WWM0000560-61, WWM0000565.

[18]    *Id.*, Ex. 41 at WWM0000560-61.

[19]    *Id.*, Ex. 41 at WWM0000573.

[20]    *Id.*, Ex. 45 at WWM0002104, Ex. 47 at WWM0003815-17.

[21]    Id., Ex. 54 at WWM0002230, Ex. 56 at WWM0002255-56.

sent 30 process letters providing clear deadlines for participating in the process.[22]  PSC also established a data room and conducted multiple in-depth due diligence meetings.[23]

16.     By June 11, 2025, PSC received informal feedback from several bidders, but received only two IOIs.[24]  One was from Diversified.[25]  The other was not competitive, as it was based on an "earn-out" structure that involved only speculative cash payments.[26]  The Debtors immediately notified the ABL Lenders of both IOIs and disclosed to them that Diversified is owned, at least in part, by Evan Greenberg.[27]

17.     On June 25, 2025, Diversified submitted a letter of intent ("**Initial Diversified LOI**") proposing a cash purchase price of $48 million to be accomplished via a foreclosure sale.[28] The Initial Diversified LOI proposed a two-week due diligence period, closing by August 29, 2025, and an exclusivity period.[29]  The Debtors rejected the Initial Diversified LOI, advising Diversified that the purchase price was too low and any exclusivity provisions was a non-starter.[30]

18.     At the ABL Lenders' request, concurrently with the going concern sales process, Paladin ran a liquidation sale process, which was considered to be a "Plan B," if the going concern process was unsuccessful.[31]  As part of this process, Paladin reached out to liquidators, including

---

[22]     *Id.*, Ex. 129 at WWM0001108, Ex. 101 at WWM0002725.

[23]     *Id.*, Ex. 80 at WWM0002429, Ex. 86 at WWM0000999, Ex. 87 at WWM0002485-86, Ex. 95 at WWM0000907.

[24]     *Id.*, Ex. 74 at WWM0002881, Ex. 75 at WWM0002704, Ex. 129 at WWM0001108.

[25]     *Id.*, Ex. 129 at WWM0001108.

[26]     *Id.*, Ex. 72 at WWM0001335-37.

[27]     *Id.*, Ex. 74 at WWM0002881.

[28]     *Id.*, Ex. 79 at WWM0001286, Ex. 81 at WWM0002699.

[29]     *Id.*, Ex. 79 at WWM0001287.

[30]     *Id.*, Ex. 98 at WWM0002543.

[31]     *Id.*, Ex. 104 at WWM0001297.

Hilco, Gordon Brothers and Ritchie Brothers.[32]  Paladin also requested that the ABL Lenders provide them with any other potential liquidators capable of liquidating a large amount of equipment.  Ultimately, the Debtors received a joint IOI from Hilco and Ritchie Brothers and an IOI from Nations Capital, a Gordon Brothers affiliate.[33]

19.    To advance the processes, the Debtors, with the consent of the ABL Lenders, gave Diversified, Hilco/Ritchie Brothers and Gordon Brothers until July 22, 2025 to submit binding LOIs.[34]  The Debtors also agreed to provide both Hilco/Ritchie Brothers and Gordon Brothers with a $75,000 work fee in connection with their respective diligence efforts.[35]  The work fee was discussed with and consented to by the ABL Lenders.[36]  Diversified was not provided with a work fee.[37]  As a result, both Hilco/Ritchie Brothers and Gordon Brothers began to conduct extensive due diligence and Diversified continued its diligence process.[38]

20.    On July 22, 2025, the Debtors received three LOIs—one each from Diversified, Hilco/Ritchie Brothers and Gordon Brothers.[39]  Diversified offered $55 million cash and assumption of $9.9 million of liabilities.[40]  This was significantly above the $48 million purchase price set forth in the Initial Diversified IOI.[41]  The Hilco/Ritchie Brothers LOI presented several options, the most attractive of which was a $53.5 million "guaranteed payment" for the Debtors'

---

[32]    *Id.*, Ex. 85 at WWM0000999.

[33]    *Id.*, Ex. 93 at WWM0001420.

[34]    *Id.*, Ex. 83 at WWM0002447.

[35]    *Id.*, Ex. 82 at WWM0000887, Ex. 85 at WWM0000885.

[36]    *Id.*, Ex. 83 at WWM0002447.

[37]    *See id.*, Ex.83 at WWM0002447

[38]    *Id.*, Ex. 87 at WWM0002485-86.

[39]    *Id.*, Ex. 93 at WWM0001420, Ex. 92 at WWM0001356.

[40]    *Id.*, Ex. 92 at WWM0001357.

[41]    *Id.*, Ex. 79 at WWM0001286, Ex. 81 at WWM0002699.

equipment.[42]  The Gordon Brothers LOI was not competitive, offering significantly less money than the other LOIs (including Hilco/Ritchie Brothers) to liquidate the Debtors.[43]

21.     The CRO and Paladin immediately began to analyze the various LOIs to determine which was the highest and/or best offer.[44]  On July 31, 2025, Paladin provided the ABL Lenders with a presentation comparing the LOIs.  The Debtors also delivered all of the LOIs to the ABL Lenders and continued to keep them fully updated on the sales process.[45]

22.     The CRO and the Board reviewed the LOIs and determined that, to maximize optionality, they would advance the process in two key ways.[46]  First, Paladin would engage with Hilco/Ritchie Brothers to determine the cost and timing of a liquidation pursuant to the Hilco/Ritchie Brothers LOI.[47]  This was important because the ABL Lenders had requested a "monetization plan" by August 15, 2025, which would be based on the Hilco/Ritchie Brothers LOI and would provide a detailed liquidation plan for the Debtors.[48]  Paladin engaged with Hilco/Ritchie Brothers and produced a monetization plan, which it delivered to the ABL Lenders on August 15, 2025.[49]  The plan, based on the Hilco/Ritchie Brothers LOI required a 60 to 90 day liquidation period during which the Debtors would need to remain operational.[50]  This was necessary because the Debtors' equipment is on rent to customers throughout the United States

---

[42]     *Id.*, Ex. 89 at WWM0000864.

[43]     *Id.*, Ex. 93 at WWM0001422, Ex. 96 at WWM0001040.

[44]     *Id.*, Ex. 97 at WWM0002523.

[45]     *Id.*, Ex. 93 at WWM0001420, Ex. 92 at WWM0001356.

[46]     *Id.*, Ex. 98 at WWM0002542-43.

[47]     *Id.*

[48]     *Id.*, Ex. 97 at WWM0002524-25, Ex. 104 at WWM0001297

[49]     *See generally id.*, Ex. 104.

[50]     *Id.*, Ex. 104 at WWM0001306

and in other countries and must be collected before it can be sold.[51]   The monetization plan proposed that this liquidation period occur within the context of a chapter 11 case to provide the protection of the automatic stay during the liquidation process.[52]

23.    Second, the Debtors would negotiate with Diversified to attempt to improve its bid.[53]   To this end, the Debtors contacted Diversified to discuss certain deal terms, including seeking to increase both the cash payment and the assumption of liabilities.   After several rounds of negotiation, the Debtors obtained the following improvements:[54]

- Diversified agreed to assume substantially all of the Debtors' trade obligations— an increase in assumed liabilities from the $9.9 million included in the July 22, 2025 LOI to $13.1 million.

- Diversified agreed to post a $100,000 deposit, which would be subject to forfeit if financing contingencies were not timely removed.

- Diversified agreed to remove all financing contingencies by August 22, 2025.

- Diversified reduced the immediate cash purchase price from $55 million to $52.5 million, but added profit sharing mechanism whereby the ABL Lenders would share up to $2.5 million in proceeds from certain "liquidity events" (such as the sale of assets or distributions to equity) occurring within three years of the close.[55]

24.    Shortly thereafter, the Board and the Restructuring Committee met to consider the Hilco/Ritchie Brothers LOI, the monetization plan and the Diversified LOI, as improved.[56]   After a comprehensive review of the various bids, and after consulting with their advisors, the Board and Restructuring Committee determined that the Diversified LOI, if executable, was the best

---

[51]    *Id.*, Ex. 104 at WWM0001309.

[52]    *Id.*, Ex. 104 at WWM0001297, WWM0001317.

[53]    *Id.*, Ex. 98 at WWM0002543.

[54]    *See id.*

[55]    *Id.*, Ex. 112 at WWM0001385-89.

[56]    *Id.*, Ex. 108 at WWM0000912.

available option and that the Debtors should continue to pursue it.[57]  Among other things, the Restructuring Committee determined that the Going-Concern Transaction provided the most consideration to the Debtors' estates (including ABL Lenders) because the Debtors did not need to fund a liquidation process, preserved jobs, resulted in the assumption of trade debt and did not involve significant post-close risks.[58]  The Hilco/Ritchie Brothers LOI came with significant uncertainty and was unlikely to result in more value than the Going-Concern Transaction.[59]  The Restructuring Committee communicated its views to the ABL Lenders.[60]  The ABL Lenders did not indicate any disagreement regarding the Debtors' analysis of the bids.

25.     On August 20, 2025, the Debtors executed a non-exclusive LOI with Diversified (the "**Diversified LOI**"), which contained the improvements described above, a copy of which was provided to the ABL Lenders.[61]  The Diversified LOI did not contain any exclusivity provisions and the Debtors specifically retained the right to negotiate other offers with third parties.[62]

26.     In addition to the Diversified LOI, Diversified produced a "highly confident" letter from Macquarie indicating that it could get credit committee approval for the transaction by September 5, 2025.[63]  While the "highly confident" letter was not a commitment, it did provide a

---

[57]     *Id.*, Ex. 108 at WWM0000912.

[58]     *Id.*, Ex. 108 at WWM0000927, WWM0000933-35.

[59]     *Id.*

[60]     *Id.*, Ex. 112 at WWM0001384, Ex. 111 at WWM0002577.

[61]     *Id.*, Ex. 112 at WWM0001384, WWM001391.

[62]     *Id.*, Ex. 112 at WWM0001385-89.

[63]     *Id.*, Ex. 100 at WWM0000722-23.

clear indication that Macquarie would be able to purchase the Debtors' assets, which it would then lease to Diversified.  The "highly confident" letter was sent to the ABL Lenders.[64]

27.     Additionally, any concerns regarding funding in connection with the Diversified LOI were resolved on or around September 9, 2025, when Macquarie, the financing source for Diversified LOI, received internal approval from its credit committee to fund the cash purchase price for the Going-Concern Transaction.[65]  A copy of Macquarie's letter was forwarded to the ABL Lenders.[66]

28.     After further arm's length negotiations, on October 11, 2025, the Debtors and each of the Going-Concern Purchasers entered into a fully binding asset purchase agreement (the asset purchase agreement with Diversified, the "**Diversified Agreement**," the asset purchase agreement with Macquarie, the "**Macquarie Agreement**," and collectively, the "**Going-Concern Agreements**"), subject to Court approval [Docket No. 174].  Under the Macquarie Agreement, Macquarie will directly acquire the Debtors' hard assets, which will then be leased to Diversified.  Under the Diversified Agreement, Diversified will acquire the Debtors' working capital and other assets and assume most of the Debtors' trade liabilities and certain real property leases.  The Going-Concern Agreements removed any concern regarding the feasibility of the Going-Concern Transaction and provided a floor for any alternative bids to top.

### C.     The Independent Decisionmakers Have Continued to Consider Bids

29.     On September 26, 2025, the Debtors filed the Sale Motion, seeking approval of the Going-Concern Transaction.  On October 1, 2025, the Debtors filed the Sale Notice [Docket No. 113] and served it on the Sale Notice Parties, including parties that had expressed interest in the

---

[64]       *Id.*, Ex. 102 at WWM0001472.

[65]       *Id.*, Ex. 126 at WWM0001780-81.

[66]       *Id.*, Ex. 126 at WWM0001779.

sale process, as well as all known creditors [Docket No. 184].  The Debtors also published the Sale

Notice in the *Wall Street Journal* and the *Houston Chronicle* [Docket Nos. 182, 183].  The Debtors

gave parties in interest 21 days' notice of the Sale Hearing and invited potential bidders to submit

alternative bids:

> As set forth in the Motion, the Going-Concern Transaction is subject
> to higher and better offers.  In order to obtain the highest and
> otherwise best bid for the Assets, the Debtors will continue to
> consider any alternative bids that may be submitted prior to the Sale
> Hearing.  If the Debtors determine that an alternative bid is higher
> and better than the Going-Concern Transaction, the Debtors will file
> a notice ahead of the Sale Hearing designating such alternative
> bidder as the purchaser of the Assets . . . and the proposed asset
> purchase agreement to effectuate the Sale to an Alternative
> Purchaser . . . .

Sale Notice at 2.  The Sale Notice includes contact information for PSC.  *Id*. at 3.

30.     Following the dissemination of this notice, several parties expressed interest, and

one party signed an NDA.  The Debtors will continue to consider any new bids that may come in.

Additionally, on October 8, 2025, Hilco and Ritchie Brothers submitted a new bid (the "**Revised

Hilco/Ritchie Brothers Bid**").  The Debtors and their advisors analyzed the Revised Hilco/Ritchie

Brothers Bid, reviewed the revised bid with the Restructuring Committee and the Board, and the

Restructuring Committee, the CRO, and the Board each determined that it was inferior to the

Going-Concern Transaction due to its lower face value, inherent contingencies, likelihood of

delay, and failure to assume any claims or preserve any jobs.  The Debtors sent a counteroffer to

Hilco/Ritchie Brothers on October 15, 2025, which was not accepted by Hilco/Ritchie Brothers.

Hilco/Ritchie Brothers sent a response to the Debtors' counteroffer on October 18, 2025.  The

Debtors continue to negotiate the terms of the Revised Hilco/Ritchie Brothers Bid.  As of the date

hereof, the Going-Concern Transaction is still the best available option after a process that has

lasted for more than seven months.

**D.     The Going-Concern Transaction Is Not an Insider Transaction**

31.     The Debtors' business judgment that the Going-Concern Transaction is the highest and best bid is entitled to deference and should be approved.  Heightened scrutiny may be warranted where an insider or fiduciary is involved on both sides of the transaction and the transaction has not been independently negotiated and approved on behalf of the debtor.  *See In re Univ. Heights Ass'n*, 2007 Bankr. LEXIS 1200, at *13 (Bankr. N.D.N.Y. Jan. 22, 2007) (applying heightened scrutiny where proposed sale involved "insiders on both sides of the transaction"); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, at *34-35 (Bankr. D.N.J. Mar. 26, 2008) (noting that debtor, a Delaware corporation, was required to meet the heightened scrutiny required under "applicable Delaware non-bankruptcy law" with respect to an asset sale to debtor's management).  By contrast, the business judgment rule applies – and the debtor's business judgment is entitled to deference – when the transaction has been negotiated and approved by independent members of the debtor's board.  *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992) ("The business judgment rule is available when a majority of a corporation's independent and disinterested outside directors have approved a transaction."); *see also In re Crimson Expl. Inc. Stockholder Litig.*, 2014 Del. Ch. LEXIS 213, at *39 (Del. Ch. Oct. 24, 2014) (explaining that entire fairness review is only triggered where the parties "engage in a conflicted transaction").

32.     Given the facts and circumstances of these chapter 11 cases, the Court should defer to the Debtors' business judgment regarding the best outcome available to the estates.  To begin, the Greenbergs do not sit on both sides of the proposed transaction.  To the contrary, the Debtors have conducted the sale process through their independent Restructuring Committee, the Board (on which no Greenberg sits), and CRO, advised by independent advisors.  Macquarie, the entity actually purchasing the Debtors' hard assets under the Going-Concern Transaction, has no affiliate

relationship with Diversified, the Debtors, or the Greenbergs, and has not been represented by the Debtors' advisors.  Similarly, Diversified, the entity that is affiliated with the Greenbergs, is separately represented by its own advisors.  In sum, the sale process has been conducted independent of the Greenbergs and no Greenberg has negotiated or approved the transaction on behalf of the Debtors.

33.     Moreover, there is no *per se* prohibition on sales to insiders.  Rather, courts assessing insider transactions under the heightened scrutiny standard will examine the process and price to ensure they are fair and "fiduciary duties were properly taken into consideration."  *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).  Insider sale transactions would fail heightened scrutiny where the insider's involvement on both sides of the sale compromises the debtor's ability to fulfil its duty and select the highest and best bid.  *See, e.g.*, *In re Flour City Bagels, LLC*, 557 B.R. 53, 82 (Bankr. W.D.N.Y. 2016) (finding insider sale did not satisfy heightened scrutiny where debtor's selection of insider bid "was likely colored by his bias in favor of [insider bid]" and failed to "consider the uncertainties of litigation that potentially rendered [insider bid] less appealing" than competing bid).  That is certainly not the case here.

34.     As stated in the First Day Declaration, the Sale Motion and above, and as the evidence will show at trial, the Debtors conducted the sale process entirely through the CRO, the Board, the Restructuring Committee and their professionals.  No Greenberg was on the Debtors' Board during the sale process, and no Greenberg was involved in the sale process, except as a bidder in connection with the Diversified bid.  Thus, the Debtors followed the proper protocol to ensure that the sale process was not tainted by conflicts.  Further, the Debtors treated Diversified like every other bidder: it had to sign NDAs and meet applicable deadlines, and it had to improve its bid over several rounds of arms'-length negotiations through both sides' professionals.

Moreover, Macquarie, who is not an insider of the Debtors, is the purchaser of the Debtors' hard assets and would have only agreed to the transaction if it is fair. The involvement of Macquarie, as well as the Debtors' CRO, independent directors, and professionals, in the sale process demonstrates that entire fairness scrutiny is unnecessary here. *See, e.g.*, *In re LATAM Airlines Grp. S.A.*, 2022 Bankr. LEXIS 649, at *125 (Bankr. S.D.N.Y. Mar. 15, 2022) (holding that "[w]here, as here, numerous non-insider stakeholders were involved in good faith negotiations of a transaction" and "numerous proposed compromises and settlements of billions of dollars of claims" occurred in the negotiations, the "business judgment standard is appropriately applied") (citing *In re Residential Cap., LLC*, 2013 Bankr. LEXIS 2601, at *65 (Bankr. S.D.N.Y. June 27, 2013)); *see also In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (holding that the entire fairness standard did not apply when the "negotiations that resulted in the settlement were initiated by [the investment banker] for the benefit of the enterprise, not by [an investor] for his benefit, and that the settlement was approved by independent members of [the debtors'] board").

35.     In any event, the Going-Concern Transaction is the highest and best bid the Debtors received through a fair, competitive and robust sale process. It maximizes the value of the Debtors' assets, provides the highest recovery for all creditors and is in the best interest of creditors, including the ABL Lenders. Because the Going-Concern Transaction reflects a fair price achieved pursuant to fair dealing and a fair process, it should be approved under any standard.

## II.     The ABL Lenders Are Adequately Protected for the Use of their Cash Collateral and the Sale of their Collateral

36.     The ABL Lenders' disagreement with the Debtors' decision to file these chapter 11 cases and to pursue the Going-Concern Transaction is not lack of adequate protection. Their preference to sell their claims and liquidate the Debtors prior to the chapter 11 cases is not the

relevant metric. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371–72 (1988) ("[T]he 'interest in property' protected by § 362(d)(1) does not include a secured party's right to immediate foreclosure . . . the creditor's 'interest in property' obviously means his security interest without taking account of his right to immediate possession of the collateral on default").

37.     The Going-Concern Transaction in fact provides the very protection that the ABL Lenders claim the Debtors cannot provide.  It will result in the most value, and the ABL Lenders' liens (to the extent valid) will attach to the cash proceeds subject to all rights of surcharge, which necessarily adequately protects them. *See* 11 U.S.C. § 361(2) (providing for replacement liens as a form of adequate protection).

38.     The ABL Lenders cannot plausibly argue that the chapter 11 cases have resulted in a diminution in value of their collateral.  The ABL Lenders were prepared to release such liens prepetition by selling their claims to Gordon Brothers.  The ABL Lenders have refused to disclose their reserve price, but the Debtors note that a sale of the ABL Lenders' claim would provide no consideration to the Debtors' estates (and would in fact undermine their efforts to maximize value) and that Gordon Brothers submitted a far lower bid than the Going-Concern Transaction (the lowest liquidation bid that the Debtors received).  Given the ABL Lenders' willingness to sell their claims to Gordon Brothers, the ABL Lenders may not now argue that the value of their collateral is higher than that which Gordon Brothers was itself willing to pay for calculating any diminution in value.  Pursuant to section 506(a) of the Bankruptcy Code, collateral value "should be calculated 'in light of the "disposition or use" in fact "proposed," not the various dispositions or uses that might have been proposed.'" *In re Sears Holdings Corp.*, 51 F.4th 53, 63 (2d Cir. 2022) (quoting *Assocs. Comm. Corp. v. Rash*, 520 U.S. 953, 964 (1997)) (holding that the bankruptcy court

reasonably assessed collateral value by its net orderly liquidation value where the "two 'realistic scenarios'" had been "a going-concern sale or a forced liquidation").

39.     The ABL Lenders ignore these well-settled principles, and instead cite the prepetition Borrowing Base Certificate as purported evidence of prepetition value.  The ABL Lenders offer no authority for the novel proposition that untested book values for accounting purposes are evidence of value.  Rather, it is well-established that the purchase price resulting from the Debtors' comprehensive, months-long sale process is the best evidence of value.  *In re Allonhill, LLC*, 2019 Bankr. LEXIS 1304, at *126 (Bankr. D. Del. Apr. 25, 2019) ("[T]he best evidence of [debtor's] value is the price that [debtor] and [purchaser] negotiated after an extensive marketing process and negotiations. . . . [A] market test – reflecting the actual price a willing buyer agrees to pay – is the best determination of fair market value"); *In re Champion Enters.*, 2012 Bankr. LEXIS 4009, at *66-67 (Bankr. D. Del. Aug. 30, 2012) ("The sales process overseen by the Court was a thorough and arm's length market test, which represents the best evidence of [debtor's] fair market value at the time of the § 363 sale.").  Nor can the ABL Lenders argue that assumption of liabilities under the Going-Concern Transaction constitutes diminution in collateral value.  That value was never available to the ABL Lenders under any transaction, and it is common for purchasers to assume liabilities necessary to operate the business as a going concern.

40.     Here, the Debtors' limited use of cash collateral to preserve their business, ensure collection of postpetition receivables, and bridge to the value-maximizing Going-Concern Transaction has served to adequately protect the ABL Lenders.  *See In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) ("A secured creditor holding both a mortgage securing a debt on a parcel of real property, and a perfected security interest in rents derived therefrom, holds two distinct interests [and the creditor's] interest in the collateral itself is

adequately protected when a portion of the rents are applied to its operation and maintenance."). The Debtors plan to file a proposed third interim order extending the Debtors' authorization to use cash collateral to continue preserving their business for a limited period while the parties close the Going-Concern Transaction. As the updated budget attached to such proposed order will demonstrate, the Debtors' cash position has continued to improve during these chapter 11 cases. Thus, the ABL Lenders' purported interest in cash collateral has been, and continues to be, adequately protected.

41. The ABL Lenders' argument that the administrative costs of the chapter 11 cases result in *per se* diminution in value is incorrect as a matter of law. Section 506(c) of the Bankruptcy Code "prevent[s] a windfall to a secured creditor at the expense of the estate," which could result if the secured creditor realized all the benefits of a debtor's actions to preserve or improve its collateral value while shouldering none of the corresponding costs. *In re JKJ Chevrolet*, 26 F.3d 481, 483 (4th Cir. 1994); *In re Felt Mfg. Co.*, 402 B.R. 502, 528 (Bankr. D.N.H. 2009) ("Section 506(c) 'was designed to extract from a particular asset the cost of preserving or disposing of that asset.'" (quoting *C.S. Assocs. v. Miller*, 29 F.3d 903, 907 (3d Cir. 1994))). If approved, the ABL Lenders will realize substantial benefits from the Going-Concern Transaction, and they cannot simultaneously complain that the costs of consummating that transaction reduced the value of liens they would have released for less value prior to the chapter 11 cases. *See In re Compton Impressions*, 217 F.3d 1256, 1260 (9th Cir. 2000) ("[Courts] measure the necessity and reasonableness of the Debtor's incurred expenses against the benefits obtained for the secured creditor and the amount that the secured creditor would have necessarily incurred through foreclosure and disposal of the property."); *In re Kent Manor Inn, LLC*, 2017 Bankr. LEXIS 1401, at *16 (Bankr. D. Md. May 22, 2017) (permitting surcharges under section 506(c) to the extent of

the benefits realized by secured creditor, measured by the increase in recovery through bankruptcy going-concern sale compared to a hypothetical foreclosure). The Debtors' professionals intend to seek surcharge against the estates for the professional fees incurred as a result of enhancing the value of the Debtors' assets through the Going-Concern Transaction.

### III. The Assets Can Be Sold Free and Clear of the ABL Lenders' Purported Liens Under Section 363(f) of the Bankruptcy Code

42.     The ABL Lenders spill much ink arguing that the Court cannot approve a sale of their collateral without their consent for an amount less than their claims free and clear of their liens. To the contrary, the Court has numerous options for approving the sale free and clear.

43.     First, there is a bona fide dispute as to the extent and validity of the ABL Lenders' liens. The fact that the Debtors (or a party in interest with standing) have not yet filed an adversary proceeding or objected to the ABL Lenders' claims (filed on October 18) is of no moment.] The ABL Lenders' characterization of the dispute as "mere innuendo" does not give them immunity. *See* Sale Obj. ¶ 6. The Debtors have cited ample authority demonstrating that the Court needs only to find an objective basis for a dispute to call section 363(f)(4) into issue. *See* Sale Mot. ¶ 51, n.7. The Debtors have provided more than enough evidence for the Court to make such a finding, and the Debtors will develop the record further at the hearing, as appropriate. Regardless, the Debtors understand that the Committee intends to file an adversary complaint challenging the validity and extent of the ABL Lenders' liens.

44.     Second, the highest and best price realized through a process like what the Debtors conducted here is sufficient to establish the value of the ABL Lenders' liens (to the extent such liens are valid). The ABL Lenders acknowledge that there is no controlling Fifth Circuit authority on this point. Sale Obj. ¶ 28. As courts have recognized, the minority position they advocate is inconsistent with the Bankruptcy Code and would significantly limit a debtor's power to dispose

of encumbered property.[67]  *See In re Boston Gen., LLC*, 440 B.R. 302, 332-33 (Bankr. S.D.N.Y. 2010) ("If section 363(f)(3) and . . . section 363(f)(5) are read in the manner suggested by the [objecting secured creditors], it seems unlikely that a Court, under any circumstance, could approve a non-consensual section 363 sale.  As both a practical matter and a matter of statutory construction, that cannot be the case.  It is hard to imagine that Congress intended to so limit a debtor's power to dispose of encumbered assets, particularly where such disposition otherwise satisfies the requirements of section 363(b)."); *see also In re Beker Indus. Corp.*, 63 B.R. 474, 476-77 (Bankr. S.D.N.Y. 1986) (holding that section 363(f)(3) permits a sale free and clear of liens where the sale price is the "best price obtain[ed]," as "it is undisputed that collateralized property can be sold for less than the amount of the lien at confirmation by cramming down a secured creditor").

45.     The majority and better-reasoned interpretation of section 363(f)(3) is that "value" refers to the economic value of the liens, not the face value of all claims secured by such liens. *Stroud Wholesale*, the lead case for the "face value" theory advanced by the ABL Lenders, predates the Supreme Court's clear guidance in *Timbers* that, pursuant to section 506(a), the value of a lien is limited to the economic value of the collateral.  *See In re Terrace Gardens Park Partnership*, 96 B.R. 707, 713 (Bankr. W.D. Tex. 1989) (adopting the economic value theory and finding that *Beker* is "better reasoned" than the *Stroud Wholesale* view, consistent with the focus of adequate protection "on the value of the collateral securing the claim," and the *Timbers* holding "suggests

---

[67]      The ABL Lenders claim that the majority view nationwide is that section 363(f)(3) requires satisfaction of the face value of all claims secured by liens on the property.  But the very treatise the ABL Lenders rely on acknowledges that the Debtors' interpretation – that "value" in section 363(f)(3) refers to the economic value of the liens – has prevailed over the face value theory in practice.  3 Collier on Bankruptcy ¶ 363.06 (noting that the view that "value" refers to the economic value of the liens  "seems to have prevailed in practice, especially in chapter 11 cases, where a sale free and clear of liens, even undersecured liens, is often required as a practical matter to permit the sale of a business as a going concern"); *see also In re Canonigo*, 276 B.R. 257, 260 (Bankr. N.D. Cal. 2002) ("By contrast, a majority of the courts that have confronted the issue have adopted the 'economic value of the lien' approach.").

that the Supreme Court would apply a similar interpretation to the expression 'value of all liens on the property' found in section 363(f)(3)" (citing *Timbers*, 484 U.S. at 372 ("The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.'"))).

46.     <u>Third</u>, the ABL Lenders can be compelled to accept money satisfaction of their interests in the Debtors' assets.  The ABL Lenders acknowledge that there is no controlling precedent in the Fifth Circuit on what constitutes qualifying legal or equitable proceeding for the purpose of section 363(f)(5).  Sale Obj. ¶ 39.  Courts have recognized that "section 363(f)(5) permits lien extinguishment if the trustee can demonstrate the existence of another legal mechanism by which a lien could be extinguished without full satisfaction of the secured debt," and that "[s]ection 1129(b)(2) cramdown is such a provision." *In re WK Lang Holdings, LLC*, No. 13-11934, 2013 Bankr. LEXIS 5224, at *29 (Bankr. D. Kan. Dec. 11, 2013); *In re Terrace Chalet Apartments*, 159 B.R. 821, 829 (N.D. Ill. 1993) (holding that section 363(f)(5) permitted sale free and clear if debtor "demonstrates it can cram down the [secured creditors] pursuant to section 1129(b)(2)"); *In re Healthco Int'l, Inc.*, 174 B.R. 174, 176 (Bankr. D. Mass. 1994) ("Such a 'cramdown' proceeding complies with the description of proceedings referred to in subparagraph (f)(5), and many courts have so held.").  The Going-Concern Transaction does not violate any confirmation requirements set forth in section 1129(b).  The ABL Lenders claim that the cramdown requirements would not be satisfied here because the Debtors "have refused to consent to [their] right to credit bid," Sale Obj. ¶ 42, n.33, but the Debtors have not blocked the ABL Lenders from submitting a credit bid.  Moreover, the ABL Lenders' right to credit bid in a cramdown proceeding is subject to and limited by section 363(k).  As the Supreme Court has acknowledged, "[section] 363(k) – and by extension [section 1129(b)(2)(A)(ii)] – provides an exception to the credit-bidding requirement if 'the court for cause orders otherwise.'" *RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 n.3 (2012). The ABL Lenders'

submission of a half-baked credit bid at this time appears to be solely for the purpose of frustrating

the best alternative that is actually before the Court, which, as the Debtors will further explain in

their forthcoming objection, is itself cause to deny the credit bid.[68]

47.     In addition, the ABL Lenders' liens (to the extent valid) will attach to the cash

proceeds of the Going-Concern Transaction. Accordingly, approving the Sale free and clear of

the ABL Lenders' purported liens is fully consistent with the requirements of the Bankruptcy Code

and can be approved under section 363(f)(5), or, as described above, at least one of the alternative

conditions set forth in section 363(f).

48.     <u>Lastly</u>, it is disingenuous for the ABL Lenders to argue they do not consent to the

Going-Concern Transaction when they agreed to sell their claim to Gorden Borther for presumably

similar or less value than what they would receive under the Going-Concern Transaction. The

only logical explanation of the ABL Lenders' rejection of the Going-Concern Transaction is their

distaste for any bid that involves the Debtors' prepetition equityholders, no matter the process by

which was achieved or the other alternatives actually available. That is not a legitimate basis to

prevent a free and clear sale.

## IV.   The Going-Concern Purchasers Are Good Faith Purchasers Entitled to the Protection of Section 363(m) of the Bankruptcy Code

49.     The ABL Lenders allege that Diversified ***may*** not be a good faith purchaser entitled

to the protections under section 363(m) of the Bankruptcy Code, because the Greenberg family's

interest in the Debtors, Nine AM and Diversified ***may*** have affected the sale process. *See* Sale

Obj. ¶ 51. As set forth in the Sale Motion, a sale to an insider is not *per se* bad faith under section

---

[68]     The Debtors hereby reserve the right to oppose the credit bid submitted by the ABL Lenders. The Debtors intend to file a statement and limited objection as soon as practicable.

24

363(m).  Sale Mot. ¶ 58.  Rather, there must be evidence of conduct amounting to fraud, collusion, or an attempt to take grossly unfair advantage of other bidders.

50.     The ABL Lenders fail to provide any evidence of fraud or collusion, or even allegations of specific misconduct, in connection with the sale process—because none exists. Rather, as the Debtors will demonstrate at the hearing, the Debtors conducted an independent process and treated the Greenbergs and Diversified like all other participants: they had to sign NDAs and meet all applicable deadlines, and they had to negotiate (and substantially improve) their proposals through arms'-length, good-faith discussions with the Restructuring Committee and independent advisors.  The Debtors similarly treated Macquarie like other parties in the process.  The ABL Lenders rely on vague and unsupported speculation about actions the Greenberg family "may have taken" or "failed to take" (without alleging any such actions) and an irrelevant digression about Evan Greenberg's business dealings in Saudi Arabia.  *See* Sale Obj. ¶ 51.  None of this is even close to evidence of bad faith conduct by the Going-Concern Purchasers in the course of the sale process.  Further, Diversified and Macquarie each intend to file declarations in support of a good faith purchaser finding, further bolstering the Debtors' entitlement to the protections of section 363(m).

## V.     The Going-Concern Transaction Is Not an Impermissible *Sub Rosa* Plan

51.     The ABL Lenders assert that the Going-Concern Transaction is a *sub rosa* plan without detailing any plausible violation of the Bankruptcy Code's confirmation requirements.[69] The ABL Lenders claim that the Going-Concern Transaction would violate section 1129(b) by "seeking to pay unsecured creditors" ahead of them.  *See* Sale Obj. ¶ 45.  That is incorrect.  The

---

[69]     Section 36 of the Procedures for Complex Cases in the Southern District of Texas provide that "[a]ny party-in-interest opposing a sale motion on the basis that the proposed sale constitutes a sub rosa plan must identify with specificity what rights or protections under 11 U.S.C. §§ 1121-1129 are being violated."

Going-Concern Transaction is unremarkable. It does not dictate the terms of an eventual plan, nor does it provide for the distribution of estate assets to any creditors. The ABL Lenders' lien (to the extent valid) will attach to all cash proceeds of the Sale. Although the Going-Concern Transaction does provide value to certain unsecured creditors, that value is from the assumption of certain trade and other liabilities—not by diverting cash payments away from the ABL Lenders. Assumption of liabilities is a common feature of section 363 sales, even sales that do not generate sufficient proceeds to repay secured debt.

52.    The Debtors are specifically empowered to assume and assign executory contracts and unexpired leases, pursuant to section 365 of the Bankruptcy Code, and such treatment is not considered a distribution of estate assets that would violate priority rules or constitute a *sub rosa* plan. *In re Chrysler LLC*, 405 B.R. 84, 99 (Bankr. S.D.N.Y. 2009) ("[P]arties to contracts that are assumed in a bankruptcy case are entitled to cure payments and adequate assurance of future performance. Therefore, it is recognized that such creditors may receive more favorable treatment than other creditors either in their class or a higher priority class. Nevertheless, such treatment is not considered a violation of the priority rules nor does it transform a sale of assets into a *sub rosa* plan."); *see also Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1312-13 (5th Cir. 1985) (noting that assumption of a lease does not "create[e] a *sub rosa* plan of reorganization, so long as such an assumption is a valid exercise of a debtor's business judgment," as it did "not alter creditors' rights, dispose of assets, and release claims to the extent proposed in the wide-ranging transaction disapproved in *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983)). Moreover, the assumption of certain liabilities is standard practice in a sale under section 363 and is based on a purchaser's business judgment that they are necessary to the successful operation of the Debtors' business as a going concern. *See In re Chrysler LLC*, 405 B.R. at 99, n.18 ("In every bankruptcy

case involving the sale of substantially all of a debtor's assets, a purchaser may decide to assume certain contracts but not others. . . . Any such assumption of liability reflects the purchaser's business judgment, the effect of which does not constitute a *sub rosa* plan because the obligation is negotiated directly with the counterparty.  Thus, any of the obligations under those agreements are satisfied by [Purchaser] and do not constitute a distribution of proceeds from the Debtors' estates.").

53.     The ABL Lenders' reliance on *Family Christian LLC* to argue that the Sale violates the absolute priority rule in section 1129(b) of the Bankruptcy Code is misplaced.  In *Family Christian*, the Court's primary concern was with the insufficient notice provided of the "extraordinarily broad releases for officers, directors, and insiders" and sale of avoidance actions. *In re Family Christian, LLC*, 533 B.R. 600, 629 (Bankr. W.D. Mich. 2015).  Although the Court mentions the 5% "tip" to unsecured creditors, it notes that issue "may arguably have been resolved," but "once again" noted "its unease with the Debtors' failure to provide notice to creditors and other parties in interest."  *Id.* at 630.  Here, on the other hand, the Going-Concern Agreements, which were filed on the docket and served on the Sale Notice Parties, do not provide for the sale or release of causes of action against the Greenbergs, except for claims directly related to the sale itself.  Additionally, the Debtors have been transparent about the fact that $13.1 million of the aggregate purchase price is based on the assumption of certain trade and other liabilities.  Moreover, such assumption is not a cash tip that would divert value from the ABL Lenders.  As explained herein, the cash sale proceeds will necessarily satisfy the ABL Lenders' secured claim, as determined pursuant to section 506(a).  The assumption of certain liabilities while the ABL Lenders' unsecured deficiency claim is not paid in full is not discriminatory and does not violate

any priority rules—and even if it were discriminatory, favoring trade creditors for valid business reasons is not considered "unfair" discrimination.[70]

54.     The Going-Concern Purchasers have made a business judgment that the assumption of certain liabilities is in the best interest of the business as a going concern.  The Going-Concern Transaction does not provide such creditors with any distribution of estate assets and, as such, does not violate priority rules or constitute a *sub rosa* plan.

## VI.     The Termination Fee Warrants Approval, if Applicable.

55.     In their eagerness to interpret any perceived slight in these chapter 11 cases as evidence of a larger conspiracy masterminded by the Greenberg family, the ABL Lenders misread the Termination Fee Motion.  The proposed $1 million Termination Fee is payable solely to Macquarie.  The Diversified Agreement includes no provision for any break-up fee or bid protections, so the ABL Lender's characterization of the Termination Fee Motion as "an attempt to cut the Greenberg family a check as an exit fee," *see* Sale Obj. ¶ 60, is wrong.

56.     Regardless of Diversified's intent to bid without a break-up fee, Macquarie, an entity unaffiliated with the Debtors, required the Termination Fee to be included in the Macquarie Agreement as consideration for the risks it has taken and expenses it has incurred by participating in the Debtors' sale process as a de facto stalking horse.  The Termination Fee is a customary bid protection, and it is eminently reasonable in comparison to Macquarie's commitment to fund $52.4

---

[70]     *See, e.g., In re Aegerion Pharm.*, 605 B.R. 22, 32 (Bankr. S.D.N.Y. 2019) (overruling an objection to a plan that separately classified trade creditors and noting that such treatment was acceptable when "trade creditors are vital to the debtors' ongoing, post-emergence business" and noting that "it is common for plans to propose "better" treatment of ongoing trade creditors"); *In re Rexford Props. Ltd. Liab. Co.*, 558 B.R. 352, 363 (Bankr. C.D. Cal. 2016) (finding that preferential treatment of trade creditors was justified as it was a "legitimate business or economic justification" and such treatment was "reasonably calculated to induce the continued support of [the trade] vendors."); *In re Havre Aerie #166 Eagles*, 2013 Bankr. LEXIS 1200, *37-41 (Bankr. D. Mont. Mar. 20, 2013) (finding that the "Plan's discrimination [was] fair" because "without the discrimination [the debtor] cannot pay trade creditors and remain in business, and would be unable to perform under the Plan if it fails to remain in business.").

million of the $52.5 million cash purchase price.  Thus, the Debtors' agreement to seek approval of the Termination Fee is a reasonable exercise of business judgment.

57.     Moreover, the Termination Fee is payable only if approved by this Court ***and*** the Debtors seek to consummate an alternative Sale Transaction on the ground that it is higher and better.  As the Debtors have not received a higher and better bid for their Assets, they are seeking approval of the Going-Concern Transaction, rendering consideration of the Termination Fee moot. If, however, a higher and better bid materializes ahead of the Sale Hearing and the Debtors pursue and consummate that bid, such additional value will conclusively demonstrate the benefit that Macquarie's participation in the sale process has conferred on the Debtors' estates, thus warranting approval of the Termination Fee as an actual and necessary expense under section 503(b).

## VII.    Disposal of Burdensome Assets Is in the Best Interests of the Debtors, their Estates, and All Parties in Interest

58.     The Debtors are solely seeking authority to dispose of de minimis assets, worth nominal amounts, that may remain in the Debtors' possession after the consummation of the Going-Concern Transaction.  The Debtors are facing severe liquidity constraints and will have limited, if any, funds available to wind-down the estates.  Because the cost of maintaining any de minis assets on their property is likely to exceed the value of the assets, it would not be efficient use of the Debtors' scarce resources to provide notice and seek the Court's approval of every asset they wish to dispose of.  This is particularly so given the ABL Lenders' apparent objections to use of the Debtors' cash in these chapter 11 cases.  If the Debtors wish to dispose of any assets with meaningful value, the Debtors will provide notice and seek the Court's approval.  Thus, the requested relief cannot possibly result in any harm or prejudice to the ABL Lenders—who have clearly stated their opposition to funding such (unnecessary) winddown costs.

**VIII.    The Committee's Concerns Regarding Professional Fees Are Valid But Premature**

59.    The Debtors fully understand and agree with the Committee's concern with respect to the payment of professional fees.  And while professional fees are normally included in a cash collateral budget, in light of the ABL Lenders' refusal to consent to the use of cash collateral, the parties' agreed budget did not provide for the payment of professional fees.  As previewed herein, the Debtors believe that sections 506 and 552(a) of the Bankruptcy Code provide a basis to charge professional fees to cash proceeds of the sale that may otherwise be subject to the ABL Lenders' purported liens.  Indeed, the Debtors' professionals intend to seek surcharge against the estates for professional fees incurred in connection with pursuing the Going-Concern Transaction, unless a consensual resolution is reached with the ABL Lenders.  But such issues do not need to be decided in connection with approval of the Cash Collateral Motion.  So, while fully supportive of the Committee's position, the Debtors believe that this objection is premature and should be overruled as irrelevant to the relief requested in the Cash Collateral Motion.

60.    The Debtors have agreed to the other modifications requested in the Committee Objection and will submit a proposed order reflecting such modifications.

## CONCLUSION

For the foregoing reasons, the Debtors request that the Court overrule the Objections as set forth herein, enter the amended Sale Order and proposed third interim order authorizing the Debtors' continued use of cash collateral to be filed by the Debtors, grant the relief requested in the Motions, and grant any other relief that may be just and proper.

October 20, 2025
Houston, Texas

/s/ *Charles R. Koster*

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:   (713) 496-9700
Email:          charles.koster@whitecase.com

- and -

**WHITE & CASE LLP**
David M. Turetsky (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:   (212) 819-8200
Email:          david.turetsky@whitecase.com
                    sam.hershey@whitecase.com

**WHITE & CASE LLP**
Roberto Kampfner (admitted *pro hac vice*)
Patrick Wu (Texas Bar No. 24117924)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:   (213) 620-7700
Email:          rkampfner@whitecase.com
                    patrick.wu@whitecase.com

- and -

**WHITE & CASE LLP**
Fan B. He (admitted *pro hac vice*)
Kristin Schultz (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:   (305) 371-2700
Email:          fhe@whitecase.com
                    kristin.schultz@whitecase.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Certificate of Service**

I certify that on October 20, 2025, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Charles R. Koster*

Charles R. Koster