```
                     UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)


                                          .
 IN RE:                                   .   Case No. 25-90379
                                          .   Chapter 11
 WORLDWIDE MACHINERY GROUP,               .
 INC., et al.,                            .   515 Rusk Street
                                          .   Houston, TX 77002
                     Debtors.             .
                                          .   Wednesday, October 22, 2025
 . . . . . . . . . . . . . . . .          .   10:01 a.m.
```

TRANSCRIPT OF MOTION FOR SALE OF SUBSTANTIALLY ALL OF
THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS AS DESCRIBED
IN SECTION 363(f) [101]
BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            White & Case LLP
                            By:  CHARLES R. KOSTER, ESQ.
                            609 Main Street, Suite 2900
                            Houston, TX 77002
                            (832) 786-6118

                            White & Case LLP
                            By:  SAMUEL P. HERSHEY, ESQ.
                                 DAVID MICHEL TURETSKY, ESQ.
                            1221 Avenue of the Americas
                            New York, NY 10020
                            (212) 819-8200

APPEARANCES CONTINUED.

Audio Operator:             Yesenia Lila, ECR

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46048
                            (855) 873-2223
                            www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

For the Debtors:             White & Case LLP
                             By:  ROBERTO J. KAMPFNER, ESQ.
                             555 South Flower, Suite 2700
                             Los Angeles, CA 90071
                             (213) 620-7700

For Diversified Fleet        Porter Hedges LLP
Holdings, LLC:               By:  JOSHUA W. WOLFSHOHL, ESQ.
                                  JOANNA D. CAYTAS, ESQ.
                             1000 Main, 36th Floor
                             Houston, TX 77002
                             (713) 226-6000

For Key Equipment            Bracewell LLP
Finance, a Division of       By:  WILLIAM ALFRED WOOD III, ESQ.
KeyBank National                  JASON G. COHEN, ESQ.
Association:                      NANCY MCEVILY DAVIS, ESQ.
                             711 Louisiana Street, Suite 2300
                             Houston, TX 77002-2781
                             (713) 223-2300

                             Bracewell LLP
                             By:  JONATHAN LOZANO, ESQ.
                             111 Congress Avenue, Suite 2300
                             Austin, TX 78701-4061
                             (512) 472-7800

Also Present:                JOHN YOUNG

                             SCOTT AVILA

                             TERRY PADDEN

TELEPHONIC APPEARANCES:

For the Debtors:             White & Case LLP
                             By:  FAN B. HE, ESQ.
                             200 South Biscayne Boulevard
                             Suite 4900
                             Miami, FL 33131-2352
                             (305) 995-5204

                             White & Case LLP
                             By:  LUCAS GREGORY CURTIS, ESQ.
                             111 South Wacker Drive, Suite 5100
                             Chicago, IL 60606-4302
                             (312) 775-4808

TELEPHONIC APPEARANCES (Continued):

| | |
|---|---|
| For Key Equipment Finance, a Division of KeyBank National Association: | Crowell & Moring LLP<br>By:   FREDERICK D. HYMAN, ESQ.<br>Two Manhattan West<br>375 Ninth Avenue<br>New York, NY 10001<br>(212) 223-4000 |
| For Cantor Fitzgerald Securities, as Prepetition Notes Agent: | Shipman & Goodwin LLP<br>By:   KATHLEEN LAMANNA, ESQ.<br>One Constitution Plaza<br>Hartford, CT 06103<br>(860) 251-5000 |
| For James River Equipment: | Ward and Smith, P.A.<br>By:   LANCE PAUL MARTIN, ESQ.<br>P.O. Box 2020<br>Asheville, NC 28802-2020<br>(828) 348-6070 |
| For Caspian Capital L.P.: | Wachtell Lipton Rosen & Katz<br>By:   ANGELA K. HERRING, ESQ.<br>51 West 52nd Street<br>New York, NY 10019<br>(212) 403-1000 |
| For 1st Source Bank: | Hunton Andrews Kurth LLP<br>By:   PHILIP GUFFY, ESQ.<br>600 Travis Street, Suite 4200<br>Houston, TX 77002<br>(713) 220-4013 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By:   JANA SMITH WHITWORTH, ESQ.<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>(713) 718-4650 |
| For Hilco Commercial Industrial, LLC: | Sidley Austin LLP<br>By:   ANTHONY R. GROSSI, ESQ.<br>787 Seventh Avenue<br>New York, NY 10019<br>(212) 839-5300 |
| For the Official Committee of Unsecured Creditors: | Pachulski Stang Ziehl & Jones LLP<br>By:   THEODORE S. HECKEL, ESQ.<br>700 Louisiana Street, Suite 4500<br>Houston, TX 77002<br>(713) 691-9385 |

TELEPHONIC APPEARANCES (Continued):

For the Official          Pachulski Stang Ziehl & Jones LLP
Committee of Unsecured    By:  BRADFORD J. SANDLER, ESQ.
Creditors:                919 North Market Street, 17th Floor
                          Wilmington, DE 19801
                          (302) 652-4100

                          Pachulski Stang Ziehl & Jones LLP
                          By:  JOHN MORRIS, ESQ.
                               ROBERT J. FEINSTEIN, ESQ.
                          1700 Broadway, 36th Floor
                          New York, NY 10019
                          (212) 561-7700

5

I N D E X
10/22/25

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| FOR THE DEBTORS: | | | | |
| Terry Padden | 42 | 53 | 57 | -- |
| Scott Avila | 58 | -- | -- | -- |

| EXHIBITS | ADMITTED |
|----------|----------|
| ECF Number 198-19 | 84 |
| ECF Number 203-5 | 64 |
| ECF Number 203-31 | 50 |
| ECF Number 205-1 | 67 |
| ECF Number 205-5 | 46 |
| ECF Number 205-9 | 68 |
| ECF Number 205-21 | 70 |
| ECF Number 205-30 | 77 |
| ECF Number 205-36 | 77 |
| ECF Number 205-38 | 78 |
| ECF Number 208-16 | 83 |
| ECF Number 208-36 | 51 |
| ECF Number 208-39 | 88 |

(Proceedings commence at 10:01 a.m.)

THE COURT: Alrighty. Good morning. This is Judge Lopez. Today is October 22nd. I'm going to call the 10 a.m. case, Worldwide Machinery, 25-90379. Why don't I take appearances in the courtroom, and then if parties wish to make an appearance on the line, why don't you hit "five star" and I will unmute your line.

Good morning.

MR. KOSTER: Good morning, Your Honor. Charles Koster, White & Case, proposed counsel for the debtors, joined by my partners, Roberto Kampfner, Sam Hershey, David Turetsky. Also in the courtroom is our independent director, John Young; our CRO, Scott Avila; and Terry Padden from Piper Sandler.

THE COURT: Okay. Good morning.

Wolfshohl, good morning.

MR. WOLFSHOHL: Good morning, Your Honor. Joshua Wolfshohl and Joanna Caytas for Diversified Fleet Holdings, LLC and Nine AM, Limited.

THE COURT: All right. Good morning.

MR. WOOD: Hey, good morning, Your Honor. Trey Wood on behalf of KeyBank as agent for the senior secured lenders. With me today is Jason Cohen, John Lozano, and Nancy Davis.

THE COURT: Good morning. Good morning.

MR. WOOD: Good morning.

THE COURT: Alrighty. Let me go to the phone line.

There's a 202 number.

MS. WHITWORTH:  Good morning, Judge Lopez.  Jana Whitworth on behalf of the U.S. Trustee.  I'm sitting in today for my colleague, Jayson Ruff.

THE COURT:  Alrighty.  Good morning.  Here's a 646 number.

MR. HYMAN:  Good morning, Your Honor.  Frederick Hyman from Crowell & Moring, also on behalf of KeyBank as agent for the senior lenders.

THE COURT:  Good morning, Mr. Hyman.

212 number?  A 212, looks like a 561 number?  All right.  Let's go with a 713.

MR. HECKEL:  Good morning, Your Honor.  Theodore Heckel, Pachulski Stang Ziehl & Jones, proposed counsel to the Official Committee of Unsecured Creditors, and joined today by my colleagues, Mr. Brad Sandler, Mr. John Morris, and Mr. Robert Feinstein.

THE COURT:  Alrighty.  Good morning.

A 646 number?

MR. MORRIS:  Your Honor, this is John Morris.

THE COURT:  Good morning.

MR. MORRIS:  Thank you.

THE COURT:  And a 212 number.

MR. GROSSI:  Good morning, Your Honor.  This is Anthony Grossi from Sidley Austin on behalf of Hilco.

Apologies for the camera issues.  Hopefully, we'll have that resolved shortly.

THE COURT:  Oh, it's all good.  Good morning.

Anyone else wish to make an appearance, please hit "five star."

All right.  If I've unmuted your line, I'd ask that you please just keep yourselves muted just so we can all hear each other.  And I'll turn it over to the debtors.  Oh, one more -- sorry.  Hold on.  It's a late flyer.  An 847 number.

MR. TORF:  Apologies, Your Honor.  Jason Torf, Tucker Ellis, appearing on behalf of Wagner Equipment Company.

THE COURT:  Ah, good morning.  Okay.

MR. TORF:  Good morning.

THE COURT:  Mr. Kampfner?

MR. KAMPFNER:  Your Honor.  Rob Kampfner, White & Case.

THE COURT:  Good morning.

MR. KAMPFNER:  Good morning.  Your Honor, we're here today on a bunch of items, but I think the item that is most important is the sale motion.  So with your permission, I'd like to start there if that's okay with you.

THE COURT:  If -- more than happy to, just trying to figure out where we are.

MR. KAMPFNER:  Okay.

THE COURT:  There's been a lot of paper that flew.  I

read everything, but I don't -- there are some numbers that I just don't have, and it'd be helpful to just kind of fill in the gaps.

MR. KAMPFNER: Okay. Absolutely.

So Your Honor, where we are today is that we have a bid for the purchase of the assets from Macquarie/Diversified. That bid is a going concern bid. It provides for a payment of $52.5 million of cash. It provides for the assumption of over $13.1 million of liabilities. It provides for the retention of over 100 employees and would essentially keep the company operating, you know, with a new buyer or the business operating.

THE COURT: So it's a 52.5 million --

MR. KAMPFNER: Correct.

THE COURT: Is that the cash bid?

MR. KAMPFNER: That's the cash amount.

THE COURT: And how much would then be allotted to the secured claim --

MR. KAMPFNER: Well --

THE COURT: -- into this deal?

MR. KAMPFNER: Well --

THE COURT: I got to compare it to a credit bid. That's why I'm trying to -- I -- I'll tell you where I'm going. There's no secret.

MR. KAMPFNER: So, you know, our view --

THE COURT:  Or how does it work?  Maybe, how does the waterfall work?

MR. KAMPFNER:  I guess how it would work right now is our view is that the liens of the lenders are disputed, but they would -- all of the liens would -- 100 percent of the lien, you know, would attach to 100 percent of the cash.  And that cash would be, you know, put into an account, you know, pending resolution of the disputes with the lender.

THE COURT:  How do I approve a sale today without knowing whether their credit bid is good or not, and it just got challenged last night?

MR. KAMPFNER:  Well, Your Honor, we think that the facts have been out there for quite a while.

THE COURT:  Yeah.

MR. KAMPFNER:  And that there's a basis for an objective dispute here and that -- a bona fide dispute and that as a result, that they're -- they shouldn't be allowed to credit bid.  And we think that they're fully protected by the fact that their liens, in whatever priority they are, will attach to the cash that gets paid under the Diversified bid.  And if it turns out that they do have a, you know, first --

THE COURT:  Did they take all the money at that point?

MR. KAMPFNER:  They will take all the money subject to surcharge rights.

THE COURT: In other words, there could be a going concern or it could just go to the secure creditor?

MR. KAMPFNER: Well, the going concern is that the business will be purchased by Diversified/Macquarie. You know, they will pay 52 million --

THE COURT: But what if they want to overbid? That's what I'm trying to -- that's where I'm a little -- I don't know what we're doing today.

MR. KAMPFNER: Why wouldn't they what? Sorry, Your Honor.

THE COURT: No, I'm just -- so you're saying there's a cash component of 52 million and then there's going to be some other stuff that goes along with this --

MR. KAMPFNER: 52.5.

THE COURT: But I just have an asset sale today. That's really all I have is -- I've been trying to emphasize this. I just have a 363 sale that has made other good stuff along with it. But at the end of the day, I'm just selling an asset. You're asking me to sell an asset today.

MR. KAMPFNER: I'm asking you to sell a business.

THE COURT: No, that's not -- but that's -- but we have an APA, right?

MR. KAMPFNER: We do. We have two APAs.

THE COURT: So we're selling stuff.

MR. KAMPFNER: We are. That is true. But again, we

are selling an entire business.  We're selling customer contracts that result in, you know, rental business of the equipment.  We're selling -- we're keeping jobs of -- up by having the business continue.  And we're selling the equipment that is used in doing that, right?  But we're selling all the business together.  We're selling the intangibles.  We're selling the IP.  We're selling the entire business to a buyer that's going to continue operations.

THE COURT:  In your opinion, and I got it, subject to the challenge.  But assuming there was a valid lien, what would their liens -- is there something their liens would not attach to that is subject to the APA?

MR. KAMPFNER:  Well, Your Honor, I think that there -- they have a lien on substantially all the assets.  I don't think their lien attaches to commercial tort claims.  I don't think that their lien attaches to avoidance actions.  I don't think --

THE COURT:  But you -- you're not selling that, are you?

MR. KAMPFNER:  Well, we are not selling that.  No.

THE COURT:  I'm saying it -- under the APA, is that -- you're there?

MR. KAMPFNER:  Yeah.  I mean, substantially all the assets are covered by this lien, if the lien is valid.

THE COURT:  Okay.

MR. KAMPFNER:  Now --

THE COURT:  I know, it's a big if.

MR. KAMPFNER:  Yeah, it's a big if.  Now, I will also mention that the lenders did file this intent to credit bid, and we do not believe that the value of that bid is higher than the Diversified/Macquarie bid or that it will result in higher recoveries to the creditor -- to any creditors, including the secured creditor.  Because --

THE COURT:  I couldn't find out what the credit bid -- I couldn't find it.

MR. KAMPFNER:  Yeah.  They didn't tell the Court, did they?

THE COURT:  No.  Well, it's --

MR. KAMPFNER:  It's confidential, so --

THE COURT:  I --

MR. WOOD:  It's not confidential, Your Honor.  Trey Wood.  It's $57 million.

THE COURT:  Yeah.  I couldn't find that on the docket.  I just wanted to -- I was --

MR. WOOD:  We didn't put it on the docket.

THE COURT:  Oh.

MR. WOOD:  But none of the bids -- there's another Hilco bid or two, and they didn't put theirs on the docket.

THE COURT:  I was just asking because I was grinding the clerks and I wanted to let them know.

MR. WOOD:  It's not a secret.

THE COURT:  It's okay.

MR. WOOD:  It's not a secret.  It's $57 million.

MR. KAMPFNER:  So --

MR. WOOD:  And we're willing to increase it in the --

THE COURT:  Got it.  Okay.  Hold on a second.  I apologize.  I just wanted -- okay.

MR. KAMPFNER:  So, Your Honor, the -- so, Your Honor, we don't think that that bid provides higher value to the estate because when you take the cash component of 52.5 plus the assumed liabilties, which are, again, over 13.1 million, you get total consideration of over 65-, $66 million.  So that amount is greater than the 57 credit bid by the lender.

So just on its face, that bid is not higher and better than the Diversified bid.  And so we think the Diversified bid continues to be the best bid.  In addition, that -- the credit bid is just not an actionable bid today.  It doesn't have -- it's not fully negotiated or fully executable.  You know, for example, if they were to win today, there would be -- the debtor would have to shut down.  There would be no cash collateral use available and collecting equipment all over the country from customers and breaching contracts to get that done.  And then collecting it for sale in a liquidation, that money is -- that -- that's going to be a worse situation for the lenders than allowing the Diversified bid to go forward,

right?  It's extremely value disruptive to have a credit bid where all of a sudden the debtor shuts down overnight, equipment is strewn all over the country, the AR would not be collected --

THE COURT:  Somebody's going to have to be responsible for it.

MR. KAMPFNER:  Somebody's going to have to do it, and it's going to have to be them at their cost.

THE COURT:  Right.

MR. KAMPFNER:  And they haven't proposed any budget to allow the debtor to wind down.  They haven't proposed any plan for the debtor.

THE COURT:  Do they have to in a credit bid for an asset?

MR. KAMPFNER:  Well, if they -- it -- I think they do if they want to make it a feasible bid that's executable. Otherwise, they would leave the estate, you know, administratively insolvent and just not able to provide -- not able to execute its share of the deal, right?  It couldn't collect equipment.  It couldn't provide the -- it couldn't turn the equipment over.

THE COURT:  Couldn't turn the equipment over.

MR. KAMPFNER:  And all of the AR -- or not all, but a significant amount of that AR would be gone because these customers, they pay -- you know, if you tell them you got to

give their equipment back, they're going to tell you, well, I'm not going to pay you then, right?  So it -- it's a -- it is essentially a fire sale liquidation, right, of the debtors.  So it is not going to result in higher value to the secured creditor than a Diversified sale where the company is going to get $52.5 million, not going to be responsible for any winddown expenses.  The business is going to be taken over by the buyer and move on, right?

And so the debtor will be left with cash, which the secured creditor will get if its liens are correct -- are avoidable -- I'm sorry.  Not avoidable.  And, you know, that will be how it will be at that point.  But it'll be a higher amount, we're very confident, than if they did this credit bid thing, where they don't even have a plan for collecting the equipment today.  They don't know how they're going to do it, right?  It's just not an actionable bid.  It's to block the Diversified bid.  That's the --

THE COURT:  Is that a concern of mine as to how they collect it, if we approve a sale for a higher credit bid?

MR. KAMPFNER:  Well, I think it is a concern of yours, because the higher value to the estate is the --

THE COURT:  But it -- but we're just selling an asset, right?  That's the point that I keep emphasizing to you.

MR. KAMPFNER:  Well, but I think --

THE COURT:  In other words, that's the -- that's what

we're selling is stuff.  So what's the biggest value for the stuff?  There could be other things that -- I've got questions for them, too.  I'm pushing -- I'm going to push them on some things, but I just want to make sure that I'm crystallizing what am I -- I'm being asked to do.  So I'm not -- we're not doing an equity sale, right?  We're doing --

MR. KAMPFNER:  No, but Your Honor, part of the purchase price is the assumption of liability.  When the new company assumes these liabilities from the debtor, though the debtor is relieved of having to pay those liabilities, those liabilities are now -- that is value to the debtors.  And so when you got -- when you look at the entire value given to the debtors, you have to give the -- you have to look at the cash component, which is the amount of cash coming in.  But you also have to look at what is going on with the liabilities.

And the fact is that after this sale is done, the debtor will have been relieved of over $13.1 million of liabilities.  And it's leases that are getting assumed and assigned, it's employee liabilities that are going to get covered by the purchaser, it's trade payables that are going to be covered by the pay -- by the purchaser in order to keep the business going.

So there's a whole slew of obligations being taken away from the debtor and assumed by Diversified.  And you have to get -- that's value as well in our mind.  That is a

dollar-for-dollar reduction of the obligations that the debtor has, so --

THE COURT:  The overall obligation of the estate, yeah.

MR. KAMPFNER:  Correct.  So when you put them together, you end up with, again, a number of well over $66 million, you know, plus the preservation of jobs, plus the maintenance of a going concern.  So we are, in fact -- even though it's not a stock sale, we are, in fact, selling a business.  We are, in fact -- you know, it is a real consideration for Diversified to assume these liabilities.

And so when you look at the -- at that number, when you add the -- and you'll hear testimony, you add the cash, you add the liabilities being assumed, it's well in excess of the lender's credit bid right now, assuming that the credit bid is even valid, which we don't concede, of course.

THE COURT:  Okay.

MR. KAMPFNER:  Do you want to -- is that what you need from me right now?

THE COURT:  Yeah.  No, that's perfect.  Yeah.

Mr. Wood, you can tell me --

MR. WOOD:  Good morning, Your Honor.  Trey Wood on behalf of KeyBank, the agent.  I've got a little presentation I'd like to make to the Court, if you could give access to -- I think it's Presenter Agent.

THE COURT: Before you do, why don't we just have a -- just a --

MR. WOOD: A talk?

THE COURT: Yeah.

MR. WOOD: Okay. Let me --

THE COURT: I want to be fair.

MR. WOOD: Okay.

THE COURT: I didn't get -- I didn't know if -- I interrupted Mr. Kampfner's initial, but just to kind of get my questions out of the way and I want to be fair to both sides.

So what is the position that your client is taking with --

MR. WOOD: Okay.

THE COURT: -- with respect to today, there's been a lot of paper moving as well, and I need to hear from the committee --

MR. WOOD: Yep.

THE COURT: -- who I -- yeah. If I remember correctly, yes, there was -- you're also subject to an adversary proceeding. I guess I'm (indiscernible) today, so --

MR. WOOD: Us and Gordon Brothers, so we're not alone. Apparently, there's some Does conspirators with us that we'll talk about here in a second. They're going to be added too, so --

THE COURT: Let me ask you kind of where we are.

MR. WOOD:  Okay.  Here's where we are --

THE COURT:  What do you think I'm being asked to do today.

MR. WOOD:  Yeah.  What you're asking -- what they're asking you to do in the Diversified bid is to sell basically two groups of our assets, our collateral, right?  It's a 363 sale.  They want to use our collateral by selling it, okay?  It's two groups, our equipment and accounts receivable.  And in the deposition testimony, everybody agreed, the independent CRO, the independent director agreed, that the value of that receivables were about $8.3 million.

So this is why the -- we agree with the Court.  The Court has to focus on the cash value of the bid because it's a sale under 363.  And you can only approve a bid under 363 if we're adequately protected.  They have to give us adequate protection.  And the only adequate protection that they've offered to us is that our liens will attach to the sale proceeds cash.  I think it's fantastic that they are assuming all these liabilities, but that's not adequate protection to us.

Where the rub is is they want to take the $8.3 million in receivable and use that to pay all the assumed liabilities.  And what do we get in exchange for $8.3 million of collateral?  We get $100,000.  We get 1 percent of the value of our collateral.  They are asking us to release our liens

against $8.3 million and give that to the Greenbergs, an insider, so that the Greenbergs can use our collateral, $8.3 million of it, to fund their future operations.  That is the entire dispute that we have here today.

If this Court tells them to leave the $8.3 million back, give us our AR, we would get $52.8 million, plus the 8.3.  That would give us over $60 million.  If this Court can create a pot of $60 million and you give me five-minute call, I will go talk to the agent, and I think we can get that deal done.  What we will never agree to is a release of $8.3 million of our collateral for $100,000 to an insider.

And you're going to hear a lot of testimony about how this was done by independent advisors, it was done in good faith, and that it was done at arm's length.  None of that's true.  And how do I know that?  Because no independent advisor, no person that's acting in good faith, and no person that's trying to do it at arm's length would sell $8.3 million for $100,000 over the secured creditor's objection.  This entire case is for the benefit of the Greenbergs.

THE COURT:  Well, let me ask you why -- I guess two questions.  Why are -- how confident are you that your client has a lien on the receivables?

MR. WOOD:  Very.  We've provided them with all of the perfection documents.  We gave it to committee.  They've never contested that.  In fact, we have forbearance agreements, where

they acknowledged it.  That's not in dispute.  That -- we have a pending cash collateral motion.  And, oh, by the way, just to answer some of the questions, we will authorize use of cash collateral to get to a sale closing of ours.  And we're no different than the Greenbergs.

THE COURT:  Well, how are you going to get the stuff?  That was one of the points.

MR. WOOD:  Yeah.

THE COURT:  Right.  We're talking potential -- put aside employees for now, which obviously is a big issue for me, but I'll put that aside.  Just -- I authorize a sale to your client.

MR. WOOD:  Right.

THE COURT:  What happens to the AR?  Who's going to go get the stuff?  Who's going to go get the stuff from around the -- they're not going to be able to do it.

MR. WOOD:  We are going to go get the stuff.  We will pay someone.  We will -- to the extent we ask any services of the debtors' employees, we would be pursuant to a transition agreement.  If they don't want to enter into a transition agreement, we'll get a third party to do it.  We -- but we will pay for that.  We are not asking the estate to bear that cost.

Our clients have already got an approval to fund $6 million into our LLC.  We are fully baked, ready to go.  This is a real bid.  The reason -- their complaint, they don't

set a bid deadline.  And so then, we file it on Monday, and their complaint, well, you're too late.  There's no bid deadline.

Why did it take us 30 days?  Because our clients took this seriously.  We had to go and get approvals to make this credit bid.  We had to go and get the lenders to sign off on the LLC agreement.  We had to go and ask the lenders to provide funding for this LLC.  We got all of that done in 30 days.  And their complaint to us is that it took us too long.

We are taking this extremely serious, Your Honor.  We do not want $8.3 million walking out the door to an insider. We are prepared to credit bid to prevent that from happening, and we're prepared to object.  It doesn't comply with 363(e). It flies right in the face.  This 363(e) says this Court shall prohibit that sale because it does not adequately protect us. That's all we're fighting about.  Got all these attorneys. This entire case is a big fight about who gets the $8.3 million.  Do the secured creditors get it or do the insider get it?

THE COURT:  What about the funding of the winddown budget argument?  You say you authorize --

MR. WOOD:  We're leaving the cash behind.  We're same as Hilco.  We're same as Diversified.

THE COURT:  I don't think the Hilco bill was put on the docket.  I don't either, but I got it.

MR. WOOD:  Yeah.  We are -- we're the same as Diversified.  They're leaving the cash behind.  We're leaving the cash behind.

THE COURT:  This is -- okay.

MR. WOOD:  That's it in a nutshell, Your Honor.  And we urge the Court to do one of two things, just deny it.  And, oh, by the way, 363 says, you can deny it without a hearing.  You don't even need to have a hearing today.  Either deny it or open it up for a bid.

THE COURT:  We're all here.

MR. WOOD:  Open it up for a bid, let us credit bid.  because you know why they don't want us to credit bid?  Because they know that they -- that the Greenbergs can't up their $100,000 bid?

THE COURT:  Well, they're saying that they -- no, I think it's more -- this has already been out there.  We're here and that you have an incomplete credit bid is from what I under -- but the evidence will show it, well -- what we've got.

But I think I have what I -- let me hear from the committee.  You filed --

MR. WOOD:  Thank you, Your Honor.

THE COURT:  I just want to understand where all the pieces fit together, and then, I'm going to share some thoughts.  Don't know if I need to unmute a line here.  You all filed an adversary.

MR. SANDLER:  Good morning.

THE COURT:  Good morning.

MR. SANDLER:  Can you hear me okay?

THE COURT:  Yes.  Just fine.

MR. SANDLER:  Great.  Your Honor, for the record, Brad Sandler with Pachulski Stang Ziehl & Jones on behalf of the committee.  And I'm not going to repeat much of what Mr. Kampfner said.  Needless to say, we agree.  You've seen our papers.

It is interesting that when we came on board in this case, which is just, you know, less than a month ago, that has -- and, you know, it's rare to find a situation where you have a secured lender and the debtors warring with each other in a sale case.  And that's what we found, and when we come on board, we try to -- we reach out to both sides.  We try to find out what the situation really is.  Usually, when there are warring parties, you know, both sides actually seek to befriend the committee.

With the debtors, when we reached out to them, we found that they were open and transparent with us.  They told us their story, they provided a lot of information to us to bring us under the tent.  We reached out to the lenders.  To this day, Your Honor, we've not had any meaningful discussion with the lenders.  They gave us the back of the hand, which was unfortunate, but it is what it is.

We continued with our investigation. That led to us doing an analysis that concluded there are viable claims against the lenders. We asked for standing from the debtors. We told them kind of what we were going to do, what we put together. They said, okay. They gave us standing --

THE COURT: When did you get standing? I'm just learning about this.

MR. SANDLER: So we stipulated, Your Honor. And actually --

THE COURT: Just when was that, Mr. Sandler?

MR. SANDLER: It was -- well, it was negotiated over the last, call it week or so. You know, we -- we've been drinking from a fire hose, Your Honor, trying to --

THE COURT: No, no, no. I got it. I just didn't know about it. That's all I'm asking.

MR. SANDLER: Yeah. So we negotiated totally fine. So we negotiated the stipulation. It took us -- you know, we asked for standing. It took, I'm going to say maybe a week or so, to negotiate the stip. The stip was filed on the docket. Then that led to -- with a copy of the draft complaint, and the complaint was then filed. And so, Your Honor --

THE COURT: You're talking about the stipulation that was filed yesterday?

MR. SANDLER: Yes.

THE COURT: Okay.

MR. SANDLER:  I think that's right.  I think it was filed yesterday.

THE COURT:  Okay.

MR. SANDLER:  And so it would've been before Docket Number 225, which is where the complaint is.  So we've been -- I don't have the exact Docket Number.

THE COURT:  Uh-huh.  Uh-huh.

MR. SANDLER:  But it would've been --

THE COURT:  I see.

MR. SANDLER:  And so Your Honor, the way we see the situation, needless to say, you know, we're looking at, you know, almost a $66 million bid versus the credit bid.  And I hear what you're saying about the cash component.  The ultimate goal of Chapter 11 is to preserve the going concern.

THE COURT:  Well, I'm going to take you up on that.  And here's what I'm wrestling with -- here's what I'm wrestling with for everybody, is that the Bankruptcy Code has a priority scheme, right?  So the purpose of the Bankruptcy Code is to see -- to follow the Code, right?  It's got big general lofty ideas to preserve a going estate.  But sometimes that happens, sometimes it doesn't, but you preserve state law rights to the extent they existed prior to the petition date, right?

So the estate gets what it gets, but everybody's rights are -- what -- the contractual rights are not disturbed. I can -- certain things can be amended, or I should say,

certain things can be adjusted.  Debt can be adjusted, but the Code gives you the power to do all of these things, right?  And so you know, I can assign -- I can authorize the assigning of a contract that may not provide for it.  We can -- 506 can -- debt -- can deal with debt, 365 can cap, you know, a long lease in some instances.

Yeah.  So you -- there are things that can be done, but the Code gives me the ability to do it.  What I don't see I have the ability to do is to consider other aspects of a sale that's just about assets subject to liens if we're just selling stuff, right?  That's what I'm saying.  In other words, right, it happens all the time in bankruptcy, right?  Somebody has a right to -- has a lien on stuff, and 363(k) says that you have a right to credit bid on the stuff.  The fact that employees could be saved by a business is a -- is -- of course, everybody wants that to happen, but sometimes people get to take their stuff and go home because that's what the Code gives them the right to do.

And so the question is, if there's an asset sale, I got to -- the duty is to maximize the value of that asset because the secure creditor has a lien on that asset and can credit bid up to the full amount.  And I can't -- in other words, if somebody's putting up 7 million but 6 million, but I can keep the business, 7 million wins, right?  Because the value of the asset is worth 7 million, because that's what

would happen in a 7, that's what the priority -- that -- if you put it in a plan, that's what the plan would require unless you could point to another provision of the Code.

But here, we're talking 363, so we've got to follow the Code. And that's what I'm saying. I think there's a lot of other good things that are going on, and I don't know if Key has the right to credit bid. But if they do, then it's the biggest amount for the asset. And sometimes, it trickles down, sometimes it just doesn't. And I'm being asked, I think, by both sides to kind of look around the other ways. And I'm just looking at 363, and that's -- we're going to have to figure out today.

But I got it. There's existential -- there's real things that we've got to figure out today. But I -- in other words, I didn't know that you had the right to sue, but it sounds like that was going to be my question. It said, derivative, and I was going to -- but now, there's a step on there. And maybe you do, but I don't know what your law -- I don't know -- how your lawsuit -- but somebody can tell me if how, outside of the priority scheme, I could do that.

MR. SANDLER: So is it your hypo, Your Honor, really -- you're making the assumption that the credit bid is valid, right? But under --

THE COURT: That's right. That's right. That's right. That's right. That's right. Yeah. No, that's what

I'm saying.  I'm saying assuming all things being equal.  All things being equal.

MR. SANDLER:  Okay.  So, if there was not a dispute -- let me kind of address it two ways.  So if there was not a bona fide dispute, which there is a bona fide dispute.

THE COURT:  Uh-huh.

MR. SANDLER:  It is embedded in not only the debtors' objection to the credit bid, but really, in the adversary proceeding that the committee instituted.  And that is a bona fide dispute.  And under (f)(4), we now have --

THE COURT:  But you just filed it last night, right?  That's what I'm saying, right?  We just filed it last night, and I don't know what's going on.  That's what I'm saying.  I think everybody needs to figure out what they're asking me to do, because I can't just on something like -- and I -- I'm not blaming anyone.  It's just the way this thing was set up.  On 24 hours' notice, I'm being asked to say that a secured creditor doesn't have a right to credit bid at a hearing that's subject to higher and better offers, right?

We're not talking about an auction where people -- we could deal with the stuff before the auction and then we have procedures.  We're talking about, show up higher and better offer, old school.  Show up at the courthouse steps and let's see what we got.  I don't know.  Maybe you got a valid point, but I don't know if we have a bona fide dispute yet.  I know --

it wasn't a bona fide dispute until last night, that's what I'm trying to argue.

I -- all everything I was hearing was stuff about Gordon Brothers, and I kept saying, I don't care about that stuff that was happening before.  Let's show up and see who shows up with cash today.  And if the -- if Key didn't credit bid, it was going to be a really short hearing.  Maybe we'll be in and out in 15 minutes.  But I don't know what we've got today.  And I'm trying to figure out what I'm being asked to do, and I don't know.

MR. SANDLER:  Okay.

THE COURT:  Of course, you have a right to credit bid, but it's going to be set -- but the question is, do you have a right to credit bid?  But I got to decide that, and I don't know how I can do it on less than 24 hours' notice.  And I didn't know that you had the ability to do this.  I didn't even know that you could -- quite frankly, I didn't know where we are.  So I think -- I'm not sure what we're doing today folks.

MR. WOOD:  Your Honor, I encourage you also to look at the stipulation because it's subject to your approval, and you never approved it.  It's a so-ordered approval.

THE COURT:  Well, I can't.  I was wondering if I had authority.  I didn't want to say this out loud and have somebody tell me.

MR. WOOD:  Yeah.

THE COURT:  Of course you can.  I didn't --

MR. WOOD:  Their stipulation was subject to your approval, and they filed it without you approving it.  They did not have standing to file it.

THE COURT:  Well, certainly.  Well, no, but sometimes people file stuff.

MR. WOOD:  But that's their -- they drafted this stipulation.

MR. SANDLER:  Your Honor, could I (indiscernible) part of what I wanted to address though about the credit bid because I really only addressed the one section, which is -- which hit the first part of your question which was to say that (f)(4) is applicable here.  And we have to focus on (f)(4), that there is a bona fide dispute.

The second issue is that the credit bid, frankly, isn't actionable.  I mean, we -- nobody knows what the credit bid is.  Forget about saying it's a $57 million credit bid.  Okay.  Well, they -- they're talking about entering into a transition services agreement.  They are extremely --

THE COURT:  I don't know if they need to though in connection with an asset sale, right?  That's what I'm saying, Mr. Sandler, is that if you're -- if it's just the stuff, then I get to ask, though.  This is courthouse -- this -- you know, we can -- but in other words, what I'm -- am I being just asked

to do kind of old school courthouse steps; put it up, let's see what it is, and they can put on their evidence.

MR. SANDLER: So (indiscernible) if there -- there's -- there is some heavy equipment in, you know, somewhere located in Timbuktu and the lenders don't pick it up, who is responsible for that charge event? Is it -- do they file a claim against the estate? Is the estate going to be further into the admin --

THE COURT: Oh, I agree. These are issues that we got to take up. I agree. But I think priority one is, what am I being asked to do today? Do I have to approve the step to then create the bona fide dispute? And then I don't -- Mr. Kampfner, what am I being asked to do? There's a lot of moving paper last night, and that's what I'm saying. I don't -- I'm not sure what we're doing today.

MR. KAMPFNER: Your Honor --

THE COURT: I'm not sure I can do anything today.

MR. KAMPFNER: Well, Your Honor, you know, we -- if you -- if -- look, what we were asking you to do is to approve the Diversified bid, subject to higher and better bids, which we don't think exist.

THE COURT: But higher is --

MR. KAMPFNER: We do -- we want to -- and I want to say -- I want to make really clear because Mr. Wood, unfortunately, mischaracterized this transaction.

THE COURT: Okay.

MR. KAMPFNER: This is a going concern transaction. That's what it is. It's a sale of --

THE COURT: It's an APA.

MR. KAMPFNER: -- the assets of the business.

THE COURT: It's an APA.

MR. KAMPFNER: There are two APAs that provide for the sale of a business. You can sell a business through an asset sale and a stock sale. This is a sale through an asset sale.

THE COURT: But that's what I'm saying. But I can't make them take less.

MR. KAMPFNER: No. But, Your Honor, this $8.3 million of receivables is not true.

THE COURT: I -- I'm not saying it's true or not. I'm just saying it -- it's --

MR. KAMPFNER: It's only there because it's a going concern, because the debtors' going to keep operating because it's going to keep serving its customers, because customers are going to keep paying. In a liquidation bid where they -- where we simply have to lock the doors --

THE COURT: Uh-huh.

MR. KAMPFNER: -- and they have to go find their equipment or whatever, that 8.3 isn't 8.3.

THE COURT: Oh, I agree with you.

MR. KAMPFNER:  It isn't 8.3, right?

THE COURT:  He's going to have --

MR. KAMPFNER:  And so what we did is we marketed this asset as a going concern.  We got one of the best investment banks in the country to run an extremely thorough process.  And what we got out of that process was a -- was the Diversified bid.  It is a going concern bid that was -- that represents the highest and best value for the business, right?  And what they're going to get is adequate protection, is what they're entitled to, which is that their liens are going to attach to all of the assets that remain.  That's what's going to happen, right?  To all the proceeds of the sale that the that the estate owns, their liens are going to attach to it.  And that is the way 363 works.  We're not doing anything that --

THE COURT:  What do I do with (k) -- that's the real question.  The question today is -- for me is, what do I do with (k)?

MR. KAMPFNER:  So, look, I think that we have --

THE COURT:  I agree with you, under any circumstance. We're dealing with 363(k), where someone's telling me they're going to put 60 -- they can put up 57 and they can go higher.

MR. KAMPFNER:  Well, Your Honor --

THE COURT:  From today's subject higher -- to higher.

MR. KAMPFNER:  Your Honor, I don't think today you can say theirs is higher.  I don't think --

THE COURT:  No --

MR. KAMPFNER:  -- today you can let them credit bid.

THE COURT:  Let me -- I guess that's what I'm saying. That's what I got to prove.  I got to --

MR. KAMPFNER:  Yeah.  Well, we have evidence that the process we ran was thorough, that the process we ran was arm's length, and that we have the highest and best bid under those circumstances.  As we've indicated, we don't think their credit bid is higher or better.  It is not executable.

THE COURT:  It's got to be higher.  Higher wins.

MR. KAMPFNER:  It is not executable, even at the -- it's just not executable.  It'll result in massive administrative claims against the estate.

THE COURT:  But that's not my issue.

MR. KAMPFNER:  Well, but I think it is your issue.

THE COURT:  But then -- no, it's not.  That's the problem, Mr. Kampfner, is that it's -- I'm dealing with a 363 sale.  I'm just selling stuff.

MR. KAMPFNER:  You're -- you --

THE COURT:  And I got it -- there's this other stuff.

MR. KAMPFNER:  You're --

THE COURT:  But maybe then maybe the answer is -- and if they can't execute on it, then the answer gets really easy.

MR. KAMPFNER:  They cannot execute on this sale. They were asked at deposition if they have any plan to collect

equipment.  They said they didn't.  They don't know how to do this.  This is just going to be a disaster for everyone involved if they win.  And it -- and again, you have to look at the total consideration.  The total consideration includes assumed liabilities.  It -- that is value to the estate.

THE COURT:  Why do I consider that in connection with a sale of assets subject to a lien?

MR. KAMPFNER:  Well, because --

THE COURT:  Is there a duty to maximize the value of the asset?

MR. KAMPFNER:  I mean, 360 -- 365 allows you to assume and assign contracts.  The value --

THE COURT:  That's a separate Code section.

MR. KAMPFNER:  The --

THE COURT:  That what I'm saying.

MR. KAMPFNER:  Yeah.  But the value of that is included in 363 sales.  When an asset and an obligation is being taken from a -- from the debtor and assume by somebody else, that's value to the estate.  And you have to include that.  It's -- you have to include that in the total price.  It's not just cash.  You're not just selling assets.  You're selling an entire business.

THE COURT:  All right.  Mr. Grossi?

MR. GROSSI:  Your Honor, thank you for the time.  I -- just in the spirit of transparency and, you know, this is

a bit of a -- an odd posture without bid procedures and things being submitted to the debtors but not submitted on the docket. I did want to explain --

THE COURT:  It's not -- it's very 1990s.  That's all it is.  It's old school.  It's -- we've done this before. What's up?

MR. GROSSI:  We are rewinding the tape for sure.  We did want to give the Court the benefit of an overview of the Hilco bid, to the extent helpful.  And listening to the debate today, it may actually be helpful because we do have an executable transaction with a negotiated -- well, a fully documented APA that's ready to be signed today with a purchase price of $54 million.

We've shared a schedule of employees and a timeline that's extraordinarily expedited to monetize the assets for the benefit of the estate with a very specified process to do so. We have a bidder who has decades of experience in executing on these types of transactions.  And our bid also includes the monetization of the AR, again, by a bidder who is extraordinarily capable of doing so for a nominal fee with those proceeds returning back to the benefit of the estate.

Debtors' position, with respect to our bid, was that the cost associated with maintaining the employees for the abbreviated time period to wind down the estate was a deduct, and as a consequence, the Diversified bid was higher and

better, and that's been their position.  But did want the Court to have the benefit of our bid.  We're happy to answer any questions as it relates to how we would execute on that bid, and we're certainly willing to engage with both the company and the parties and the creditors' committee, if that is the value maximizing path forward for the assets, as Your Honor has --

THE COURT:  Mr. Grossi, what are your thoughts on this 363 issue that I've been contemplating, in terms of what I should look at?  What is higher or better in the context of a 363 from your client, from your perspective?

MR. GROSSI:  Your Honor, I agree with your instinct that it should be the cash that comes into the estate as it relates to the assets without the deduct on what it would take to wind down the residual estate.  At -- that 363 is a focus on the assets.  What the debtors are focused on is a Chapter 11 plan, and I'm certainly sympathetic with their position, but the law says, what's the highest value for the assets?  And from our perspective, Your Honor, we think we are -- we do offer out the highest value (indiscernible).

THE COURT:  Thank you.  I share the concern that the debtors have, is that -- and Mr. Sandler has expressed it, and I think it's a valid concern about what we do today about a sale to someone else.  Sounds like Diversified eases the concern about what I would call additional liabilities or unintended liabilities or potential liabilities on the estate.

If this -- if these assets get left in the middle of nowhere who -- right?  It's the debtor that may be on the hook for this contractually.  There are going to be a bunch of additional costs against the estate, a bunch of administrative costs that could be coming, a bunch of admin claims that could be coming to the estate.

And so I share their concerns.  I'm just balancing it with what I'm being asked to approve today, which is a sale for assets for 363 and the priority code -- the priority scheme of the Bankruptcy Code, which says, secured creditors, you got to maximize the value of the asset.  And I don't know if you have a valid lien.  I don't know if you have 363(k) rights, I got to balance that with the Hilco bid.  It sounds like it's $54 million.

Why don't we take five minutes, and then we'll start with evidence?  I think let's just put -- let the debtor put their burden on.  I appreciate it.  Thank you.

(Recess taken at 10:43 a.m.)

(Proceedings resumed at 10:52 a.m.)

THE COURT:  We're back on the record in Worldwide Machinery.  Just give me a moment.

Okay.  Yesenia, why don't we get the witness cam ready?  Just have it ready.  Oh, okay.  Good.

Okay.  Mr. Kampfner, how do you wish to proceed?

MR. KAMPFNER:  Your Honor, my colleague, Sam Hershey,

is going to present our witnesses.

THE COURT:  Okay.

MR. KAMPFNER:  Since, you know, I'm not a litigator.

THE COURT:  Mr. Hershey?

MR. KAMPFNER:  Our first witness will be from Piper, Terry Padden, to describe the process.  Mr. Avila will then be the next witness, and then we'll see where we are after that.

THE COURT:  Okay.  Okay.  Mr. Hershey?

Let's turn the witness cam on.

Mr. Hershey, good morning.

MR. HERSHEY:  Good morning, Your Honor.  Sam Hershey for White & Case, proposed counsel for the debtors.  Before I start, I'll just note that the debtors did file a witness and exhibit list, which is at Docket Number 198.  We sought to confer with the secured lenders before this hearing to determine if they have objections to specific exhibits.  I think the way we're going to proceed is I'll just enter the exhibits as we go, and if they have objections, they'll raise them.

THE COURT:  Okay.

MR. HERSHEY:  So with that, Your Honor, we're going to call Terry Padden to the stand.

THE COURT:  Okay.  Mr. Padden.

MR. HERSHEY:  And Your Honor, while Mr. Padden is approaching the stand, we have some witness binders.  May I

approach and hand those up or may my colleague?

THE COURT:  Yes.  Thank you.

UNIDENTIFIED:  May I approach the witness, Your Honor?

THE COURT:  Thank you.  Yes.

MR. PADDEN:  Thank you.

MR. HERSHEY:  Okay.

THE COURT:  Oh, let me swear the witness in.

Do you -- please raise your right hand?

TERRY PADDEN, DEBTORS' WITNESS, SWORN

THE COURT:  All right.  We'll let the record reflect the witness has answered in the affirmative.

Just so we could do a quick mic check, can you spell your last name for the record?

THE WITNESS:  P-A-D-D-E-N.

THE COURT:  Okay.  You may proceed, Counsel.

MR. HERSHEY:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HERSHEY:

Q    Mr. Padden, good morning.

A    Morning.

Q    Where do you work?

A    Piper Sandler.

Q    And what is your position at Piper Sandler?

A    Managing director.

Q     How long have you worked at Piper Sandler?

A     Approximately 14 years.

Q     And which group do you work at at Piper Sandler?

A     The energy, power, and infrastructure Group.

Q     Do you have experience advising companies in connection with sale processes?

A     Yes.

Q     Do you have experience advising -- excuse me.  Do you have experience running sale processes for companies?

A     Yes.

Q     And how many sale processes would you say you've run in your career?

A     That I've run in the time as a managing director or director, maybe 15 to 20 that we brought to close.  More in prior years.

Q     Mr. Padden, are you familiar with the debtors in this case?

A     Yes.

Q     And what is your familiarity with the debtors?

A     I've been engaged to run a sale process for the company on a going concern basis.

Q     When was Piper Sandler engaged to run that sale process?

A     In March of 2025.

Q     Do you know whether the ABL lenders consented to Piper Sandler being engaged?

A     I was informed that the lenders had reviewed our engagement letter and were informed of our engagement.

Q     Mr. Padden, are you familiar with the Greenbergs?

A     Yes.

Q     And who are they?

A     The legacy owners of Worldwide Machinery.

Q     All right.  To your knowledge, were the Greenbergs in any way involved in the selection of Piper Sandler as investment banker?

A     Not to my knowledge.

Q     Were they in any way involved in the negotiation of Piper Sandler's engagement letter?

A     No.  Not to my knowledge.

Q     Have you, during the course of the sale process, taken any direction from the Greenbergs?

A     No.

Q     Have you contacted the Greenbergs to update them on the status of the sale process?

A     No.

Q     Okay.  In your experience, Mr. Padden, how is a good sale process run?

A     In our experience, after we're engaged, we conduct diligence on the company.  We gather all types of data that will allow us to pull together information that we would use in our marketing process.  We would then position that information

in a memorandum that we would distribute to potential buyers in order to best position the company for the sale.  And then we would manage that sale process to a timeline to try to get to a sequence of bids to bring the transaction to a close.

Q    And was that process followed in this case?

A    Yes.

Q    Could you open your binder to the first tab?

MR. HERSHEY:  And I'll just note this is Exhibit 75 on the debtors' witness and exhibit list.

BY MR. HERSHEY:

Q    What is this document, Mr. Padden?

A    This is a summary of the initial indications of interest that we received, the first round bids that we received during our sale process.

Q    And this is dated June 18th, 2025, correct?

A    Correct.

Q    What is Project Willow?

A    Project Willow is the code name for the sale process.

Q    Have you seen this document before?

A    Yes.

MR. HERSHEY:  I'd like to offer this document into evidence.

THE COURT:  Exhibit 1?  Any objection?

MS. DAVIS:  No objection, Your Honor.

THE COURT:  Okay.  It is admitted.

(ECF Number 205-5 admitted into evidence)

MR. HERSHEY:  Thank you, Your Honor.

BY MR. HERSHEY:

Q    Let's turn, if you will, Mr. Padden, to what is Page 4 of this exhibit.

THE COURT:  Oh, let me just note for the record that it's -- is it fair to say it's 205-5, just into the record?  I think your Exhibit 1 -- I just want to make sure that we have a -- an identification as to what Exhibit 1 was identified as.  I think it --

MR. HERSHEY:  Oh, Exhibit 75, Your Honor, on our list, or are you asking about --

THE COURT:  Exhibit -- yeah.

MR. HERSHEY:  Yes.  Sorry.  It was Debtors' Exhibit Number 75.

THE COURT:  Okay.  Perfect.

MR. HERSHEY:  Thank you, by the way.

THE COURT:  Thank you very much.  Oh, perfect.  Yep, I see it.  Thank you.

MR. HERSHEY:  Thank you.

BY MR. HERSHEY:

Q    Mr. Padden, have you turned to Page 4?

A    Yes.

Q    Okay.  Can you describe for me what Page 4 is communicating here?

A     It's an illustrative -- at the top, it's an illustrative list of some of the parties that were contacted and signed NDAs in review of the sale of the company.  At the bottom, we've listed the groups that either submitted IOIs or that were still contemplating submitting an IOI at that time.

Q     So I see at the top, it says, "204 parties contacted." You see that?

A     Yes.

Q     Is that the number of parties that Piper Sandler reached out to?

A     Yes.

Q     And then underneath that, it says, "41 NDAs signed and material sent"?

A     Yes.

Q     And is that the number of NDAs signed and material sent?

A     Yes.

Q     Okay.  And it looks like here, there's pictures of different company logos.  What do those represent?

A     Well, just what I said, the companies that I either reviewed -- the -- the ones at the bottom are the ones that were -- had either submitted bids or had not yet submitted a bid and were contemplating doing so.

Q     Okay.  How did Piper decide which companies to reach out to in connection with this process?

A     When we were in our preparation phase and, in fact, even

during our pitch, we considered similar companies in the industry, larger potential strategic acquirers, companies that may be in adjacent parts of the market, such as in the construction or energy services industry.  We looked at potential financial investors, potential distressed investors, and just brought -- brought together a list that we thought would be representative of a list that we could reach out to for -- for a sale process.

Q   Were the parties that you reached out to all domestic parties?

A   No.  We -- we had a number of international parties as well.

Q   In your experience, Mr. Padden, is this typical for the sort of outreach that Piper Sandler would do in connection with a sale process like this?

A   It's -- it's typical for broad process.  It's maybe a little bit on the high side in terms of numbers of parties. But the process that we undertook to get to the list is typical.

Q   Mr. Padden, do you know who, if anyone, this document was shared with?

A   This document was shared with the company and its advisors and, I believe, the lender parties.

Q   How often did Piper Sandler provide updates on the sale process to the company?

A     We provided weekly updates to the company, its advisors, and the lender parties on a -- a recurring weekly call.

Q     And was -- were written materials similarly prepared in connection with some of those calls?

A     Yes.

Q     Will you turn, Mr. Padden, to what is Page 7 of the presentation?

A     Yes.

Q     And you see, it looks like sort of a bar graph, and on the left-hand side of that graph, it says, "Diversified Fleet Holdings."  You see that?

A     Yes.

Q     And what is Diversified Fleet Holdings?

A     Diversified Fleet Holdings is an acquisition vehicle that is owned by the Greenbergs to pursue an acquisition of Worldwide Machinery.

Q     Was Diversified Fleet Holdings among the entities that Piper Sandler reached out to in connection with the sale process?

A     Not initially.

Q     Okay.  So how did Diversified then come to be involved in the sale process?

A     After we initiated the sale process, maybe within a few days thereafter, I was contacted by Evan Greenberg.  He was upset that he had not been included in the process and wanted

to get access to our sim and our process materials.

Q    Okay.  And what was the next step after you received that call from Mr. Greenberg?

A    I connected with the company and we determined that we would let him into the process.

Q    Okay.  Could you turn to Tab 2 in your binder, please? Have you seen this document before?

A    Yes.

Q    And what is it?

A    This is Diversified's NDA with the company.

        MR. HERSHEY:  Your Honor, this is Exhibit 62 on the debtors' witness and exhibit list.  And I would like to move this document into evidence.

        THE COURT:  Any objection?

        MS. DAVIS:  No objection, Your Honor.

        THE COURT:  Okay.  It's admitted.

    (ECF Number 203-31 admitted into evidence)

        THE COURT:  If there's someone on the line, I'm asking if you could please mute your line if you have your line unmuted.  I'm hearing a little bit of --

        Thank you.  You may proceed.

BY MR. HERSHEY:

Q    To be clear, Mr. Padden, did every party to the sale process have to sign an NDA?

A    Every party that was to receive confidential materials on

the company had to sign an NDA.

Q    And did Mr. Greenberg execute this NDA?

A    Yes.

Q    Okay.  Could you turn to Tab 3, please?

A    Yes.

Q    And what is this document?

A    This is Diversified's letter of intent.

Q    You've seen this document before?

A    Yes.

        MR. HERSHEY:  I would like to move this document into evidence.  It is Exhibit Number 146 on our list.

        THE COURT:  Any objection?

        MS. DAVIS:  No objection.

        THE COURT:  It's admitted.

    (ECF Number 208-36 admitted into evidence)

        MR. HERSHEY:  Thank you, Your Honor.

BY MR. HERSHEY:

Q    Let's just look through this real quick, Mr. Padden.  If you look at number 1 on the first page, where it says "proposed purchase price," do you see that?

A    Yes.

Q    Okay.  It says, "Proposed purchase price of approximately 65 million," correct?

A    Yes.

Q    Okay.  And some assumed liabilities of approximately 10

million.  Is that right?

A     Yes.

Q     And then if you look at 2, financing, it says, "The offer letter is subject to buyer obtaining third party financing from Macquarie Equipment Capital, Inc.  Macquarie."

A     Yes.

Q     Are you familiar with Macquarie?

A     Yes.

Q     What is Macquarie?

A     Macquarie -- I mean, Macquarie is a global asset management financial services firm.  This -- this particular entity is the equipment leasing and financing business that operates in North America.

Q     Are you familiar with that particular branch of Macquarie?

A     Yes.

Q     How is it that you're familiar with them?

A     I -- over the past two years, they've been counterparty to two other transactions that I've led.

Q     And through those interactions with them, did you develop an opinion of that group?

A     Yes.  I had a very high opinion of this group, and I communicated that opinion to the company and the lender group.

Q     And what did that group do to cause you to have a high opinion of them?

A     They had been successful in two prior transactions where

they -- they basically did everything they said they were going to do.  They behaved very well.  I rated them very highly compared to other parties that we've had as counterparties in sale or debt financing transactions.

Q    And I think you said this, but just to be clear, because I may have missed it, you said you communicated that opinion to the lender group?

A    I did.

MR. HERSHEY:  Okay.  No further questions for this witness, Your Honor.  Thank you.

THE COURT:  Thank you.

Any cross-examination?

MS. DAVIS:  Yes, Your Honor.

THE COURT:  Okay.  Counsel, if you can just state your name for the record.  Whenever you're ready, Counsel.

MS. DAVIS:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MS. DAVIS:

Q    Good morning, Mr. Padden.

THE COURT:  Will you just state your name for the record, just so we have a good, clean record (indiscernible).

MS. DAVIS:  Thank you.  Nancy Davis on behalf of the agent.

THE COURT:  Thank you.  You may proceed.

BY MS. DAVIS:

Q    Good morning, Mr. Padden.

A    Morning.

Q    I'd like you to look at the first document in your binder that you were looking at just a moment ago with Mr. Hershey. Actually, before we do that, let me just get one point of clarification.

Piper Sandler was involved in what is referred to in the pleadings as the going concern sale process, correct?

A    Yes.

Q    Piper Sandler had no involvement in the liquidating assets sale process, correct?

A    Correct.

Q    That was handled entirely by the company, right?

A    That's my understanding.

Q    And is it your understanding that that was handled by Paladin, which is the entity associated with the chief restructuring officer?

A    I -- I believe so, but I had no visibility into it.

Q    No visibility.  Thank you.  Okay.  So if we can look for just a moment at the first document in your binder, which is that Project Willow IOI summary.

A    Yes.

Q    In this document, you report the feedback that you received from the market, correct?

A    Yes.

Q    Okay.  And generally speaking, the response from the market in terms of volume was a little low, right?

A    Yes.

Q    Yes.  And fairly consistently, the feedback from the market centered around a few items, and those were fleet age, market exposure, and quality of the financials, correct?

A    Yes.

Q    And looking at this Project Willow IOI summary, among the points that you note here under REIC, if we're looking at -- it says, "Piper Sandler Page 10" at the bottom, or "WWM0002709." Do you see that?

A    Yes.

Q    Okay.  REIC, the report here is that they have concerns about the historical company performance, correct?

A    Yes.

Q    Other people responded with similar concerns about financials and company performance, correct?

A    Yes.

Q    Let's look at Document 3 in your binder.  This is the Diversified Fleet Holdings, LLC offer letter for assets, dated July 22nd, 2025.  And if we look at the first page of this document, proposed purchase price, it states a total purchase price of 64.869 million, correct?

A    Yes.

Q    And the cash is 55 million, right?

A     Yes.

Q     And then there is plus satisfaction or assumption of certain liabilities estimated in the amount of 9.869 million, right?

A     Yes.

Q     And that assumption of liabilities, at some point, came into the Diversified bid, right?

A     Yes.

Q     Their initial response to the marketing process didn't contain an assumption of liabilities, right?

A     Correct.

Q     And that was at the request of the company, that Diversified responded with an offer to pick up some of those liabilities, right?

A     Yes.

Q     And you don't know why the company asked them for that, correct?

A     My understanding is that the company wanted to sell more of the going concern portion of the company and --

Q     Okay.

A     Yes.

Q     But nevertheless, the company asked Diversified to pick up some of those assumed liabilities in its bid, right?

A     Correct.

Q     Did the company ask anybody else to pick up assumed

liabilities in its bid?

A    The company didn't offer a response to any of the bids that came in.

MS. DAVIS:  Okay.  Thank you.

No further questions.

THE COURT:  Any redirect?

MR. HERSHEY:  Very quickly, Judge.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. HERSHEY:

Q    Mr. Padden, you were asked just now, if the company asked any other bidder to pick up assumed liabilities.

A    Correct.

Q    To be clear, was there any other actionable bid from the going concern sale process besides Diversified?

A    No.

MR. HERSHEY:  Okay.  Thank you.

No further questions.

THE COURT:  Any further cross?

MS. DAVIS:  No, Your Honor.

THE COURT:  Okay.

Thank you very much for your time, sir.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Okay.

MR. HERSHEY: Your Honor, the debtors are now going to call Mr. Scott Avila to the stand.

THE COURT: Okay.

MR. HERSHEY: And we have binders, as well, for Mr. Avila that we'll pass around, if that's okay, Your Honor.

THE COURT: Okay.

MR. HERSHEY: Thank you.

MR. AVILA: How are you, sir?

THE COURT: Good morning. Can you raise your right hand?

SCOTT AVILA, DEBTORS' WITNESS, SWORN

THE COURT: Okay. And we'll let the record reflect the witness has answered in the affirmative.

And if you can just do a quick mic check and just spell your last name for the record. Thank you.

THE WITNESS: A-V-I-L-A.

THE COURT: Okay.

Mr. Hershey, whenever you're ready.

MR. HERSHEY: Thank you, Your Honor.

Okay. I see the witness has his binder.

DIRECT EXAMINATION

BY MR. HERSHEY:

Q    Mr. Avila, good morning.

A    Good morning. How are you?

Q    Good. Mr. Avila, where do you work?

A       Paladin Management Group.

Q       What is Paladin?

A       A restructuring advisory firm.

Q       How long have you worked there?

A       It was, like, 2018 when we founded it.

Q       What is your current role at Paladin?

A       A partner.

Q       And what experience do you have in the restructuring industry?

A       I've been doing this since 1991.

Q       Well, do you have experience advising distressed companies?

A       Yes.

Q       And can you just give me a little sense of what that experience constitutes?

A       I've been advising distressed companies and stakeholders for -- since 1991, which I don't like to admit anymore.  And I've served as the CRO and -- or senior officer over 40 times, 41 or 42.

Q       Mr. Avila, when did you become involved with the debtors in this case?

A       October of '24.

Q       And what is your role with the debtors?

A       Chief restructuring officer.

Q       And how did you come to be appointed the chief

restructuring officer of the debtors?

A    The special committee retained me.

Q    And when you say special committee, do you mean the restructuring committee?

A    Excuse me, restructuring committee.

Q    Okay.  Do you know which of the debtor stakeholders required the creation of the CRO position?

A    I believe it was the senior lenders.

Q    As part of your role as CRO, who has oversight over your activities?

A    The restructuring committee.

Q    And who's on that committee?

A    John Young and Rob Warshauer.

        THE COURT:  Can I -- Mr. Avila, can I ask you just to -- just move a little bit more?  Just there may be some folks on the video that can't see you.  I want to --

        THE WITNESS:  Oh, sorry.

        THE COURT:  No, no worries.

        THE WITNESS:  I didn't want to look at myself, so --

        THE COURT:  No worries.  All right.  Thank you.

        THE WITNESS:  All right.  Sorry.

BY MR. HERSHEY:

Q    Are you familiar with the Greenberg family?

A    Yes.

Q    And were any members of the Greenberg family on the

restructuring committee?

A    No.

Q    Have you ever taken direction from any member of the Greenberg family in connection with your role as CRO of the debtors?

A    No.

Q    Okay.  Mr. Avila, in your work is CRO, do you try to estimate professional fees in connection with these Chapter 11 cases?

A    Estimate, yes.

Q    Okay.  Do you know the amount of professional fees that the company has incurred in connection with these Chapter 11 cases?

A    No, I do not.

Q    All right.  Have you, at any time, had a sense of what those fees were?

A    Well, we estimated early on what they might have been, but that was early on.

Q    Well, what about sitting here today?

A    No idea.

Q    Why no idea.

A    Because this case should've been very simple, and it's become very complex.

Q    And what about that makes it difficult for you to estimate professional fees?

A     Because I have no idea about the spend of the professionals that are associated with the case.

Q     Okay.  Mr. Avila, are you aware that the debtors have filed a proposed third interim budget on the docket?

A     Yes, sir.

Q     And I'll just note it's Docket Number 124 -- sorry, I said that backwards, 214.  Have you reviewed that document?

A     Yes, sir.

Q     And do you believe that budget is sufficient to carry the debtors through closing the --

A     Yes.

Q     -- Diversified sale, if needed?

A     Yes, sir.

Q     All right.  When you were brought in as CRO, what was the company's goal, if any, expressed to you in connection with a restructuring transaction?

A     There was no goal.

Q     Okay.  Well, what was your goal then, with regard to a potential restructuring --

A     Understand the situation.

Q     Sorry.  Mr. Avila, let me -- sorry.  Let me just finish the question before you answer.  Yeah, and you can continue.

      So what was your goal with regard to a potential restructuring transaction?

A     Understand the situation, look at the options, trying to

find the best option, and get consensus in between the stakeholders for an option.

Q    And what paths did the company ultimately decide to pursue in connection with the potential restructuring transaction?

A    Well, when we -- when we determined, probably shortly after we got there, probably in the winter, or January or December, that we're going to need some type of a transaction. It was going to -- self-help wasn't going to get that.  We weren't going to refinance out of this; that we needed a transaction.  The parties wanted to go down a going concern transaction, and we had the idea that we're going to need a, call it insurance policy in the event that a going concern transaction was not going to go -- not bear fruit.  We were going to need to go down a -- explore liquidation alternatives.

Q    Okay.  Were there particular parties that the -- that the debtors considered in connection with what you called the insurance policy liquidation sales process?

A    Yes.  We talked to Ritchie Brothers, Hilco, and Gordon Brothers.

Q    And who ran that liquidating sale process?

A    My colleagues and I.

Q    Okay.  Were the secured lenders involved at all in that process?

A    They were aware.  I -- they weren't involved, but we consulted with them.

Q    How frequently did you consult with them?

A    We had weekly calls every Thursday since last October, the 24th.  And probably, we would discuss a variety of issues on those calls.  We prepared a weekly memo to the lender every week, and we would discuss that and any other issues that lenders had on the call.

Q    Okay.  Well, that actually takes me to the first document I want to enter into evidence.  Can you turn to Tab 1 in your binder?

        MR. HERSHEY:  And I'll just note that this is Exhibit Number 36 on our witness and exhibit list.

BY MR. HERSHEY:

Q    Mr. Avila, have you seen this document before?

A    Yes.

Q    And what is it?

A    It's the weekly memorandum we provided all stakeholders for week ending October 24th.

Q    Okay.

        MR. HERSHEY:  Your Honor, again, this is Exhibit 36 on our list.  I'd like to offer it into evidence at this time.

        THE COURT:  Any objection?

        MS. DAVIS:  No objection.

        THE COURT:  Okay.  It's admitted.

    (ECF Number 203-5 admitted into evidence)

BY MR. HERSHEY:

Q    Mr. Avila, is this representative of the sorts of presentations that you would prepare to give to the lenders?

A    You know, it would vary week by week.  As new information was obtained, as additional processes were obtained, we would update this accordingly.

Q    And Mr. Avila, you mentioned two processes.  One was the liquidation sale process.  The other, you called the going concern sale process.  Why did the company consider pursuing a going concern sale process?

A    Our goal was to maximize the value of the estate, the business.

Q    And were the lender supportive of the company pursuing that process?

A    Yes, they were.

Q    Did the company hire an investment banker in connection with the going concern sale process?

A    Yes, we did.

Q    And who was that?

A    Piper.

Q    And why?  Piper?

A    We went through an interview process.  We always do this.  You gather names and potential candidates.  We interview them.  We discuss that with the stakeholders.  And the decision was made they were going to have the -- the best option to provide the most value to the stakeholders.

Q    Did the lenders approve of hiring Piper as the investment banker for the company?

A    Yes.

Q    Now, I just want to be clear.  You testified that Paladin ran the liquidation sale process.  What involvement did Piper have with that process?

A    None.  They actually -- their engagement letter had a carveout provision.  They were not going to be compensated in the event that Hilco, Gordon Brothers, or the other liquidator for that matter was -- was the ultimate solution.

Q    Okay.  So sticking with the going concern sale process, did that process result in any indications of interest?

A    Yes.

Q    How many?

A    Two.

Q    And were both of those indications of interest actionable?

A    No.

Q    How many were?

A    Only one.

Q    Okay.  So let's turn to Tab 2 in your binder.  Okay.  You see this document?

A    Yes, sir.

Q    Have you seen it before?

A    Yes, sir.

Q    What is it?

A    It's an indication of interest from Diversified Fleet Holdings to -- it was addressed to Piper Sandler, but it's the company regarding the purchase of assets.

MR. HERSHEY:  Okay.  And this is Exhibit Number 71 on the debtors' witness and exhibit list, and I'd like to offer it into evidence at this time.

THE COURT:  Any objection?

MS. DAVIS:  No objection.

THE COURT:  It's admitted.

(ECF Number 205-1 admitted into evidence)

MR. HERSHEY:  Okay.

BY MR. HERSHEY:

Q    Mr. Avila, just let's go through the economic terms briefly.  Let's look at the second bullet on the first page.

A    Yes, sir.

Q    And you see a purchase price of 55 to 65 million there?

A    Yes, sir.

Q    Okay.  And then on the last bullet on the page, it says, "100 percent of the purchase price will be funded with cash at closing.  Buyer intends to use third-party debt or lease financing to fund the entire purchase price at closing."  You see that?

A    Correct?

Q    What was the company's reaction to this IOI?

A    They -- well, let's say -- when I say -- when you say

company, let's call it the restructuring committee --

Q    Sure.

A    -- in my opinion was that while it was nice, it didn't --
it had a financing contingency to it, so we didn't put as much
weight in that proposal.

Q    Was this IOI shared with the lenders?

A    Yes, it was.

Q    Let's turn to Tab 3.  You recognize this document?

A    Yes, sir.

Q    And what is this document?

A    It is dated June 25th.  It's a letter of intent from
Diversified Fleet Holdings again to the company with respect to
the purchase of assets.

        MR. HERSHEY:  Okay.  This is Document Number -- or
Exhibit Number 79 on our exhibit list.  I'd like, at this time,
to move it into evidence.

        THE COURT:  Any objection?

        MS. DAVIS:  No objection, Your Honor.

        THE COURT:  It's admitted.

        MR. HERSHEY:  Thank you, Your Honor.

    (ECF Number 205-9 admitted into evidence)

BY MR. HERSHEY:

Q    To your knowledge, Mr. Avila, is this the first letter of
intent that Diversified submitted?

A    No, this is the second.

Q    Well, the other was an indication of interest, right?

A    Okay.  Sorry.  Yes, sir.

Q    Okay.  Again, looking at the economics, so number one, proposed purchase price, says, "Buyer proposes a total cash purchase price of 48 million."

A    Correct.

Q    And then in two, it says, "100 percent of the purchase price will be funded with cash at closing."  And if you go down a few lines, towards the end, it says, "In support of this LOI, buyer's in discussions with Macquarie Equipment Capital, Inc." See that?

A    Yes, sir.

Q    Okay.  Was this shared with the secured lenders?

A    Yes, sir.

Q    And what was the restructuring committee's reaction to this LOI?

A    Similar to the letter of -- of interest received on the 11th, it still had a financing contingency to it.

Q    Okay.  Did the restructuring committee have any reaction to the fact that Macquarie was identified in this document?

A    It was nice, but, again, it's still -- it's still a contingent financing issue.

Q    And why is that important, that it's contingent financing?

A    Because they can't close the transaction.

Q    Okay.  Let's turn to Tab 4.  Okay.  There are three

attachments here that I'm going to take you through one by one. So let's actually -- let's turn the page. And actually, maybe the easiest thing to do, since this isn't his evidence yet, I'll just ask you.

So this is an email from Mr. Kampfner that is dated July 23rd, 2025. See that?

A    Yes, sir.

Q    Okay. And it identifies three attachments: an LOI from Nations Capital/Gordon Brothers, an LOI from Hilco/Ritchie Brothers, and an LOI from Diversified. Do you see that?

A    Yes, sir.

Q    Okay. Have you reviewed each of those LOIs?

A    Yes.

MR. HERSHEY: If you want me to authenticate them, I will, but otherwise we're going to walk through them and I would offer these into evidence. This is Exhibit 91 to the debtor's witness and exhibit list.

MS. WHITWORTH: No objection.

THE COURT: It's admitted. Thank you.

(ECF Number 205-21 admitted into evidence)

MR. HERSHEY: Thank you.

BY MR. HERSHEY:

Q    All right. So let's turn the page. We'll start with the Diversified LOI. Okay. You said you've reviewed this before, so I'll just take you to number 1. It says, "Buyer proposes a

total purchase price of 64.869 million.  This total consideration is based on a cash purchase price of 55 million plus the satisfaction and/or assumption of certain liabilities estimated in the amount of 9.869 million."  You see this?

A     Yes, sir.

Q     Okay.  What was the restructuring committee's reaction to this offer and now splitting between cash and assumption of liabilities?

A     Well, it obviously improved since the last one.  And again, it was much more favorable because the price had come up and also the assumption of liabilities of almost $10 million.

Q     Why was the assumption of liabilities viewed as favorable by the restructuring committee?

A     Because we were going to have to then deal with a -- a bunch of liabilities, operating liabilities.

Q     Explain a little more to me why that's important?

A     Well, then, how are we going to adjudicate those liabilities?  Either a process like this or another process. We would be left with that and left with these -- if the assets could be sold, we were going to be left with all these liabilities.  So by taking, at this point, the majority of the liabilities, it was -- it had a -- a value to the estate, to us.

Q     And had the company communicated to Diversified that assumption of liabilities was something that would be valuable

to them?

A    Yes, either through counsel or to Piper.

Q    Okay.  And to be clear, this offer increased from the 48 million that was previously offered in cash, right?

A    Correct.

Q    Okay.  Let's turn to -- I'll tell you exactly where it is. So you're going to have to follow along with the numbers at the bottom of the page.  So this is going to be WWM, ends 1181.

A    Yes.  I'm there.

Q    You there?  Great.  You testified that you've seen this document before.  What is it?

A    This is an offer from -- a letter of intent, excuse me, from Nations Capital, and which basically is Nations Capital and Gordon Brothers, to enter some type of transaction with us.

Q    And was this part of the going concern sale process or the liquidation sale process?

A    The liquidation sale process.

Q    Okay.  Turning over to the second page, you'll see in the middle of that page, it says, "Option 1, guarantee structure." See that?

A    Correct.

Q    And it says, "Agent shall guarantee a minimum gross recovery from the sale of assets equal to," I'm going to approximate, $40 million gross proceeds.  See that?

A    Correct.

Q    Okay.  What was the restructuring committee's reaction to this letter of intent?

A    Well, let's keep in mind two things.  We -- we're pursuing a path with the -- I'll just call them the liquidators.  And that path was to determine, if a going concern could not go through, would they be interested in purchasing the assets or through a fee proposal?  You'll notice this has two options, so we'll focus on the option 1.  It was lower than the Diversified bid.  It had some contingencies to it that made even that -- any recovery over the 40 concerning.

Q    Okay.  Let's turn now -- in the same document we're going to go to the page ending 1226 with the bottom numbers.

A    1226.

Q    It's towards the very back.

A    Oh, okay.  Okay.

Q    What is this document?

A    Similar to the Nations document, this is from Hilco/Ritchie Brothers regarding their two options and their proposal to enter into a transaction with the company.

Q    Okay.  I'd like you within this document, this letter of intent, to turn two pages, to turn one, two.  And you should be at the page ending 1229 at the bottom?

A    Yes, sir.

Q    Okay, great.  Do you see towards the bottom of that page, it says, "Option 2, guaranteed return"?

A     Yes, sir.

Q     And it says, "Agent will provide a guaranteed return to the company of $50 million"?

A     Correct.

Q     What was the restructuring committee's reaction to this proposal?

A     Again, it's -- it's a favorable transaction to pursue down a guarantee -- you know, their -- their option of a sale. There was some issues on the -- on the AR because you can see that it -- it would be a different -- it wouldn't be a going concern so the collectability had an issue to it.  That was -- I believe that was the challenges of this offer.

Q     Okay.  Let's turn to Tab 5 in your binder.  Okay. Let's -- actually, I -- I'll do this.  There's two documents I wanted to look at, so why don't we just look at them quickly so you can authenticate them, and then we'll get this into evidence.  So can you turn one page?

A     Yes.

Q     And do you see this should say "high confidence letter" at the top?  Do you see that?

A     What page?

Q     On Tab 5?

A     I'm in Tab 5.  Let's see.  Attachment judgment.  Subject. Revised offer.  No, I think -- well, if I turn two pages --

Q     There you go.

A      -- yes.

Q      Sorry about that.  That's my fault.

A      Yes.

Q      All right.  Now does it say high confidence letter?

A      Yes.  Now it says high confidence letter.

Q      Have you seen this before?

A      Yes, sir.

Q      What is it?

A      It's a letter from Macquarie to Worldwide and basically saying that they have highly -- they're highly confident they can execute a transaction as demonstrated in the Diversified letter.

Q      And what was the restructuring committee's reaction to this letter from Macquarie?

A      It was very favorable.  We're moving down the path of a firm commitment.  It was -- it was a favorable -- we're moving down the path.  It was favorable.

Q      Okay.  Now I want you to turn two pages and you see -- should see a letter.  It says "Offer for assets"?

A      Yes.

Q      Okay.  You seen this before?

A      Yes, sir.

Q      What is it?

A      It's an updated offer from Diversified Holding to purchase the assets from Worldwide.

Q    And am I correct in understanding, just looking at this, that the cash purchase price has become 52.5 million and the assumed liabilities are now 13.1 million?

A    That's correct.

Q    Okay.  What was the restructuring committee's reaction to this offer?

A    Much more favorable, in the sense that it -- we believe it took -- it -- it was going to assume most, if not all, of the liabilities of the business, which would allow us to avoid any costly type of process to effect -- adjudicate those liabilities.

Q    And what would be the cost of adjudicating those liabilities?

A    I don't know.

Q    What do you mean you don't know?

A    Well, I -- we -- at the time, we weren't sure what the process would've been if it was zero.

Q    Okay.  Before I forget, every LOI that I've shown you, I don't know if I've asked for each one, these were all shared with the secured lenders, right?

A    Yes, sir.

        MR. HERSHEY:  Okay.  And before I forget, as well, I'll now offer this into evidence.  It's Exhibit Number 100 on the debtors' witness and exhibit list.

        MS. WHITWORTH:  No objection, Your Honor.

THE COURT:  It's admitted.

(ECF Number 205-30 admitted into evidence)

MR. HERSHEY:  Thank you very much.

BY MR. HERSHEY:

Q    Okay.  Let's turn to Tab 6.

A    I'm there.

Q    Okay.  And I'd like you to turn one page.  You recognize this document?

A    Yes, sir.

Q    What is it?

A    It's an additional offer from Diversified Holding to purchase the assets from Worldwide Holdings.

Q    And this has the same cash consideration and assumption of liabilities as the last offer.  And it now adds additional future consideration, which is described in a footnote.  Is that right?

A    That's correct.

MR. HERSHEY:  Okay.  So this is Exhibit Number 106 on our exhibit list, I'd like to offer into evidence.

THE COURT:  Any objection?

MS. WHITWORTH:  No objection, Your Honor.

THE COURT:  Okay.  It's admitted.

(ECF Number 205-36 admitted into evidence)

BY MR. HERSHEY:

Q    And what was the restructuring committee's reaction to

this offer?

A    Similar to the last one, it's improved.  You know, it continues to improve.  So not only are we picking at 52.5, we're also throwing half -- offering a liquidity event of two and a half -- potential up to $2.5 million of additional value.

Q    Okay.  You can turn to Tab 7.  And you can -- as with many of these documents, they're attached to email so you can turn one page back.  You see it says unanimous written consent?

A    Yes, sir.

Q    Have you seen this document before?

A    Yes, sir.

Q    What is it?

A    It's unanimous written consent by the board to approve the sale -- to approve and accept the LOI from Worldwide.

Q    From Diversified?

A    Diversified.

Q    Thank you.

        MR. HERSHEY:  I would like to offer this into evidence.  It is Exhibit Number 108 on our witness list.

        MS. WHITWORTH:  No objection, Your Honor.

        THE COURT:  Thank you.

    (ECF Number 205-38 admitted into evidence)

BY MR. HERSHEY:

Q    Okay.  And let's look at the right-hand side, so where it says Resolutions, see that?

A    Yes, sir.

Q    Okay. And it says, "Resolved that each and every authorized officer of the Company, including Scott Avila, is hereby authorized, empowered, and directed in the name and on behalf of the Company and its subsidiaries to execute the LOI." You see that?

A    Yes, sir.

Q    And that's referring to the Diversified LOI, right?

A    Yes, sir.

Q    Now, did the company, after it executed the Diversified LOI, stop pursuing other options?

A    No, sir.

Q    Okay. In fact, if you look at the next paragraph in the middle, it says provided -- I'm sorry. It's actually at the top, that "Scott Avila, the CRO of the Company, is also directed to continue to pursue the liquidation bids as he deems appropriate," right?

A    Yes, sir.

Q    And why did the company issue this resolution?

A    To inform Diversified and Macquarie that we were going to pursue their transaction to see if they could get to a position to close this.

Q    Okay.

A    And at the time, based on the information we had, based on the analysis we did, it was still -- it was the highest and

best value and it had the most certainty, too.

Q    Okay.  I'd like to direct your attention to -- we're going to flip back in just a little bit.  This is Page 923.  You'll see it's a presentation from Paladin?

A    Yes, sir.

Q    Okay.  I take it you've seen this before?

A    Yes, sir.

Q    What is it?

A    It's a presentation we made to all stakeholders with respect to the Diversified asset purchase and discussion materials associated with that.

Q    Okay.  When you say all stakeholders, does that include the secured lenders?

A    Yes, sir.

Q    Okay.  Could you turn, within this document, to Page 10?  You see a chart there?

A    Yes, sir.

Q    Okay.  Can you just describe for me what this chart describes?

A    It was trying to provide a summary between the Diversified bid, and at this point, it was the Hilco/Ritchie Brothers bid because their bid was really combined, and it starts with the total of what we call the economic value, which is all the value, including cash plus assumption of liabilities, what we believe was the net purchase of the senior lender.  You can see

the -- the recovery of -- the estimated recovery of the lender.

We then showed additional funding required, which was going to require to effectuate a longer-term process because the Hilco/Ritchie Brothers was a longer-term process.  We were going to have to wind down the business and pull equipment out of -- out -- out of customers, which would require funding.  We talked about what assumed liabilities are, pursuant to their document, and also unsecured excluding Caspian's recovery of -- basically an unsecured excluding Caspian in any deficiency claim (indiscernible) recovery.  We also demonstrate when cash that would go to the lenders, which at this point was October 5th, compared to December 14th.

Q    What conclusions regarding the Diversified bid as compared to the Hilco/Ritchie Brothers bid could one draw from this presentation?

A    That the Diversified bid, based on the information at that time, was better than the Hilco bid.

Q    Better in what sense?

A    Well, it was sooner.  Obviously, it was more.  And we thought both were, you know, uncertain at the time, but we looked at it overall, numbers speak for themselves.

Q    And when you say it was better, was it better for the secured lenders or just the company?

A    We believed it was better for the secured lenders.

Q    And why was Gordon Brothers not included in this side-by-

Avila - Direct                                    82

side?

A    On August 15th, pursuant to one of the forbearance agreements we had to -- we -- we presented to the lenders, a presentation that compared Hilco and Gordon Brothers and the Gordon Brothers' bid was far inferior to the Hilco bid, so we were not going to compare that here.  It's like A, B, I don't need A anymore.  I'm just going B and C.

Q    Okay.  Could you turn to Tab 8, please?

A    Yes, sir.

Q    When you get there, you have to turn back a few pages so you reach the letter?

A    Yes, sir.

Q    You there?

A    Yes, sir.

Q    Okay.  You see that this is a letter from Macquarie, right?

A    Yes, sir.

Q    And it says, "Update on financing for Diversified Fleet Holdings, LLC's acquisition."  See that?

A    Yes, sir.

Q    All right.  What is this document?

A    This is a commitment letter where they're committed to purchase the assets on a going concern basis and it's got -- it's gone through committee credit committee approval.  So their credit committee has approved this financing.  I call --

it's purchase, not even a financing.

MR. HERSHEY:  Okay.  So before we continue, I'll just move this into evidence.  It's Exhibit Number 126 on our list.

MS. WHITWORTH:  No objection, Your Honor.

THE COURT:  It's admitted.

(ECF Number 208-16 admitted into evidence)

BY MR. HERSHEY:

Q    Okay.  So sorry, so you were testifying that this has received credit committee approval?

A    Correct.

Q    And what was your reaction to learning that Macquarie had received credit committee approval?

A    Well, this fundamentally changed the -- the situation, because now we have a firm commitment from a major financial institution that are buying the -- you know, they're putting up -- not only buying -- they're buying the assets, basically.

Q    And was that reaction shared by the restructuring committee?

A    Yes, it was.

Q    Okay.  Let's turn to Tab 9.  And you can turn past the exhibit page to the first actual page of the document.

A    Okay.

Q    And I'll just note that this document has also been filed on the docket at Docket Number 174.  Mr. Avila, have you seen this before?

A    Yes, sir.

Q    What is it?

A    It's an asset purchase agreement between Worldwide Machinery and Macquarie Equipment Capital.

MR. HERSHEY:  I would like to move this into evidence.  It's Exhibit 19 on our exhibit list.

MS. DAVIS:  No objection, Your Honor.

THE COURT:  It's admitted.

(ECF Number 198-19 admitted into evidence)

MR. HERSHEY:  Thank you.

BY MR. HERSHEY:

Q    So Mr. Avila, is this a binding agreement between Macquarie and the debtors?

A    Yes, sir.  Both parties executed it.

Q    And actually, let's just look real quick.  If you could turn -- so I'm actually now going to use the numbers at the top of the page.

A    Okay.

Q    So it's out of 93.  So could you turn to Page 27 of 93?

A    Yes, sir.

Q    Is that your signature there on behalf of the company?

A    Yes, sir.

Q    And if you turn the page over, is that Mr. Downey's signature on behalf of Macquarie?

A    It sure looks like that.

Q    Now, in connection with this agreement, did Macquarie request a breakup fee?

A    They did not.

Q    Okay.  So is there a termination fee that's current -- that we're currently seeking approval of in connection with Macquarie?

A    Correct.

Q    Okay.  And tell me about that.  Why is -- what is your view of the breakup fee?

A    Well, my view of the breakup fee is this was -- the thought was this was going to be out of court and that it was not subject to any higher and better, that the special committee was going to make that decision -- excuse me -- the restructuring committee was going to make that decision.  Now that we're in court, they've come back and asked for that. They had not asked for expense reimbursement.  And it's only, I mean, like 2 percent.  I've seen it usually 3 percent.  I've seen it higher.  So that seems reasonable to me.

Q    Okay.  Let us turn to Tab 10.  Now, I'll note this document is also filed in the docket.  So the last one was 174-1.  This is 174-2.

     Mr. Avila, have you seen this document before?

A    Yes, sir.

Q    And what is this document?

A    It's an asset purchase agreement between Worldwide

Machinery and Worldwide Machine Operating Company and Diversified Fleet Holdings.

MR. HERSHEY:  Okay.  And I'll just note that apparently this is also part of Exhibit 19 in our exhibit list, so I won't seek to readmit it into evidence.

BY MR. HERSHEY:

Q    And, Mr. Avila, is this a binding commitment between the debtors and Diversified?

A    Yes, it is.

Q    Okay.  Can we turn to, again, we'll go by the numbers at the top of the page, Page 39 of 161?

A    I'm there.

Q    And is that your signature?

A    Yes, sir.

Q    Okay.  And on the next page, is that Mr. Greenberg's signature for Diversified Fleet Holdings?

A    It appears to be.

Q    Okay.  So at this point, Mr. Avila, do you have any doubt about Macquarie's commitment to financing?

A    No.

Q    Please turn to Tab 11.

A    Okay.

Q    So I believe this was filed on the docket this morning, but I don't have the Docket Number.  It is -- well, why don't you tell me what this is?

A      Tab 11?

Q      Yeah.

A      There was a filing of supplemental exhibit to the Diversified agreement.  It looks like we -- we've modified some of the supplemental filings.

Q      Yeah.  And my colleague informs me this is filed on the docket at Docket Number 228.  Mr. Avila, who prepared this document?

A      Are you talking about the spreadsheet in the back or are you talking about the legal document up front?

Q      Sorry.  Are we looking at the same --

A      Tab 11?

Q      Oh, maybe -- you know, maybe you don't have the binder.  I apologize.  Oh, okay.  No, yours has a notice that mine doesn't have.  Okay.  Yeah.  So I'm talking not about the notice at the front, I'm talking about the document at the back.  So this is -- this is on the docket at 228-1 because it's an exhibit.  Who prepared this document?

A      Are you talking about the spreadsheet?

Q      I am.

A      Okay.  My team and the management team at Worldwide.

Q      Okay.  And I'm sorry if you testified to this.  I was conferring with my colleague on the docket number.  What is this document meant to reflect?

A      The assumed liabilities associated with the -- the full

value of the assumed liabilities associated with the Diversified-Macquarie transaction.

Q    And what was your team's reason for creating this document?

A    To work with Diversified and confirm that they're picking up these liabilities.

Q    And have Diversified and Macquarie agreed that this will be a schedule to the asset purchase agreement?

A    Yes, sir.

Q    Okay.  Okay.  Let us turn to Tab 12.  Have you seen this document before?

A    Let me get the second page.  Yes, sir.

Q    What is it?

A    It is an asset purchase agreement that was marked up, and it is from -- to Worldwide Machinery and Worldwide Machine Operation from Ritchie Bros., Inc.

         MR. HERSHEY:  Okay.  I would like to move this into evidence.  It is Exhibit Number 149 on our exhibit list.

         MS. DAVIS:  No objection, Your Honor.

         THE COURT:  Okay.  It's admitted.

    (ECF Number 208-39 admitted into evidence)

BY MR. HERSHEY:

Q    Okay.  Let's go to Page number ending 407.

A    407.  Okay.  I'm there.

Q    Okay.  You see it says, "2.5, consideration"?

A      Yes, sir.

THE COURT:  What page are you on, Counsel?

MR. HERSHEY:  Oh, I'm sorry.  It's the Bates number, it ends 3407.

THE COURT:  Thank you.

MR. HERSHEY:  Thank you, Your Honor.

BY MR. HERSHEY:

Q    So you see that it's Section 2.5, consideration?

A      Yes, sir.

Q    Okay.  And it says, under A, "A cash amount equal to 54 million minus," and then a series of things?

A      Correct.

Q    Okay.  And then there's some other terms.  What was the restructuring committee's reaction to this document?

A      On face, the 54 looks great, but you start looking at 25 percents up front.  Only 25.  Then 75 when we collect the assets.  So that part, if you're -- we're focused on section 25, there was some concerns about that.  And if you want me to go to the other sections, we can do that.

Q    Well --

A      But that was a concern right there.

Q    Okay.  I mean, are there other sections that you want to mention?

A      The receivable section.

Q    And what about the receivable section is noteworthy?

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Avila - Direct                90

A    Well, you're going to collect it, but this was not a going concern, so you're liquidating this.  So the -- the collectability of this is going to be in question.

Q    Okay.

A    And I've heard --

THE COURT:  Can someone point me to a provision at which --

BY MR. HERSHEY:

Q    Yeah.  Which -- can you point the judge to the particular provision that you're addressing?

A    Following page, 12, Section 2.8.

MR. HERSHEY:  2.8, Your Honor.

THE WITNESS:  At the bottom.  A.

THE COURT:  Oh, the accounts receivable.  Yes.  Okay.

BY MR. HERSHEY:

Q    Okay.  Let's turn to Tab 13.

A    Okay.

Q    Do you recognize this document?

A    I believe so.

Q    Okay.  Do you know what it is?

A    It's a -- it looks like an updated asset purchase agreement from -- now it's WW Acquisition, LLC.  I believe that's still the same, Ritchie Bros., Hilco.

Q    Okay.  And I believe counsel to the secured lenders, we don't have to flip to the particular page, represented that

this is a credit bid for $57 million.  Did you hear that statement?

A    I guess this is the credit bid.  Excuse me.

Q    Yes.  And just to answer my question, did you hear that representation from counsel to the --

A    I did.

Q    -- secured lenders?  Okay.  When was this credit bid made?

A    Just the other day.

Q    Okay.  And do you know why the secured lenders chose to credit bid --

A    I have absolutely no idea.

Q    -- previous to the hearing?  Okay.  What is the company's view of this credit bid?

A    The company's view is it's not executable on -- on face.

Q    Why is that?

A    Because of the reasons you heard earlier.  You have to -- you have a lot of issues to be able to effectuate the actual wind down of this.  And you have to do it quickly.  It's costly.  And who's going to do it?

MR. HERSHEY:  Okay.  I think -- I think, Your Honor, if we may, before I move on to the next exhibit --

You want to -- you want to just --

MR. KAMPFNER:  Yeah, Your Honor, can we take a short break?

THE COURT:  Sure.

MR. KAMPFNER:  I would like to have some discussions with my clients.

THE COURT:  Yeah.  No, no, no.  Absolutely.  Let me ask.  How much time do you think you need in terms of a short break?

MR. HERSHEY:  Well --

THE COURT:  The reason I'm asking, it's 11:45.  I don't know --

MR. HERSHEY:  -- you know, even if we do lunch and then we come back after --

THE COURT:  Okay.  Why don't we -- can we just -- we'll take a break for lunch now.  And then in terms of housekeeping, after we finish -- take as much time as you need in terms of this witness -- who else is slated for today?

MR. HERSHEY:  Sure.  So I would estimate I have no more than 10 minutes left with this witness on my direct.  And then we have two more witnesses that we intend to call.  We intend to call Mr. Young, who is on the debtors' board and a member of the restructuring committee.  And we intend to call Mr. Bleaker, who is the 30(b)(6) witness that the lenders produced yesterday for deposition.

THE COURT:  How much time do you think you need with them?

MR. HERSHEY:  With Mr. Young, I need no more than 10 minutes total.  With Mr. Bleaker, I probably need no more than

10 minutes total as well.

THE COURT:  Okay.  Any other witnesses on what I would call this side of the table?

MR. HERSHEY:  No, Your Honor.

THE COURT:  Okay.

Ms. Davis, just from a --

MS. DAVIS:  Logistically, Your Honor --

THE COURT:  -- housekeeping standpoint --

MS. DAVIS:  -- Mr. Avila is also a witness that we've designated, and so if it's okay with the Court, we'd like to just complete our cross and direct at the same time.  I think that'll probably take 20 minutes.

THE COURT:  Okay.

MS. DAVIS:  Yeah.  And, Sam, just by way of clarification, did you say you were calling Mr. Bleaker by deposition?

MR. HERSHEY:  No.  We -- we'd like to cross-examine him or take him as a hostile witness.

MR. WOOD:  He's not available.  We were never asked to bring him.  And he wasn't subpoenaed.  He's not available.

MR. HERSHEY:  I don't know.  That's surprising to me, Your Honor.

MR. WOOD:  That's why we took his deposition.

MR. HERSHEY:  I mean --

THE COURT:  No.

MR. HERSHEY: Let me just be clear, Your Honor. We -- they asked us for a list of witnesses about a week ago. His name was on our list. His name is on the witness and exhibit list we filed two days ago with the Court. He was designated by them yesterday. He appeared for deposition. This is the first I've heard that we won't be able to ask him questions today.

THE COURT: Sounds like we do need to take a lunch break. We'll let you all talk about that and then we'll pick that up. But let's assume that he is not here. Then what are we left with? And it -- so you --

MR. HERSHEY: Let me just say, Your Honor --

THE COURT: We -- we've got another -- I got it. I know. We -- we'll take that up. So theoretically, we're talking another 10 minutes on direct here. So why don't we come back at -- is 12:45 okay for everyone?

MS. DAVIS: Yes, Your Honor.

THE COURT: And you can kind of leave your stuff here.

MR. HERSHEY: Yes, Your Honor.

THE COURT: And then we'll pick back up.

And I'll remind you that you're still under oath and you speak with no one about your testimony.

THE WITNESS: Yes, sir.

THE COURT: Okay. All right. Let's come back at

12:45.  Thank you.

MS. DAVIS:  Thank you, Your Honor.

(Recess taken at 11:48 a.m.)

(Proceedings commence at 12:48 p.m.)

THE COURT:  Okay.  We are back on the record in Worldwide Machinery.  It's my understanding that the parties are asking for an additional 30 minutes.  I just want to confirm, just so the folks on the phone would know.

MR. HERSHEY:  Yes, Your Honor.  Sam Hershey, White & Case, proposed counsel of the debtors.  The parties would like an additional 30 minutes to continue their discussions.

THE COURT:  Okay.  Not a problem.  I will come back in 30 minutes.  We will keep the line open, but we'll keep it on mute, and I'll come back in 30 minutes.  Thank you.

(Recess taken at 12:48 p.m.)

(Proceedings resumed at 1:22 p.m.)

THE COURT:  Good afternoon.  This is Judge Lopez. We'll get started in Worldwide Machinery in just one minute.

Okay.  I need to turn my camera on.  All right.  Are we ready to proceed?

MR. KAMPFNER:  Your Honor, I think we have a resolution to the various motions that are before you, thankfully, and I would like to read it on the record and make sure with my -- with the counsel for the lenders here that I'm stating it correctly.

THE COURT: Okay.

MR. KAMPFNER: So Diversified will increase the cash portion of its bid to $56 million. 40 -- 54 million of that will be paid to the lenders in satisfaction of their secured claim. There -- the 2.5 million, approximately, of cash in the estate -- in operating cash in the estate will be estate cash. The lenders will receive a release of all claims from the estate. And the bid is -- this bid is subject to an overbid --

THE COURT: Okay.

MR. KAMPFNER: -- from Hilco or anyone else that wants to make it. And the overbid -- the minimum overbid is as follows.

THE COURT: Okay.

MR. KAMPFNER: 56 million cash, 5.8 million of either assumed liabilities or cash, and an extra million dollars for a termination fee, which will be litigated. The money has to be cash at close or assumption of debt at close. There can be no, you know, payment over time as equipment comes in. It's just that's the money you get at close; that's the end of the deal.

And so -- is that accurate?

MR. COHEN: Thank you, Mr. Kampfner.

MR. KAMPFNER: Sure.

MR. COHEN: Jason Cohen for the senior secured lenders, Your Honor. I would just add that 54 million is to be paid to us at closing.

MR. KAMPFNER:  Yes.

THE COURT:  Yes.

MR. COHEN:  Also, the closing will occur on or before October 31st?

MR. KAMPFNER:  Yes.

MR. COHEN:  And while we will get a full release, that will also include a withdrawal of the adversary complaint at closing.

THE COURT:  And it ends everything.

MR. COHEN:  I'm sorry?

THE COURT:  It would end the -- resolve the adversary proceeding as well, right?

MR. COHEN:  Yes, sir.

THE COURT:  Let me just -- one mechanical question. Is there a date by which any overbid must be submitted?

MR. KAMPFNER:  So our view is that it should be submitted now.  We are here at a public hearing, and if somebody wants --

THE COURT:  I agree.  Today's the day.  Today is decision day.

MR. KAMPFNER:  They can make their bid or not bid.

THE COURT:  Higher or better.  Today.  And today, higher means that.  I agree.  I think -- I don't know if anyone's going to -- let me just ask.

MR. KAMPFNER:  One other point.

THE COURT:  Yes.

MR. KAMPFNER:  I'm sorry.  And to be fair, it wasn't expressly stated, but is -- there will be a waiver of the deficiency claim as for the rest of the -- you know, in case there's some -- yeah.

MR. COHEN:  Yes, that's agreed.

MR. KAMPFNER:  And the other thing is the adversary, it's dismissed as to the lenders, right?  So it doesn't necessarily mean we have to dismiss it against Gordon Brothers.

THE COURT:  Just as against the --

MR. KAMPFNER:  Yeah.

MR. WOLFSHOHL:  Why don't you just dismiss for prejudice?

MR. COHEN:  Yeah.

THE COURT:  I think that's right.

MR. COHEN:  With prejudice.  Yeah.  Okay.  Got it.

MR. KAMPFNER:  Thank you.

THE COURT:  Okay.  So the overbid, if I understand it, is 50 --

MR. KAMPFNER:  62.8 million cash, or --

THE COURT:  Can you -- I just want -- 56 million in cash, right?

MR. KAMPFNER:  I'm sorry.  It's -- but it's the million dollar term.  It's -- just to make it more simple --

THE COURT:  Yeah.

MR. KAMPFNER:  -- it's 57 million cash and 5.8 million of assumed liabilities or cash.

THE COURT:  50 -- say that again on the record.  I just want to make sure.

MR. KAMPFNER:  It's 57 million cash.

THE COURT:  57 million in cash.

MR. KAMPFNER:  Plus 5.8 million in either cash or assumed liabilities.

THE COURT:  Plus 5.8 million in either cash or assumed liabilities.

MR. KAMPFNER:  Yes, for a total of 62.8.

THE COURT:  62.8 million and the ability to close on or before October 31st.

MR. KAMPFNER:  And due in cash at close.

THE COURT:  Cash at closing.  So at a minimum, you've got to show up with the 57 million in cash at closing, right?  Because the other -- could be assumed liabilities.

MR. KAMPFNER:  Yeah.  Because you assume them at close too, but they are what they are.

THE COURT:  Yep.  You're assuming them at closing.  What I'm going to do is -- this is just read on the record.  What I'm going to do -- if anyone's listening, I'm going to give everyone 15 minutes.  I've just heard it on the record.  It's essentially -- you've got to come up with 57.  I think this is -- let me just note for the record.

I'm willing and ready to approve this deal. This satisfies -- I have evidence on the record about process, notice. The only -- every other bid that was described to me, I think this is higher. And it also has the approval of the secured lender with the ability, as far as I know, to credit bid. And this resolves that. This resolves litigation, but this satisfies 363 in every way.

So what I'm going to do is just -- I'm not going to open up the line now. What I'm going to do is just come on the line at 1:45 and someone will either tell me there's $62.8 million ready to go, or I'm going to approve the sale. That's what I'm going to do. So I'm going to -- it's 1:29. I'll come back at 1:45 and just open up the line, give whoever's listening 15 minutes to kind of figure out what they want to do, but 15 minutes.

This is a hearing today subject to higher or better offers. It is entirely appropriate for anyone to show up, but today's the day and everybody had to be ready to go. This is equivalent of an auction at the courthouse then. So I agree 100 percent. So I'll come back in 15 minutes, and we'll see where we go.

Thank you.

THE COURTROOM DEPUTY:  All rise.

(Recess taken at 1:30 p.m.)

(Proceedings resumed at 1:45 p.m.)

THE COURT: Okay. Good afternoon. This is Judge Lopez. We are back on the record. It is 1:45 p.m. We are back on the record in Worldwide Machinery Group.

Let me just -- anyone on the line before we went out -- I've unmuted one line, if there's someone else who wishes to have their line unmuted who I've recognized before, please hit "five star." Anyone new, I will do so at this time.

Okay. I just unmuted a 212-839 number.

MR. GROSSI: Good afternoon, Your Honor. Anthony Grossi, Sidley Austin, on behalf of Hilco.

THE COURT: Okay. Anyone else?

Okay. Mr. Grossi, is there anything you wish to tell me, sir?

MR. GROSSI: Your Honor, I wish we could supply you with the 1990s courtroom drama auction update, but we're unable to provide an overbid. We did want to let the parties know that to the extent there are any under or non-utilized assets, that we remain interested in acquiring those assets. But thank you, Your Honor, for the time, and thank you to all of the parties.

THE COURT: Mr. Grossi, thank you very much for your time.

Is there anyone else who wishes to be heard on the line? Anyone in the courtroom?

MR. SANDLER: Your Honor?

THE COURT: Yes, yes, Mr. Sandler.

MR. SANDLER: Just very, very, very briefly, Your Honor. So with, you know, the response from Mr. Grossi, and it would have been fun to, in some respects, to have an auction. I'm glad that the answer is actually they don't want to overbid, because the committee, of course, wants to see a going concern. We think that's the way to maximize the value for everybody in the capital structure, and there's really a lot at stake here.

Some of the vendors have seven-figure claims. The more than 100 employees have families. This will provide work for them. And again, while I think that -- and I want to thank Your Honor, too, for the interesting discussion we had this morning about a secured lender's rights under (f)(4) and (k). And while I think that's intellectually interesting, I'm more than happy to walk away from that discussion to save those jobs.

I think the bankruptcy process worked here. I want to thank the debtors, the lenders, and the committee members for their time and efforts so that we got the adversarial process to come to the right result, which is keeping the going concern alive.

THE COURT: Yes.

MR. SANDLER: And frankly, I'm sure that makes your job a little easier to boot, Your Honor. So with that, I just

want to say the committee supports the settlement, and we think this is an excellent result.

THE COURT:  Mr. Sandler, just one piece of just confirmation so we have it clear on the record.

I haven't signed this -- obviously, I haven't signed anything yet, but it is my understanding that if, upon approval of this sale, that the secured lender, who is named in the adversary proceeding, to the extent that I sign it, and that they will be dismissed from that litigation, I just want confirmation that that's your understanding as well.

MR. SANDLER:  That is, Your Honor, and that's part of the settlement.  And again, to support the going concern, we are, you know --

THE COURT:  Okay.

MR. SANDLER:  -- that's what settlements are all about.

THE COURT:  Thank you.

MR. SANDLER:  So as to the lenders -- the main lenders, KeyBank, et cetera, they will be dismissed from the litigation.

THE COURT:  Okay.  All right, folks.  Thank you very much.

I'll then note for the record, but unless anyone wishes to speak, I'm ready to roll.  Okay.  I'll note then before the Court is a motion filed by the debtor for approval

of a sale under two APAs under Section 363 of the Bankruptcy Code.

I'm going to find that there's been proper notice and service of today's hearing.  This is a core proceeding under 28 U.S.C. 157, and the Court is the one presiding over this bankruptcy case, so I have jurisdiction under Section 1334.

The proposed sale has two APAs, one to Macquarie and one to Diversified.  Their -- Court has conducted a hearing and conducted evidence in connection with that motion.  The approval of those APAs is subject to kind of the -- what I would call the amended terms of the sale that were read into the record just a little while ago around 1:15 p.m.

And I'm going to note that the applicable section is Section 363 of the Bankruptcy Code, which provides that upon notice in a hearing the debtor is authorized to sell assets outside of the ordinary course of business.

I'm comfortable with the testimony.  This -- there's been proper notice under the rules.  But then I do appreciate that -- the work of Piper Sandler and the CRO in connection with alerting additional parties and making sure that we did have a robust process.  And I'm comfortable that fair market value for the assets has been established under Section 363.

So I'm going to approve the sale.  I'm going to find that the buyers are subject to the good faith protections under Section 363(m).

And based upon all the evidence before me, there is no evidence of collusion.  And so there's no finding.  I think 363(n) would not apply here.  These assets will be sold free and clear under Section 363(f) of the Bankruptcy Code.  I -- and so I'm going to approve the sale.

I thank everyone for their time.  It sounds like someone's going to get me a revised order to sign.  Or what do you want me to sign?

MR. KOSTER:  Your Honor, Charles Koster for the debtors.  Yes, we'll work with the purchasers and the lenders on a revised form of order reflecting the settlement that was announced on the record and Your Honor's ruling.  We will upload that as soon as possible.

THE COURT:  Okay.  Can I just note for the record, I think in terms of things get uploaded for me to sign, if there's -- I think you can probably, on the adversaries, do stipulated dismissals.  You don't need -- I just -- I want -- but if somebody wants me to sign it, just upload it and let Ms. Saldana know.  I'm on a -- the reason I'm mentioning all this is that I'm on a plane tomorrow at noon, and so if there's something I can sign before noon tomorrow, I'll sign it.  If not, it'll likely be, you know, 6 or 7 that night, but I got it.  Somebody's going to -- I'm going to need to sign stuff, and if -- I just want to make sure that people are aware.  I can sign something tonight if you have it.  If you need

tomorrow morning, I can do that as well.  Just let us know, and I'll get it on -- I'll get it signed on the docket so that parties can be able to do it.

The only thing I would just ask is once the sale closes, if someone can just kind of file a one-pager on the docket, just notice of closing, just so I know that it's done, and just let Ms. Saldana know so that there's notice that everything is there.

Mr. Koster, what do you envision in terms of -- assuming there's a closing on or before October 31st, which all expectations are there will be, what does the next phase of this case look like?

MR. KOSTER:  Debtor's expectation is to file a combined plan and disclosure statement as soon as practical and then seek confirmation of that plan as fast as Your Honor will be able to consider it.

THE COURT:  So just work with dates.  My case manager -- I want this to be as efficient as possible.  Let's just pick dates and see where we go.

There's an 847 number that I unmuted.

I just -- let's just pick dates and make them as efficient as possible, and we'll see where we go.  I think -- you're more than welcome to appear, but if parties want to appear by video, I'm certainly amenable to everything.  We'll just make this as efficient as possible for the rest of the

case.  I thank everyone for your time.  Take your boxes, and I'll see you on the next one.

MR. KOSTER:  One more item on the agenda today.  I think substantially everything is mooted in light of the resolution on the sale.  We do have a cash collateral order third interim that's filed at Docket Number 214.  That will allow us to bridge with use of cash collateral to the sale, after which time we would be using estate cash that the lenders don't have liens on anymore.

THE COURT:  Okay.  214?

MR. KOSTER:  214, and I believe that's fully consensual.

THE COURT:  Okay.  Y'all okay with me sign 214?  Okay.  Okay.

MR. TORF:  Your Honor, this is Jason Torf.  I just have one quick item.  May I chime in here for a second?

THE COURT:  Sure, just for -- yes.

MR. TORF:  And I apologize to jump in here, Your Honor.  Again, Jason Torf on behalf of Wagner Equipment Company.  Going back to the sale motion, we had negotiated with the buyer's counsel some language specific to Wagner in the draft sale order.  With that being revised, can we ensure that the revisions are shared with me so that we have an opportunity to make sure that appropriate language is in there for Wagner again?

THE COURT:  My -- Mr. Wolfshohl is shaking his head, yes.

MR. WOLFSHOHL:  That's the intent, Your Honor.

MR. TORF:  Thank you very much, Mr. Wolfshohl, and to the Court.  Appreciate it.

THE COURT:  Alrighty, folks, thank you very much.  Have a good day.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings concluded at 1:55 p.m.)

* * * * *

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Alicia J. Jarrett*

_____

ALICIA JARRETT, AAERT NO. 428      DATE: October 29, 2025

ACCESS TRANSCRIPTS, LLC

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)