**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Worldwide Machinery Group, Inc. *et al.*[1] | ) | Case No. 25-90379 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND REVISED AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT**
**CHAPTER 11 PLAN OF WORLDWIDE MACHINERY GROUP, INC.**
**AND ITS AFFILIATED DEBTORS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Worldwide Machinery Group, Inc. (8029), Worldwide Machinery, Ltd. (3666), Worldwide Operating, Inc. (7023), and Worldwide Machinery GP, LLC (5399).  The location of Debtor Worldwide Machinery Group, Inc.'s corporate headquarters is 2200 Post Oak Boulevard, Suite 1000, Houston, Texas 77056.

December 24, 2025
Houston, Texas

/s/ *Charles R. Koster*

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:   (713) 496-9700
Email:          charles.koster@whitecase.com


- and –


**WHITE & CASE LLP**
David M. Turetsky (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:   (212) 819-8200
Email:          david.turetsky@whitecase.com
                    sam.hershey@whitecase.com

**WHITE & CASE LLP**
Roberto Kampfner (admitted *pro hac vice*)
Patrick Wu (Texas Bar No. 24117924)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:   (213) 620-7700
Email:          rkampfner@whitecase.com
                    patrick.wu@whitecase.com


- and -


**WHITE & CASE LLP**
Fan B. He (admitted *pro hac vice*)
Kristin Schultz (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:   (305) 371-2700
Email:          fhe@whitecase.com
                    kristin.schultz@whitecase.com

*Counsel to the Debtors and Debtors in Possession*

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ....................................................7

    A.    Defined Terms .....................................................................................................7

    B.    Rules of Interpretation ......................................................................................17

    C.    Computation of Time ........................................................................................17

    D.    Governing Law .................................................................................................17

    E.    Reference to Monetary Figures .........................................................................18

    F.    Reference to the Debtors or the Wind-Down Debtors .......................................18

    G.    Controlling Document ......................................................................................18

ARTICLE II. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ...........................................................................................................18

    A.    The Debtors' Corporate History .......................................................................18

    B.    The Debtors' Business Operations.....................................................................18

    C.    The Debtors' Prepetition Capital Structure.......................................................19

ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 FILINGS .................................20

ARTICLE IV. MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES.........21

    A.    First Day Relief.................................................................................................21

    B.    Appointment of Creditors' Committee .............................................................22

    C.    Schedules and Statements .................................................................................22

    D.    Retention of Professionals ................................................................................22

    E.    Cash Collateral Motion ....................................................................................22

    F.    Adversary Proceeding against the ABL Lenders ...............................................22

    G.    The Going-Concern Sale...................................................................................23

    H.    ABL Lenders' Claims .......................................................................................24

    I.    The Sale Hearing and Global Settlement ..........................................................24

    J.    Relief From Stay Motion ..................................................................................24

    K.    Motion to Dismiss ............................................................................................25

ARTICLE V. SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES .........25

ARTICLE VI. ADMINISTRATIVE PROFESSIONAL AND PRIORITY TAX CLAIMS ...................26

    A.    Administrative Claims ......................................................................................26

    B.    Statutory Fees ...................................................................................................27

    C.    Professional Fee Claims ...................................................................................27

    D.    Priority Tax Claims ..........................................................................................28

ARTICLE VII. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ....................................................................................................29

    A.    Classification of Claims and Interests...............................................................29

B.    Treatment of Claims and Interests ................................................................... 29

C.    Reservation of Rights Regarding Claims ........................................................ 32

D.    Elimination of Vacant Classes ........................................................................ 32

E.    Voting Classes Where No Valid Votes Are Received ..................................... 32

F.    Subordinated Claims ....................................................................................... 32

G.    Controversy Concerning Impairment ............................................................. 32

H.    Withdrawal of Plan; Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ................................................................................................................ 32

ARTICLE VIII. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................ 33

A.    The Wind-Down Debtors ................................................................................ 33

B.    Sources of Consideration for Plan Distributions............................................ 40

C.    Wind-Down ..................................................................................................... 40

D.    Corporate Dissolution ..................................................................................... 40

E.    Corporate Action ............................................................................................. 41

F.    Cancellation of Notes, Instruments, Certificates, and Other Documents ....... 41

G.    Effectuating Documents; Further Transactions .............................................. 41

H.    Section 1146(a) Exemption............................................................................. 42

I.    Preservation of Rights of Action..................................................................... 42

J.    Access to Going-Concern Purchasers' Books and Records and Personnel ..... 43

K.    Closing the Chapter 11 Cases .......................................................................... 43

ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES........... 43

A.    Rejection of Executory Contracts and Unexpired Leases................................ 43

B.    Claims Arising from the Rejection of Executory Contracts and Unexpired Leases......... 43

C.    Contracts and Leases Entered Into After the Petition Date ............................ 44

D.    Insurance Policies ........................................................................................... 44

E.    Warranties ....................................................................................................... 44

F.    Reservation of Rights...................................................................................... 44

ARTICLE X. PROVISIONS GOVERNING DISTRIBUTIONS ................................................. 45

A.    Distributions on Account of Claims Allowed as of the Effective Date ........... 45

B.    Distribution Agent ........................................................................................... 45

C.    Disputed Claims Reserves ............................................................................... 45

D.    Special Rules for Distributions to Holders of Disputed Claims ...................... 46

E.    Delivery of Distributions ................................................................................ 46

F.    Undeliverable and Unclaimed Distributions Held by Distribution Agent ...... 46

G.    Time Bar to Cash Payments ............................................................................ 47

H.    Manner of Payment ......................................................................................... 47

I.    Fractional Distributions ................................................................................... 47

J.    Foreign Currency Exchange Rate .................................................................... 47

K.    *De Minimis* Distributions ............................................................................... 47

L.    No Postpetition Interest on Claims ................................................................. 47

|  | M. | Allocation Between Principal and Accrued Interest | 48 |
|  | N. | Single Satisfaction | 48 |
|  | O. | Compliance with Tax Requirements | 48 |
|  | P. | Claims Paid or Payable by Third Parties | 48 |
|  | Q. | Setoffs and Recoupments | 49 |
|  | R. | Securities Law Matters | 50 |
|  | S. | Administration of Taxes | 50 |

**ARTICLE XI. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS** ............. 50

|  | A. | Allowance of Claims | 50 |
|  | B. | Prosecution and Settlement of Disputed Claims | 50 |
|  | C. | Pending Objections | 51 |
|  | D. | Claims Assumed by Purchaser | 51 |
|  | E. | Adjustment to Claims Without Objection | 51 |
|  | F. | Estimation of Claims | 51 |
|  | G. | Disallowance of Claims and Interests | 51 |

**ARTICLE XII. RELEASE, INJUNCTION, AND RELATED PROVISIONS** ........................... 52

|  | A. | General Settlement of Claims and Interests | 52 |
|  | B. | Releases by the Debtors | 52 |
|  | C. | Releases by the Releasing Parties | 53 |
|  | D. | Exculpation | 53 |
|  | E. | Injunction | 54 |
|  | F. | Reimbursement or Contribution | 55 |
|  | G. | Release of Liens | 55 |

**ARTICLE XIII. CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE** ................... 55

|  | A. | Conditions Precedent to Confirmation | 55 |
|  | B. | Conditions Precedent to the Effective Date | 56 |
|  | C. | Waiver of Conditions Precedent | 56 |
|  | D. | Effect of Non-Occurrence of Conditions to Consummation | 56 |

**ARTICLE XIV. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN** ............... 56

|  | A. | Modification of Plan | 56 |
|  | B. | Effect of Confirmation on Modifications | 57 |
|  | C. | Withdrawal of Plan | 57 |

**ARTICLE XV. RETENTION OF JURISDICTION** ............................................. 57

**ARTICLE XVI. MISCELLANEOUS PROVISIONS** ........................................... 59

|  | A. | Immediate Binding Effect | 59 |
|  | B. | Additional Documents | 59 |
|  | C. | Dissolution of Official Committee | 59 |
|  | D. | Reservation of Rights | 59 |
|  | E. | Successors and Assigns | 60 |

F.      Service of Documents ................................................................................... 60
G.      Term of Injunctions or Stays ........................................................................ 60
H.      Entire Agreement .......................................................................................... 61
I.      Plan Supplement Exhibits ............................................................................ 61
J.      Non-Severability ........................................................................................... 61
K.      Votes Solicited in Good Faith ...................................................................... 61
L.      Waiver or Estoppel ....................................................................................... 61
M.      No Waiver ..................................................................................................... 62

ARTICLE XVII. CONFIRMATION OF THE PLAN ...................................................... 62
A.      Voting Procedures and Acceptance .............................................................. 62
B.      Statutory Requirements for Confirmation of the Plan .................................. 63
C.      The Best Interest of Creditors Test ............................................................... 63
D.      Feasibility ...................................................................................................... 65
E.      Eligibility to Vote on the Plan ...................................................................... 65
F.      Confirmation Without Acceptance by All Impaired Classes ........................ 65

ARTICLE XVIII. PLAN-RELATED RISK FACTORS .................................................... 66
A.      General Bankruptcy Law and Plan Related Considerations .......................... 66
B.      Financial Information Disclaimer .................................................................. 69
C.      Disclosure Statement Disclaimer .................................................................. 69
D.      Alternatives to Confirmation and Consummation of the Plan ....................... 71

ARTICLE XIX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......... 72
A.      General Tax Considerations ........................................................................... 72
B.      U.S. Federal Income Tax Consequences to the Debtors ............................... 72
C.      U.S. Federal Income Tax Consequences to Holders of Claims and Interests ................. 73
D.      Information Reporting and Backup Withholding ........................................... 76
E.      Reservation of Rights ..................................................................................... 77

## TABLE OF EXHIBITS

Exhibit A          Liquidation Analysis

Exhibit B          Organizational Chart

Exhibit C          Litigation Reserve Term Sheet

## Introduction

Worldwide Machinery Group, Inc., Worldwide Machinery, Ltd., Worldwide Operating, Inc., and Worldwide Machinery GP, LLC (collectively, the "**Debtors**"), as debtors and debtors in possession in the above-captioned cases (the "**Chapter 11 Cases**"), propose this *Combined Disclosure Statement and Joint Chapter 11 Plan of Worldwide Machinery Group, Inc. and Its Affiliated Debtors* (the "**Disclosure Statement**," "**Plan and Disclosure Statement**," or "**Plan**") for the resolution of all outstanding claims against and equity interests in the Debtors. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Other agreements and documents supplement this Plan and have been or will be filed with the Bankruptcy Court. Unless otherwise indicated, capitalized terms used herein shall have the meanings set forth in Article I, below.

The Plan is a liquidating plan. The Debtors conducted a prepetition marketing process and, pursuant to prior orders of the Bankruptcy Court, obtained Court-approval to sell substantially all of their assets to Macquarie Equipment Capital, Inc. and Diversified Rental Services, LLC. The Plan provides for the distribution of proceeds from this sale transaction, as well as other cash, and the timely monetization of all remaining property of the Debtors. Causes of Action not sold, transferred, or otherwise waived or released before the Effective Date of the Plan shall, following the Effective Date, be prosecuted or otherwise resolved by the Wind-Down Debtors for the benefit of the Holders of General Unsecured Claims. All Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims shall be satisfied in full.

**THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THE CHAPTER 11 CASES (THE "COMMITTEE") BELIEVE THAT HOLDERS OF ALLOWED CLAIMS ENTITLED TO VOTE ON THIS PLAN WILL RECEIVE HIGHER RECOVERIES UNDER THIS PLAN THAN THEY WOULD RECEIVE UNDER AN ALTERNATIVE CHAPTER 7 LIQUIDATION BASED ON BENEFITS PROVIDED UNDER THIS PLAN.** Specifically, the Debtors and the Committee believe that this Plan will maximize recoveries compared to a chapter 7 liquidation because (i) there would likely be additional costs, expenses, and time incurred in replacing existing management and professionals in a chapter 7 case, which would further diminish Estate assets, delay the prosecution of the Retained Estate Claims and Causes of Action and delay distributions to creditors, and (ii) the prosecution of Retained Estate Claims and Causes of Action in a focused and effective manner by the Plan Administrator will maximize the value of the Retained Estate Claims and Causes of Action compared with a potential prosecution by a chapter 7 trustee.

For these and other reasons, it is the Debtors' and the Committee's opinion that confirmation and implementation of the Plan is in the best interest of and will maximize recoveries to the Debtors' Estates, creditors, and other stakeholders. **THEREFORE, THE DEBTORS AND THE COMMITTEE RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN CAST A VOTE TO ACCEPT THE PLAN.**

## Disclaimer

This Plan and Disclosure Statement describes certain statutory provisions, events in the Chapter 11 Cases, and certain documents that may be attached or incorporated by reference. Although the Debtors believe that this information is fair and accurate, this information is qualified in its entirety to the extent that it does not set forth the entire text of such documents or statutory provisions. The information contained herein or attached hereto is made only as of the date of this Plan and Disclosure Statement. There can be no assurances that the statements contained herein will be correct at any time after such date.

This Plan and Disclosure Statement has been prepared in accordance with sections 1123 and 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws.  This Plan and Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission or any securities exchange or association reviewed or commented on the accuracy or adequacy of the statements contained herein.  Other than the Bankruptcy Court, no other governmental or other regulatory agency approvals have been sought or obtained as of the date of the mailing of this Plan and Disclosure Statement.

The Debtors submit this Plan and Disclosure Statement, as may be amended from time to time, under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 to all of the Debtors' known Holders of Claims entitled to vote on the Plan. The purpose of this Plan and Disclosure Statement is to provide adequate information to enable Holders of Claims who are entitled to vote on the Plan to make an informed decision in exercising their respective right to vote on the Plan. Every effort has been made to provide adequate information to Holders of Claims on how various aspects of the Plan affect their respective interests.

In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records or that was otherwise made available to them at the time of such preparation and on various assumptions.  Although the Debtors believe that such information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, the Debtors make no representations or warranties as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' financial condition and their future results and operations.  Except where specifically noted, the financial information contained in this Plan and Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction.

This Plan and Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver.  A party with standing may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Plan and Disclosure Statement as of the date hereof, unless otherwise specifically noted.  Although the Debtors may subsequently update the information in this Plan and Disclosure Statement, the Debtors do not have an affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.  Holders of Claims and Interests reviewing this Plan and Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Plan and Disclosure Statement was filed.  Information contained herein is subject to completion or amendment.  The Debtors reserve the right to file an amended plan and disclosure statement.

Confirmation and effectiveness of the Plan are subject to certain conditions precedent described in Article XIII of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that such conditions precedent will be satisfied or waived.  You are encouraged to read this Plan and Disclosure Statement in its entirety, including, but not limited to Article XVIII of this Plan and Disclosure Statement entitled "Plan-Related Risk Factors," before submitting your ballot to vote to accept or reject the Plan.  Even

after the Effective Date, Distributions under the Plan may be subject to delay so that Disputed Claims can be resolved.

The Debtors have not authorized any entity to give any information about or concerning the Plan and Disclosure Statement other than that which is contained in this Plan and Disclosure Statement.  The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Plan and Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests who are not entitled to vote on the Plan) will be bound by the terms of the Plan and any transactions contemplated hereby.

The contents of this Plan and Disclosure Statement should not be construed as legal, business, financial, or tax advice.  Each Holder of a Claim or Interest should consult his, her, or its own legal counsel, accountant, or other advisors as to legal, business, financial, tax and other matters concerning his, her, or its Claim or Interest, the solicitation, or the transactions contemplated by the Plan and Disclosure Statement. This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

Nothing contained herein shall constitute an admission of any fact or liability by any party or be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.

### The Solicitation

This Plan and Disclosure Statement is submitted by the Debtors to be used in connection with the solicitation of votes on the Plan and to describe and provide the terms of the plan of liquidation of the Debtors.

The Debtors requested that the Bankruptcy Court hold a hearing on conditional approval of this Plan and Disclosure Statement to determine whether this Plan and Disclosure Statement contains "adequate information" in accordance with section 1125 of the Bankruptcy Code.  The Bankruptcy Court entered an order conditionally approving the Disclosure Statement as containing adequate information on November December 1, 2025. [Docket No. 315] (the "**DS Order**").  Pursuant to section 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the Debtors and the condition of the Debtors' books and records . . . that would enable a hypothetical reasonable investor typical of Holders of claims or interests of the relevant Class to make an informed judgment about the plan . . . ."

**All Holders of Claims are encouraged to read and carefully consider this Plan and Disclosure Statement in its entirety before voting to accept or reject the Plan.  In making a decision to accept or reject the Plan, each Holder of a Claim must rely on its own examination and evaluation of the Debtors as described in this Plan and Disclosure Statement, including the merits and risks involved with respect to such Plan and Disclosure Statement.**

**A hearing to consider the final approval of the Disclosure Statement and Confirmation of the Plan has been set for December 22, 2025, at 1:00 p.m. (prevailing Central Time).  Objections to the final approval of the Disclosure Statement or objections to Confirmation of the Plan must be made in writing and must be filed with the Bankruptcy Court and served on counsel for the Debtors on or**

before 5:00 p.m. (prevailing Central Time), on December 17, 2025.  Bankruptcy Rule 3007 and the DS Order govern the form of any such objection.

<u>**NOTICE OF OBJECTION BY THE U.S. TRUSTEE**</u>

**THE U.S. TRUSTEE ASSERTS THAT THE PLAN'S OPT-OUT PROVISIONS ARE AN IMPERMISSIBLE METHOD OF OBTAINING CREDITORS' APPROVAL FOR THIRD-PARTY RELEASES BECAUSE FAILURE TO ACT CANNOT BE CONSIDERED CONSENT TO THOSE RELEASES. THE U.S. TRUSTEE PREVIOUSLY FILED AN OBJECTION [DOCKET NO. 291] RAISING THIS ISSUE, AMONG OTHER PLAN CONFIRMATION OBJECTIONS. THE U.S. TRUSTEE'S OBJECTION CAN BE OBTAINED FREE OF CHARGE FROM THE DOCKET MAINTAINED ON THE CLAIMS AND NOTICING AGENT'S WEBSITE, AVAILABLE AT HTTPS://CASES.STRETTO.COM/WORLDWIDEMACHINERY/.**

<u>**Answers to Commonly Asked Questions**</u>

**What is chapter 11 of the Bankruptcy Code?**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or liquidate their assets in a controlled and value-maximizing fashion.  The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed.  During a chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the bankruptcy court orders the appointment of a trustee.  No trustee has been appointed in the Chapter 11 Cases.  The Plan is being proposed by the Debtors.  The Debtors have worked to propose a plan of liquidation in an effort to minimize the overall administrative costs associated with the Chapter 11 Cases and maximize value to Holders of Allowed Claims and Interests.

**How do I determine how my Claim or Interest is classified?**

Under the Plan, Administrative Claims are unclassified and will be treated in accordance with <u>Article VI</u> of the Plan.  All other Claims and Interests are classified in a series of Classes, as described in <u>Article V</u> and <u>Article VII</u> of the Plan.  You may review such Articles to determine how your Claim or Interest is classified.

**How do I determine what I am likely to recover on account of my Claim or Interest?**

After you determine the classification of your Claim or Interest, you can determine the likelihood and range of potential recovery under the Plan with respect to your Claim or Interest by referring generally to the chart below, which is also included in <u>Article V</u> of the Plan and qualified by <u>Article VII</u> of the Plan. The estimated recoveries in this chart do not include projected proceeds of the Retained Estate Claims and Causes of Action, which may increase the ultimate recoveries of the Class of General Unsecured Claims.

| <u>Class</u> | <u>Claims or Interests</u> | <u>Status</u> | <u>Voting Rights</u> | <u>Estimated Allowed Claims or Interests</u> | <u>Estimated Recoveries of Allowed Claims or Interests</u> |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote | $0.00 | 0% |

4

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Claims or Interests | Estimated Recoveries of Allowed Claims or Interests |
|---|---|---|---|---|---|
| 2 | ABL Loan Claims | Impaired | Entitled to Vote | $117,600,000.00 | 46% |
| 3 | Caspian Loan Claims | Impaired | Entitled to Vote | $72,686,468.71 | 0%-5% |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote | $5,655,449 | 0%-5% |
| 5 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $1,758,000.00 | N/A |
| 6 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0 | N/A |
| 7 | Parent Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | 0% |

The chart above provides an estimate of recoveries under the Plan and may be compared to the estimated recoveries that such Classes would receive in a hypothetical chapter 7 liquidation, as reflected in the liquidation analysis attached to this Plan and Disclosure Statement as **Exhibit A**.

**What is necessary to confirm the Plan?**

Under applicable provisions of the Bankruptcy Code, confirmation of the Plan requires that, among other things, at least one Class of Impaired Claims votes to accept the Plan. Acceptance by a Class of Claims means that at least two-thirds in the total dollar amount and more than one-half in number of the Allowed Claims actually voting in the Class vote in favor of the Plan. Because only those Holders of Claims who vote on the Plan will be counted for purposes of determining acceptance or rejection of the Plan by an Impaired Class, the Plan can be approved with the affirmative vote of members of an Impaired Class who own less than two-thirds in amount and one-half in number of the Claims in that Class.  In addition to acceptance of the Plan by a Class of Impaired Claims, the Bankruptcy Court must find that the Plan satisfies a number of statutory requirements before it may confirm the Plan.

If one or more Classes vote to reject the Plan, the Debtors may still request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code. In such case, the Debtors will be required to demonstrate that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Impaired Claims or Interests that has rejected the Plan. This method of confirming a plan is commonly called a "cramdown." In addition to the statutory requirements imposed by the Bankruptcy Code, the Plan itself also provides for certain conditions that must be satisfied for the Plan to be confirmed and go effective.

**Is there an official committee of unsecured creditors in this case?**

Yes. An official committee of unsecured creditors was appointed on September 23, 2025. The Committee is represented by the law firm of Pachulski Stang Ziehl & Jones LLP. The Committee supports the confirmation of the Plan.

**When is the deadline for returning my ballot?**

**THE BANKRUPTCY COURT HAS DIRECTED THAT, TO BE COUNTED FOR VOTING PURPOSES, YOUR BALLOT MUST BE RECEIVED BY THE CLAIMS AND NOTICING AGENT NOT LATER THAN DECEMBER 17, 2025 AT 5:00 P.M. (PREVAILING CENTRAL TIME).**

**It is important that all Holders of Impaired Claims vote on the Plan. The Debtors believe that the Plan provides the best possible recovery to Holders of Claims and Interests. The Debtors believe that acceptance of the Plan is in the best interest of Holders of Claims and Interests and recommend that Holders of Impaired Claims vote to accept the Plan.**

If you would like to obtain additional copies of this Plan and Disclosure Statement or any of the documents attached or referenced herein, or have questions about the solicitation and voting process or the Chapter 11 Cases generally, please contact Stretto Inc., the Debtors' claims and noticing agent, by either (a) visiting the Debtors' restructuring website at https://cases.stretto.com/WorldwideMachinery/, (b) calling (833) 944-1768 (Toll Free) or +1 (949) 617-1571 (International), or (c) emailing teamworldwidemachinery@stretto.com and referencing "WWM Solicitation" in the subject line.

## Overview of Plan

An overview of the Plan is set forth below. This overview is qualified in its entirety by reference to the Plan. If the Bankruptcy Court confirms the Plan and, in the absence of any applicable stay, all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.

The Plan is a liquidation plan. Under the Plan, the ABL Administrative Agent and the ABL Lenders will retain the $54 million from the closing of the Going-Concern Transaction that they have already received in full satisfaction of their claims against the Debtors and shall receive a release from the Debtors. The remaining Cash from the Going-Concern Sale and from the Debtors' operations prior to the Going-Concern Sale shall be used to pay priority claims, Administrative Claims (including Professional Fees) and to fund the activities of the Plan Administrator. The Plan Administrator shall pursue various Retained Estate Claims and Causes of Action, including a Claim against Gordon Brothers for violating a non-disclosure agreement and certain avoidance actions. The proceeds from the Causes of Action (net of costs) will be available to pay certain Administrative Claims for Professional Fees and to make distributions to unsecured creditors, including General Unsecured Creditors and the deficiency claims of the Caspian Lenders. Although the Debtors believe that some of their Causes of Action have merit, litigation is by its nature risky and there is no guaranty that the Debtors will receive any proceeds therefrom. Recoveries to unsecured creditors occur only if the Plan Administrator is successful in recovering proceeds from Causes of Action. The Plan further provides for the termination of all Interests in the Debtors, the dissolution and wind-up of the affairs of the Debtors and their Affiliates, and the vesting of any remaining assets in the Wind-Down Debtors on the Effective Date.

The Wind-Down Debtor Assets, including the net proceeds, if any, from the prosecution of Retained Estate Claims and Causes of Action, will be distributed to creditors as set forth in the Plan and Disclosure Statement and the Plan Administrator Agreement. As of the Effective Date of the Plan, except as otherwise provided in the Plan and Disclosure Statement, the Wind-Down Debtors will be responsible for all payments and Distributions to be made under the Plan to the Holders of Allowed Claims.

# ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

**A.      Defined Terms**

1.      "*ABL Administrative Agent*" means Key Equipment Financing, a division of KeyBank National Association, as administrative agent under the ABL Credit Agreement.

2.      "*ABL Credit Agreement*" means that certain Second Amended and Restated Credit Agreement by and between Debtors Worldwide Machinery, Ltd. and Worldwide Operating, Inc., as borrowers, certain guarantors party thereto, the ABL Administrative Agent, certain lenders party thereto, KeyBank National Association, as issuing bank and PNC Bank National Association, as documentation agent, as amended, amended and restated, supplemented, or otherwise modified from time to time.

3.      "*ABL Lenders*" means the lenders under the ABL Credit Agreement.

4.      "*ABL Loan*" means the revolving line of credit extended pursuant to the ABL Credit Agreement.

5.      "*ABL Loan Claims*" means all Claims against each of the Debtors arising from or based upon the ABL Credit Agreement.

6.      "*Administrative Claim*" means a Claim against any of the Debtors for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, all fees and charges assessed against the Debtors' Estates under 28 U.S.C. § 1930, and all Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court.

7.      "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

8.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

9.      "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein, such Claim or Interest (or any portion thereof) (a) that is evidenced by a Proof of Claim filed by the Claims Bar Date, the Administrative Claims Bar Date, or such other date fixed by the Bankruptcy Court, as applicable (or for which Claim or Interest a Proof of Claim is not or shall not be required to be filed under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court); (b) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; (c) that has been expressly Allowed under the Plan, any stipulation approved by the Bankruptcy Court, or a Final Order of the Bankruptcy Court; or (d) is compromised, settled, or otherwise resolved to by the Debtors and the Holder of such Claim or Interest; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof or request for estimation thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order; *provided*, *further*, that except as otherwise expressly provided herein, the amount of any Allowed Claim or Allowed Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code.  Except as otherwise expressly specified in the Plan or any Final Order, and except to

the extent such interest is Allowed pursuant to section 506(b) of the Bankruptcy Code, the amount of an Allowed Claim shall not include interest or any premium on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, (x) a Proof of Claim filed after the Claims Bar Date or a request for payment of an Administrative Claim filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim, and (y) a Claim or Interest that has been disallowed by a Final Order or settlement shall not be Allowed for any purposes whatsoever. "Allow," "Allowance," and "Allowing" shall have correlative meanings.

10. "*Ballot*" means the applicable form or forms of ballot(s) distributed to each Holder of an Impaired Claim entitled to vote on the Plan on which the Holder indicates either acceptance or rejection of the Plan and (when applicable) any election for treatment of such Claim under the Plan.

11. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Cases.

12. "*Bankruptcy Court*" means (a) the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases; (b) to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code; or (c) such other court as may have jurisdiction over the Chapter 11 Cases or any aspect thereof to the extent of such jurisdiction.

13. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated by the United States Supreme Court pursuant to 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

14. "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or day on which commercial banks in New York, New York are required or authorized by law to remain closed.

15. "*Cash*" means legal tender of the United States of America and equivalents thereof.

16. "*Caspian Collateral Agent*" means Cantor Fitzgerald Securities, as administrative agent and collateral agent under the Caspian Credit Agreement.

17. "*Caspian Credit Agreement*" means that certain Credit Agreement by and between Debtor Worldwide Machinery Ltd., certain guarantors party thereto, the Caspian Collateral Agent, and certain lenders party thereto, as amended, amended and restated, supplemented, or otherwise modified from time to time.

18. "*Caspian Lenders*" means the lenders under the Caspian Credit Agreement.

8

19.     "*Caspian Loan*" means the term loan provided under the Caspian Credit Agreement.

20.     "*Caspian Loan Claims*" means all Claims against each of the Debtors arising from or based upon the Caspian Credit Agreement.

21.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of state, federal, or other law, in each case other than the claims transferred to the Going-Concern Purchasers under the Going-Concern Agreements.  For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) claims for breach of statutory, equitable, or constructive trusts created under applicable law or in equity or the misappropriation of funds held in trust or other causes of action or claims related thereto; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

22.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

23.     "*Claim*" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

24.     "*Claims and Noticing Agent*" means Stretto, Inc., the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by order of the Bankruptcy Court [Docket No. 8].

25.     "*Claims Bar Date*" means the applicable deadline for filing proofs of Claim.

26.     "*Claims Objection Deadline*" means the date that is 210 days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

27.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Claims and Noticing Agent.

28.     "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

29.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases on September 23, 2025, as may be reconstituted from time to time.

30.     "*Committee Members*" means, each solely in its capacity as a former or current member of the Committee, (a) Wagner Equipment, (b) UNI International, America Corp., and (c) Masaveu Post Oak Houston, LLC.

9

31.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

32.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

33.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order, as such hearing may be continued from time to time.

34.    "*Confirmation Order*" means the order of the Bankruptcy Court approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code and confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

35.    "*Consummation*" means the occurrence of the Effective Date.

36.    "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) for cure of a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor pursuant to section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

37.    "*D&O Liability Insurance Policies*" means, collectively, all insurance policies (including any "tail policy") issued at any time, whether expired or unexpired, to any of the Debtors or an Affiliate of any Debtor for certain liabilities of one or more Debtors and/or their current or former directors, managers, and officers, and all agreements, documents or instruments related thereto.

38.    "*Debtors*" means, collectively, (a) Worldwide Machinery Group, Inc.; (b) Worldwide Machinery, Ltd.; (c) Worldwide Operating, Inc.; and (d) Worldwide Machinery GP, LLC.

39.    "*Disclosure Statement*" has the same meaning as Plan and Disclosure Statement.

40.    "*Disputed*" means, with respect to any Claim or Interest, a Claim or Interest (or any portion thereof) that is (a) not yet Allowed, and (b) not disallowed under the Plan, the Bankruptcy Code, or a Final Order or settlement, as applicable.

41.    "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Debtors for distribution on account of Disputed Claims that are subsequently Allowed after the Effective Date in accordance with Article X of the Plan.

42.    "*Distributable Cash*" means the Debtors' Cash on hand as of the Effective Date (including proceeds from the Going-Concern Transaction) but excluding, for the avoidance of any doubt, any Cash necessary to (x) satisfy Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Professional Fee Deficiency Claims in full; and (y) fund the reasonable expenses of the Plan Administrator.

43.    "*Distribution*" means Cash, property, interests in property or other value distribution to Holders of Allowed Claims, or their designated agent, as applicable under this Plan and/or the Plan Administrator Agreement.

10

44.     "*Distribution Agent*" means, as applicable, the Debtors, the Wind-Down Debtor, the Plan Administrator, or any entity designated by the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, to make or to facilitate Distributions that are to be made pursuant to the Plan or the Plan Administrator Agreement.

45.     "*Distribution Date*" means a date selected by the Debtors or the Wind-Down Debtors, on or after the Effective Date, upon which the Distribution Agent shall make Distributions to Holders of Allowed Claims or Allowed Interests entitled to receive Distributions under the Plan.

46.     "*Diversified*" means Diversified Rental Services, LLC.

47.     "*Diversified Agreement*" means that certain Asset Purchase Agreement, dated as of October 11, 2025, between the Debtors and Diversified (as amended from time to time).

48.     "*Effective Date*" means, with respect to the Plan, the date that is a Business Day on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in <u>Article XIII</u> of the Plan have been satisfied or waived in accordance with the Plan; and (c) the Plan is declared effective by the Debtors.  Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

49.     "*Entity*" has the meaning set for in section 101(15) of the Bankruptcy Code.

50.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

51.     "*Exculpated Party*" means each of the following in its capacity as such: (a) each Debtor; (b) the Committee and each Committee Member; (c) John T. Young, Jr.; and (f) Robert Warshauer.

52.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to rejection, assumption, or assumption and assignment under section 365 of the Bankruptcy Code.

53.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; *provided*, that, the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, the local rules of the Bankruptcy Court or applicable non-bankruptcy law, may be filed relating to such order shall not prevent such order from being a Final Order.

54.     "*General Unsecured Claim*" means any Claim against the Debtors as of the Petition Date, other than (a) an Administrative Claim, (c) a Priority Tax Claim, (d) a Priority Non-Tax Claim, (e) an ABL Loan Claim, (f) a Caspian Loan Claim, or (g) an Intercompany Claim.

55.     "*Going-Concern Agreements*" means the Macquarie Agreement and the Diversified Agreement.

56.    "*Going-Concern Purchasers*" means Macquarie and Diversified.

57.    "*Going-Concern Transaction*" means the sale of substantially all the assets of the Debtors to the Going-Concern Purchasers under section 363 of the Bankruptcy Code on the terms and conditions set forth in the Sale Documents, as approved by the Sale Order.

58.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

59.    "*Holder*" means an Entity holding a Claim or an Interest, as applicable, each solely in its capacity as such.

60.    "*Impaired*" means, when used in reference to a Class, a Class of Claims or Interests that are impaired within the meaning of section 1124 of the Bankruptcy Code.

61.    "*Insurance Coverage Rights*" means any direct or derivative rights, interests, claims, entitlements or Causes of Action of any Debtor under any of the Insurance Policies, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits, or other payment arising out of or under the Insurance Policies.

62.    "*Insurance Policies*" means the D&O Liability Insurance Policies and any and all known and unknown insurance policies or contracts that have been issued at any time to, whether expired or unexpired, or that provide coverage to, any of the Debtors or any Affiliate of any Debtor, and all agreements, documents or instruments related thereto, including but not limited to, any agreements with third-party administrators; *provided*, that "Insurance Policies" shall not include any insurance policies or contracts that were assigned to the Going-Concern Purchasers in connection with the Sale, except to the extent of any rights retained by the Debtors under such transferred insurance policies or contracts pursuant to the Sale Order or any other Final Order.

63.    "*Insurer*" means any company or other entity that issued any Insurance Policies, any third-party administrators of claims against the Debtors or asserted under the Insurance Policies, and any respective predecessors and/or affiliates thereof.

64.    "*Intercompany Claim*" means a Claim held by any Debtor against any other Debtor, other than any Administrative Claim.

65.    "*Intercompany Interest*" means an Interest held by a Debtor in another Debtor.

66.    "*Intercreditor Agreement*" means that certain Intercreditor and Subordination Agreement, dated January 22, 2022, by and between the ABL Administrative Agent and the Caspian Collateral Agent.

67.    "*Interest*" means any common stock, limited liability company interest, equity, ownership, profit interest, unit, or share in any Debtor (including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, or to obtain any such interest or other ownership interest in any Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferrable, preferred, common, voting, or denominated "stock" or a similar security.

68.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

69.     "*Litigation Reserve*" means a Cash reserve, which, subject to the terms of Article VIII.A.6 of the Plan, shall be established, as part of the Wind-Down Reserve for purposes of paying the fees and expenses incurred by the Plan Administrator in connection with prosecuting the Retained Estate Claims and Causes of Action and shall be funded pursuant to the terms of the Litigation Reserve Transaction.

70.     "*Litigation Reserve Term Sheet*" means the non-binding indicative term sheet attached hereto as **Exhibit C**, which sets forth the proposed terms to provide financing for the Litigation Reserve.

71.     "*Litigation Reserve Transaction*" means (i) the financing transaction contemplated by the Litigation Reserve Term Sheet, or (ii) if applicable, an alternative financing transaction entered into by the Debtors or the Wind-Down Debtors for purposes of funding the Litigation Reserve; *provided*, that, the Litigation Reserve Term Sheet remains subject to negotiation and the Debtors and the Wind-Down Debtors reserve all rights to seek approval of any Litigation Reserve Transaction.

72.     "*Macquarie*" means Macquarie Equipment Capital, Inc.

73.     "*Macquarie Agreement*" means that certain Asset Purchase Agreement, dated as of October 11, 2025, between the Debtors and Macquarie (as has been amended from time to time).

74.     "*Parent*" means Worldwide Machinery, Inc.

75.      "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

76.     "*Petition Date*" means September 11, 2025, the date on which the Chapter 11 Cases were commenced.

77.     "*Plan*" has the same meaning as Plan and Disclosure Statement.

78.     "*Plan Administrator*" means the Person or Entity, or any successor thereto, designated jointly by the Committee and the Required Wind-Down Debtor Beneficiaries, after consultation with the Debtors, whose identity shall be disclosed in the Plan Supplement, and who shall serve as the administrator of the Wind-Down Debtors and have all powers and authorities set forth in Article VIII.C herein and the Plan Administrator Agreement.

79.     "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors and the Plan Administrator governing the Plan Administrator's rights and obligations in connection with the Plan and the wind-down of the Debtors, which shall be included in the Plan Supplement.

80.     "*Plan and Disclosure Statement*" means this plan and disclosure statement, including the Plan Supplement and any exhibits, appendices, schedules, ballots, and related documents hereto, as amended, supplemented or modified in accordance with applicable law, and any procedures related to the solicitation of votes to accept or reject the Plan, as the same may be amended, modified, supplemented, or amended and restated from time to time, in accordance with the terms hereof.

81.     "*Plan Documents*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court, including, without limitation, the Plan Supplement, the Plan Administrator Agreement, and the Confirmation Order.

82. "*Plan Supplement*" means the documents and forms of documents, schedules, and Plan exhibits, as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, to be filed in a supplement to the Plan that includes the necessary documentation to effectuate the Plan, including (a) the Plan Administrator Agreement and (b) the Retained Estate Claims and Causes of Action Schedule.

83. "*Priority Non-Tax Claim*" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim or Priority Tax Claim.

84. "*Priority Tax Claim*" means any Claim of a Governmental Unit entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

85. "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests entitled to the same treatment in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interest under the Plan, as applicable.

86. "*Professional*" means any Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

87. "*Professional Fee Amount*" means $2,500,000 minus all amounts paid to Professionals after November 24, 2025.

88. "*Professional Fee Claim*" means (1) any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court, and (2) fees incurred after the Confirmation Date relating to Plan implementation or prosecution of final fee applications by the Debtors' or Committee's Professionals.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

89. "*Professional Fee Escrow Account*" means the escrow account established and funded by the Debtors with Cash in an amount equal to the Professional Fee Amount.

90. "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

91. "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder to demand or receive payment of such Claim prior to the stated maturity of such Claim from and after the occurrence of a default.

92.     "*Related Party*" means each of, and in each case in its capacity as such, current and former directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliates, affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

93.     "*Released Party*" means each of the following in its capacity as such: (a) each Debtor; (b) the Committee, (c) each Committee Member, solely in its capacity as a Committee Member; (c) the ABL Lenders and the ABL Administrative Agent; (d) the Caspian Lenders and the Caspian Collateral Agent; (e) John T. Young, Jr.; (f) Robert Warshauer; (g) Scott Avila, (h) Joe McInnis and (i) with respect to each of the foregoing Entities in clauses (a) through (h) above, their current and former officers, directors, employees, attorneys, accountants, investment bankers, financial advisors, consultants and other Professionals; *provided* that, with respect to the Debtors, the released officers and directors are only those listed in clauses (e)-(h); *provided further* that each Entity that timely and properly opts out of the release in Article XII of the Plan shall not be a Released Party.

94.     "*Releasing Party*" means each of the following in its capacity as such: (a) the Released Parties; (b) all Holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the release contained in Article XII.C of the Plan; (c) all Holders of Claims and Interests that (i) vote to reject the Plan, (ii) vote to accept the Plan, (iii) are deemed to reject the Plan, or (iv) are presumed to accept the Plan and who do not affirmatively opt out of the release contained in Article XII.C of the Plan; and (d) with respect to any of the foregoing Entities in clauses (b) through (c) above, their current and former officers, directors, employees, attorneys, and agents.

95.     "*Remaining Case*" means the Chapter 11 Case of Worldwide Machinery Group, Inc., which shall be designated as the lead case in accordance with Article VIII.K of the Plan.

96.     "*Required Wind-Down Debtor Beneficiaries*" means Wind-Down Debtor Beneficiaries that hold at least one-half in amount of the Allowed Claims held by Wind-Down Debtor Beneficiaries.

97.     "*Retained Estate Claims and Causes of Action*" means Claims and Causes of Action vesting in the Wind-Down Debtors pursuant to Article VIII.I of the Plan, including, but not limited to, (i) Causes of Action against Gordon Brothers Commercial & Industrial, LLC and their affiliates, and (ii) all other Causes of Action listed or described in the Retained Estate Claims and Causes of Action Schedule. Notwithstanding the foregoing and regardless of the Retained Estate Claims and Causes of Action Schedule, "Retained Estate Claims and Causes of Action" do not include (i) Professional Fee Claims, (ii) any Claims or any Causes of Action that were transferred to the Going-Concern Purchasers in connection with the Going-Concern Transaction, released pursuant to the Sale Order, and (iii) any Claims or any Causes of Action released under the Plan or a Final Order, including Claims or Causes of Action that are released pursuant to the Plan under Article XII.  Unless otherwise released by the Plan, the Debtors and the Wind-Down Debtors reserve all Causes of Action (including all defenses) against or related to all Persons or Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding against the Debtors or the Wind-Down Debtors or to which any Debtor or Wind-Down Debtor is or may in the future become a party, whether formal or informal or judicial or non-judicial.

15

98.     "*Retained Estate Claims and Causes of Action Schedule*" means the schedule of Retained Estate Claims and Causes of Action, as the same may be amended, modified, or supplemented from time to time, which will be included in the Plan Supplement.

99.     "*Sale Closing Date*" means October 28, 2025.

100.     "*Sale Documents*" means the Going-Concern Agreements and all other documents executed and delivered or adopted by the Debtors and the Going-Concern Purchasers in connection with the Going-Concern Transaction and/or pursuant to the Sale Order.

101.     "*Sale Order*" means the *Order (I) Authorizing and Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, and Encumbrances, and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; (III) Authorizing the Disposal of Any Remaining Assets; and (IV) Granting Related Relief* [Docket No. 246].

102.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may be amended, modified, or supplemented from time to time.

103.     "*Secured Claim*" means any Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order entered by the Bankruptcy Court to the extent of the value of the creditor's interest in the Estate's interest in such property, or (b) subject to setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff, in each case as determined pursuant to section 506(a) of the Bankruptcy Code.

104.     "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and the rules and regulations promulgated thereunder.

105.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 of the Bankruptcy Code.

106.     "*Unimpaired*" means, when used in reference to a Class, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code.

107.     "*Wind-Down Debtors*" means, collectively, all Debtors and successors thereto after the Effective Date, which shall be responsible for, among other things, effectuating the wind-down of the Debtors' Estates, commencing, litigating, and settling the Retained Estate Claims and Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and making distributions pursuant to the terms of the Plan and the Plan Administrator Agreement.

108.     "*Wind-Down Debtor Assets*" means all of the Debtors' assets, which shall vest in the Wind-Down Debtors as of the Effective Date pursuant to the Plan Administrator Agreement, including the Retained Estate Claims and Causes of Action, the Wind-Down Reserve, and, subject to <u>Article IX.D</u> of the Plan, the Insurance Coverage Rights.

109.     "*Wind-Down Debtor Beneficiaries*" means any Holders of Allowed Caspian Loan Claims or Allowed General Unsecured Claims.

110.    "*Wind-Down Debtor Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Debtors or the Plan Administrator in connection with carrying out the obligations of the Wind-Down Debtors pursuant to the terms of the Plan and the Plan Administrator Agreement.

111.    "*Wind-Down Director*" means Joe McInnis, and any successor thereto.

112.    "*Wind-Down Reserve*" means the amount established by the Plan Administrator to fund the Wind-Down Debtors.

## B.    Rules of Interpretation

For purposes of this Plan and Disclosure Statement: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan and Disclosure Statement in its entirety rather than to any particular portion of the Plan and Disclosure Statement; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (k) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" and (l) any immaterial effectuating provisions may be interpreted by the Debtors or the Wind-Down Debtors, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan all without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into

17

in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

**E.    Reference to Monetary Figures**

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

**F.    Reference to the Debtors or the Wind-Down Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

**G.    Controlling Document**

In the event of any inconsistency among this Plan and Disclosure Statement or any exhibit or schedule hereto, the provisions of this Plan and Disclosure Statement shall govern.  In the event of any inconsistency among this Plan and Disclosure Statement and any document or agreement filed in the Plan Supplement, such document or agreement shall control.  In the event of any inconsistency among this Plan and Disclosure Statement or any document or agreement filed in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.

**ARTICLE II.**
**THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

**A.    The Debtors' Corporate History**

Prior to the Going-Concern Transaction, the Debtors were a prominent provider of heavy equipment for the construction and mining industries.  With a robust fleet of heavy equipment, the Debtors offered a diverse range of products, including earthmoving machinery, material handling equipment, and attachments, catering to various customer needs.  An organizational chart illustrating the Debtors' current corporate structure is attached hereto as **Exhibit B**.

**B.    The Debtors' Business Operations**

Prior to the Going-Concern Transaction, the Debtors had approximately 117 employees in the United States.  Their main facilities are located in: Denver, Colorado; Salt Lake City, Utah; Lubbock, Texas; Houston, Texas; Dallas, Texas; Alburquerque, New Mexico; and Dickinson, North Dakota.  For the fiscal year ending June 30, 2025, the Debtors generated total revenue of approximately $67 million, and, as of the Petition Date, the Debtors had over $190,000,000 in aggregate principal amount of prepetition secured debt obligations.

The Debtors' business was generally divided into three segments: (i) heavy equipment rental, (ii) buying and selling heavy equipment, and (iii) sale and rental of Superior brand specialty equipment.

### 1. Equipment Rental

Prior to the Going-Concern Transaction, the Debtors' core business was equipment rental service. The Debtors maintained a competitive edge through a robust and diverse asset base of high-quality machinery and the capacity to address the requirements of specialized projects. The Debtors had seven full-service equipment yards that served the rental business and maintained approximately 560 major assets/vehicles. The Debtors built a foundation for profitable growth by establishing a presence in rapidly growing new markets, including renewable energy. Nearly 70% of the rental business was focused on civil construction and approximately 30% was focused on renewable and pipeline construction. The Debtors also had strong customer loyalty and satisfaction through their parts and service support.

### 2. Equipment Buying and Selling

The Debtors' business operations also included the purchase and sale of large earthmoving equipment manufactured by leading original equipment manufacturers, such as Caterpillar and John Deere, capturing the spread of equipment prices between wholesale and retail markets. The Debtors had extensive experience in both domestic and international markets, spanning over 70 countries.

### 3. Superior Brand

The Debtors also sold and rented Superior brand equipment. Superior is a specialty brand that has been designed and fabricated to the Debtors' specifications for approximately 30 years. The Debtors sold and rented Superior equipment to contractors in North America and worldwide, primarily to renewable and pipeline clients. A wide range of civil, pipeline, and renewable energy specialty equipment were manufactured for the Debtors in Busseto, Italy by Laurini, and selectively in Houston, Texas, by Worldwide Machinery. As of the Petition Date, the Debtors had nearly 160 units of Superior equipment in their fleet.

### C. The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors' capital structure consisted of: (a) the ABL Loan; (b) the Caspian Loan; and (c) the John Deere Loans (as defined below).

### 1. ABL Loan

Debtors Worldwide Machinery, Ltd. and Worldwide Operating, Inc., as borrowers, certain guarantors party thereto, the ABL Administrative Agent, and the ABL Lenders were parties to the ABL Credit Agreement, which provided for the ABL Loan in an aggregate principal amount of up to $132.5 million (later reduced to $122.5 million).

The ABL Loan is secured by a first-priority lien on all assets, including receivables, of the Debtors. As of the Petition Date, the aggregate principal amount outstanding under the ABL Loan was at least $117.6 million.

### 2. Caspian Loan

Debtor Worldwide Machinery Ltd., certain guarantors parties thereto, including Worldwide Operating, Inc., the Caspian Collateral Agent, and the Caspian Lenders are parties to the Caspian Loan. The Caspian Loan is secured by a second-priority lien on all assets, including receivables, of the Debtors. As of the Petition Date, the aggregate principal amount outstanding under the Caspian Loan was approximately $70.9 million.

19

### 3. Intercreditor Agreement

The rights and remedies of the ABL Lenders and the Caspian Lenders, and the relative priorities of the ABL Collateral and the Caspian Collateral, are governed by the Intercreditor Agreement by and between the ABL Administrative Agent and the Caspian Collateral Agent.

### 4. John Deere Loans

As of the Petition Date, Debtor Worldwide Machinery, Ltd. was also party to certain retail installment contracts with John Deere Financial (the "**John Deere Loans**"). The John Deere Loans financed the Debtors' acquisition of certain pieces of equipment, with such equipment serving as the sole collateral for the John Deere Loans. As of the Petition Date, the aggregate principal amount outstanding under the John Deere Loans was approximately $1.7 million.

The Debtors' liability under the John Deere Loans was assumed by the Going-Concern Purchasers under the Going-Concern Agreements.

## ARTICLE III.
## EVENTS LEADING TO THE CHAPTER 11 FILINGS

The Debtors' business was heavily impacted by COVID and a catastrophic decline in the pipeline industry. Despite extensive efforts to restructure (including through a subordinated capital raise in 2022), the Debtors were not able to recover from such impacts. The Debtors have been in default on their first-lien ABL Loan since 2024, and have sought to work collaboratively with the ABL Lenders to restructure their affairs and maximize value. To that end, with the consent of the ABL Lenders, the Debtors retained Paladin Management Group ("**Paladin**") and appointed Scott Avila, a principal of Paladin, as chief restructuring officer (the "**CRO**") in October of 2024 to assist the Debtors in a restructuring of their affairs. The Debtors also retained two independent directors—Mr. John T. Young, Jr., on August 15, 2024, and Mr. Robert Warshauer, on October 7, 2024—to further strengthen governance. On October 7, 2024, the Debtors formed a restructuring committee (the "**Restructuring Committee**") comprised of Mr. Young and Mr. Warshauer to oversee all restructuring matters. The independent directors and Restructuring Committee were appointed with the consent of the ABL Lenders. In January of 2025, Alan Greenberg, Evan Greenberg and Adam Greenberg, the majority equity owners of the Debtors, resigned from the Board of Directors and have had no further participation in governance matters.

After an in-depth analysis, by March of 2025, the Debtor's Board of Directors, CRO, and the Restructuring Committee determined that a sale and/or liquidation of the Company would maximize value for creditors and other stakeholders. With the ABL Lenders' consent, the Debtors undertook a dual-track sale process with the goal of identifying potential going-concern and liquidating asset sales. The Debtors retained Piper Sandler & Company ("**PSC**") to market their assets to third parties as a going concern. PSC ran a comprehensive sales process, contacting approximately 202 parties, including strategic and financial potential counterparties. In addition, 39 non-disclosure agreements were signed with various parties, and a Confidential Information Memorandum was prepared and sent to 38 parties. Ultimately, two formal indications of interest ("**IOI**") were received by PSC on July 6, 2025. One was not competitive. The other was an IOI from Diversified and funded by Macquarie. Diversified later sent the Debtors a letter of intent on July 22, 2025 contemplating the Going-Concern Transaction.

Simultaneously with the going-concern sale process, the Debtors (with the consent of the ABL Lenders) also sought bids from equipment liquidators. The Debtors received two liquidation bids on July 22, 2025. One bid, from Nations Capital, LLC, an affiliate of Gordon Brothers ("**Gordon Brothers**") was

not competitive.  The other, a bid from Hilco Commercial Industrial and Ritchie Brothers (such bid, the "**Hilco/Ritchie Brothers Bid**"), was competitive with the Going-Concern Transaction.  At the direction of the Restructuring Committee, Paladin analyzed the two bids and showed that the Going-Concern Transaction was the superior bid.  Among other things, the Going-Concern Transaction provides slightly higher recoveries to the ABL Lenders in comparison to the Hilco/Ritchie Brothers Bid, but also preserves the Debtors as a going concern and provides for the assumption of most trade liabilities, reducing wind-down costs.  On August 22, 2025, the Restructuring Committee determined that the Going-Concern Transaction was superior and provided an analysis to the ABL Lenders explaining its reasoning.  On September 9, 2025, Macquarie provided a letter to the Debtors indicating that its credit committee had approved the Going-Concern Transaction.  This solidified the decision of the Restructuring Committee to pursue the Going-Concern Transaction.

For close to a year, the Debtors had been operating pursuant to a series of forbearance agreements and amendments with the ABL Lenders.  With their then-current forbearance period set to expire on September 5, 2025, the Debtors sought an extension from the ABL Lenders to provide the Debtors with the time and liquidity to pursue the Going-Concern Transaction and/or other value-maximizing alternatives.  The ABL Lenders conditioned continued forbearance on the Debtors' pre-consent to a sale of the claims under the ABL Credit Agreement to Gordon Brothers pursuant to an agreement between such parties.  Such consent would have undermined the Going-Concern Transaction and any competitive sales process, provided no benefit to the Debtors whatsoever, and, in fact, would have harmed the Debtors by eliminating the Company's ability to maximize value through a fair sale process.  The Board of Directors and the Restructuring Committee, after carefully considering the ABL Lenders' demands, simply could not agree to this condition.  Importantly, the Debtors made several proposals to extend the forbearance period that were advantageous to the ABL Lenders but stopped short of consent, including a proposal to negotiate in good faith with Gordon Brothers during the forbearance period, each of which the ABL Lenders declined.

After reviewing the Debtors' cash position, the ABL Lenders' ongoing sweeps of the Debtors' cash, and the risk that the ABL Lenders could exercise additional remedies at any time, thereby jeopardizing the Going-Concern Transaction and the Debtors' ability to continue as a going concern (and, indeed, any serious effort to maximize value), the Restructuring Committee and the Board of Directors determined that a chapter 11 filing was in the best interest of all stakeholders so that the Debtors could continue to pursue the Going-Concern Transaction (while considering any potential higher and better offers).

## ARTICLE IV.
## MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief

On September 11, 2025, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  On September 13 and 18, 2025, the Debtors filed several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, and service providers, and continuing the use of their cash management system and payment of insurance policies and taxes following the commencement of the Chapter 11 Cases.  At hearings on September 15 and 19, 2025, the Bankruptcy Court granted all of the relief initially requested in the First Day Motions on an interim or final basis.

The First Day Motions and all orders for relief granted in the Chapter 11 Cases can be viewed free of charge at https://cases.stretto.com/WorldwideMachinery.  A brief description of each of the First Day

Motions and the evidence in support thereof is also set forth in the *Declaration of Scott Avila in Support of Debtors' Petitions and Requests for First Day Relief* [Docket No. 19].

**B.      Appointment of Creditors' Committee**

On September 23, 2025, the U.S. Trustee appointed the Committee comprised of the three Committee Members [Docket No. 87]. The Committee filed an application for the retention of Pachulski Stang Ziehl & Jones LLP, as counsel [Docket No. 238].

**C.      Schedules and Statements**

On October 6, 2025, the Debtors filed their Schedules [Docket Nos. 141-148]. On October 21, 2025, the Debtors amended the Statement of Financial Affairs for Worldwide Machinery Group, Ltd. [Docket No. 147].

**D.      Retention of Professionals**

The Debtors filed applications for, and the Bankruptcy Court entered orders approving, the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the chapter 11 cases, including: (a) White & Case LLP, as restructuring counsel [Docket Nos. 171, 271]; (b) PSC as investment banker [Docket Nos. 173, 270]; and (c) Scott Avila, from Paladin, as the Chief Restructuring Officer [Docket Nos. 172, 273].

**E.      Cash Collateral Motion**

On the Petition Date, the Debtors filed a motion for entry of an order authorizing the emergency use of purported "cash collateral" of the ABL Lenders and the Capsian Lenders (the "**Funded Debt Secured Parties**") on a non-consensual basis [Docket No. 18] (the "**Cash Collateral Motion**") and providing adequate protection to the Funded Debt Secured Parties to the extent there is any diminution in value of the purported collateral. The ABL Lenders objected to the Cash Collateral Motion. On September 15, 2025, the Bankruptcy Court approved the Cash Collateral Motion on an interim basis [Docket No. 54]. The Debtors and the Funded Debt Secured Parties agreed upon a second interim order for the use of cash collateral, and the Bankruptcy Court approved it on October 8, 2025 [Docket No. 161]. On October 20, 2025, the Debtors and the Funded Debt Secured Parties agreed to a third interim order for use of cash collateral, and the Bankruptcy Court approved the order [Docket No. 261].

**F.      Adversary Proceeding against the ABL Lenders**

During the Chapter 11 Cases, the Committee has been investigating prepetition activities by parties in interest. The Debtors and the Committee reached an agreement regarding the Committee's prosecution, on behalf of the Debtors' estates, of certain claims against the ABL Lenders and Gordon Brothers Commercial & Industrial, LLC and its affiliates. On October 21, 2025, the Debtors and the Committee filed the *Stipulation and Agreed Order Granting Leave, Standing, and Authority to the Official Committee of Unsecured Creditors to Prosecute Certain Claims* [Docket No. 221].

On the same day, the Committee commenced an adversary proceeding *Official Committee of Unsecured Creditors v. Key Equipment Finance, a Division of KeyBank National Association, et al.*, Adv. Pro. No. 25-03791 (CML), and filed a complaint against the ABL Administrative Agent, Gordon Brothers Commercial & Industrial, and Does 1–100 [Adv. Pro. Docket No. 1] (the "**Complaint**"). The Complaint contains eight counts and alleges various bad faith actions taken by the ABL Lenders and Gordon Brothers

in connection with the ABL Lenders' attempt to sell their claims under the ABL Credit Agreement to Gordon Brothers prior to the Petition Date and the ABL Lenders' attempts to block the Debtors' pursuit of a value maximizing going concern sale.

On October 29, 2025, the Committee withdrew the Complaint as to the ABL Administrative Agent and Does 1-100 with prejudice as part of the settlement between the Debtors, the Committee and the ABL Lenders discussed below [Adv. Pro. Docket No. 4].

**G.    The Going-Concern Sale**

As discussed above, the Debtors filed the Chapter 11 Cases on an emergency basis to preserve their ability to operate while pursuing the Going-Concern Transaction, subject to higher or better bids, despite the ABL Lenders' challenges.  On September 26, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (III) Authorizing the Disposal of Any Burdensome Assets; and (IV) Granting Related Relief* [Docket No. 188] (the "**Sale Motion**").  Through the Sale Motion, the Debtors sought approval of the Going-Concern Transaction under which the Debtors' tangible assets would be purchased by Macquarie, an entity unaffiliated with the Debtors, and Diversified (or its designee), an entity controlled by the Debtors' majority shareholders, for an aggregate purchase price of no less than $65.6 million, comprised of $52.5 million in cash and the assumption of certain trade and lease liabilities valued at approximately $13.1 million.

On October 11, 2025, the Debtors and each of the Going-Concern Purchasers entered into a fully binding asset purchase agreement, subject to Court approval [Docket No. 174].  Under the Macquarie Agreement, Macquarie agreed to directly acquire the Debtors' hard assets, which will then be leased to Diversified.  Under the Diversified Agreement, Diversified agreed to acquire the Debtors' working capital and other assets and assume most of the Debtors' trade liabilities and certain real property leases.  The Going-Concern Agreements removed any concern regarding the feasibility of the Going-Concern Transaction and provided a floor for any alternative bids to top.  The Debtors gave parties in interest 21 days' notice of the sale hearing and invited potential bidders to submit alternative bids [Docket No. 113].

In connection with the Going-Concern Transaction, the Debtors filed the *Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale and Cure Costs* [Docket No. 114] (the "**Assumption Notice**") on October 1, 2025, to provide counterparties to executory contracts and unexpired leases notice of assumption and assignment to Diversified and the proposed cure amount.  The Debtors supplemented the Assumption Notice on October 2 and October 17, 2025 [Docket Nos. 119 and 195].

On October 11, 2025, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Termination Fee and (II) Granting Related Relief* [Docket No. 177], seeking a $1 million termination fee in the event the Debtors decided to pursue an alternative transaction.

The only party to formally object to the Sale Motion was the ABL Lenders.  They alleged that the sale process was run for the sole benefit of the Greenberg family, designed to allow existing equity to retain value free of secured debt.  They argued that the Debtors cannot sell the assets free and clear of their interest to the Going-Concern Purchasers under section 363(f) of the Bankruptcy Code.  *See* [Docket No. 188].  The Debtors replied to the ABL Lenders' allegations and explained that the Going-Concern Transaction was selected as the highest and best bid after conducting a process that overseen by the independent Restructuring Committee of the Debtors' Board of Directors and their independent CRO, who have been

23

advised by the Debtors' independent and experienced restructuring professionals. The ABL Lenders were consulted with and had agreed to each step of the sale process. The Going-Concern Transaction is a sound exercise of the Debtors' business judgment. It provides the greatest value to the Debtors and their stakeholders, including the ABL Lenders, trade counterparties, and employees [Docket No. 213]. The Committee supported the Going-Concern Transaction [Docket No. 202].

On October 20, 2025, the ABL Lenders submitted a credit bid for a portion of their claim. [Docket No. 206]. The Debtors did not believe the credit bid was higher and better than the Going-Concern Transaction and filed a statement in response to the credit bid, which the Committee joined. [Docket Nos. 226, 229]

## H.   ABL Lenders' Claims

On October 17 and 18, 2025, the ABL Lenders filed Proofs of Claim (numbers 34-41) asserting a purported secured claim in the amount of $133,460,506.76 (the "**ABL Claims**") relating to obligations arising out of the ABL Credit Agreement.

## I.   The Sale Hearing and Global Settlement

On October 22, 2025, the Bankruptcy Court held an evidentiary hearing on the Sale Motion and the Cash Collateral Motion. During the hearing, the Debtors, the ABL Lenders and the Committee negotiated and were able to reach a global settlement resolving all pending disputes in the Chapter 11 Cases.

As part of the settlement, the Going-Concern Purchasers agreed to increase the cash portion of the purchase price from $52.5 million to $56 million and reduced the assumed liability from $13.1 million to $9.6 million. The Debtors agreed to pay the ABL Lenders $54 million in cash from the proceeds of the Going-Concern Transaction. The ABL Lenders agreed to consent to the Going-Concern Transaction and waive all of their deficiency claims. The Committee agreed to dismiss the ABL Lenders from the Complaint with prejudice. The Debtors agreed to give the ABL Lenders general releases. Lastly, the parties agreed that the Going-Concern Transaction should be subject to an overbid.

The parties notified the Bankruptcy Court of the settlement at the hearing. The Bankruptcy Court approved the settlement and requested any parties in interest who wish to submit and overbid do so at the hearing. No party submitted an overbid.

The Bankruptcy Court approved the Going-Concern Transaction at the hearing. On October 27, the Bankruptcy Court entered the Sale Order approving the Going-Concern Transaction [Docket No. 246] containing the terms of the settlement amongst the parties. It found the Going-Concern Transaction pursuant to the Going-Concern Agreements is in the best interests of the Debtors, their creditors, their Estates, and all other parties in interest. The Going-Concern Purchasers are good faith purchasers and participated in the sale without collusion, in good faith, and from arm's-length bargaining positions. The sale closed on October 28, 2025.

## J.   Relief From Stay Motion

On September 26, 2025, the ABL Lenders filed the *Emergency Motion of Key Equipment Finance, a Division of KeyBank National Association, for Relief from the Automatic Stay* [Docket No. 100]. The motion has been withdrawn as part of the settlement amongst the parties [Docket No. 254].

K.      **Motion to Dismiss**

October 3, 2025, the ABL Lenders filed the *Emergency Motion of Key Equipment Finance, a Division of KeyBank National Association, to Dismiss or, in the Alternative, Convert Chapter 11 Cases* [Docket No. 131]. The motion has been withdrawn as part of the settlement amongst the parties [Docket No. 254].

## ARTICLE V.
## SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

The Plan classifies Claims and Interests into seven different Classes. The following chart provides a summary of the Debtors' estimate of the anticipated recoveries of each Class of Claims and Interests.[2] **The estimated recoveries in this chart do not include projected proceeds of or the cost of prosecuting the Reserved Estate Claims and Causes of Action, which the Debtors do not believe is subject to estimation at this time and will likely increase the ultimate recoveries of the Class of General Unsecured Claims**. The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article VII of this Plan and Disclosure Statement.

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Claims or Interests | Estimated Recoveries of Allowed Claims or Interests |
|---|---|---|---|---|---|
| 1. | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote | $0.00 | 0% |
| 2. | ABL Loan Claims | Impaired | Entitled to Vote | $117,600,000.00 | 46% |
| 3. | Caspian Loan Claims | Impaired | Entitled to Vote | $72,686,468.71 | $0-5% |
| 4. | General Unsecured Claims | Impaired | Entitled to Vote | $5,655,449.00 | $0-5% |
| 5. | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $1,758,000.00 | N/A |

---

[2]   The amounts contained in this Article V represent the Debtors' estimate of the Claims that they believe will ultimately be Allowed based on their review of the filed Proofs of Claim and their books and records, and do not represent amounts actually asserted by Creditors in Proofs of Claim or otherwise. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases and such Claims remain subject to objections as necessary or appropriate. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. The actual amount of the Allowed Claims may be greater or lower than estimated. *See* Art. XVIII.

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Claims or Interests | Estimated Recoveries of Allowed Claims or Interests |
|---|---|---|---|---|---|
| 6. | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0 | N/A |
| 7. | Parent Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | 0% |

## ARTICLE VI.
## ADMINISTRATIVE PROFESSIONAL AND PRIORITY TAX CLAIMS

Administrative Claims, Professional Fee Claims, and Priority Tax Claims are treated in accordance with section 1129(a)(9) of the Bankruptcy Code.  In accordance with section 1123(a)(1) of the Bankruptcy Code, such Claims are not designated as Classes of Claims.

**A.      Administrative Claims**

**1.      Filing of Administrative Claims**

The Holder of an Administrative Claim, other than a Professional Fee Claim, or an Administrative Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors and the Wind-Down Debtors, notice of such Administrative Claim by no later than the Administrative Claims Bar Date.  Such notice must include, at a minimum, (a) the name of the Holder of the Claim, (b) the amount of the Claim, and (c) the basis of the Claim (including the date on which services or goods were provided) and evidence thereof.

**HOLDERS WHO ARE REQUIRED BUT FAIL TO FILE AND SERVE A REQUEST FOR PAYMENT OF AN ADMINISTRATIVE CLAIM (OTHER THAN A PROFESSIONAL FEE CLAIM) BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED FROM ASSERTING SUCH ADMINISTRATIVE CLAIM AGAINST THE DEBTORS, THE ESTATES, THE WIND-DOWN DEBTORS OR THEIR RESPECTIVE PROPERTY, AND SUCH ADMINISTRATIVE CLAIM WILL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE. OBJECTIONS TO AN ADMINISTRATIVE CLAIM MUST BE FILED AND SERVED ON THE REQUESTING PARTY BY THE LATER OF (I) NINETY (90) DAYS AFTER THE FILING OF THE APPLICABLE REQUEST FOR PAYMENT OF ADMINISTRATIVE CLAIMS, SUBJECT TO EXTENSIONS SOUGHT BY MOTION FILED WITHIN SUCH PERIOD AND AS SUCH PERIOD MAY BE EXTENDED FROM TIME TO TIME, OR (II) SUCH OTHER PERIOD OF LIMITATION AS MAY BE SPECIFICALLY FIXED BY A FINAL ORDER FOR OBJECTING TO SUCH ADMINISTRATIVE CLAIMS.**

### 2.      Payment of Allowed Administrative Claims

The Going-Concern Purchasers have assumed and will pay, in accordance with the Going-Concern Agreements, certain trade liabilities following closing of the Going-Concern Transaction.  With respect to all other Administrative Claims, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable or unless otherwise assumed pursuant to the Going-Concern Agreements, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to 28 U.S.C. § 1930) will receive, in full and final satisfaction, settlement, release, and discharge of, and, in exchange for such Administrative Claim, treatment as is consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or an amount of Cash equal to the unpaid amount of such Allowed Administrative Claims in accordance with the following: (a) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date (other than Administrative Claims assumed by the Going-Concern Purchasers) in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court or as agreed with the Wind-Down Debtors.

### B.      Statutory Fees

On or before the Effective Date, all fees due and payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each applicable Debtor for each quarter (including any fraction thereof).  After the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 will be paid by the Wind-Down Debtors from the Wind-Down Debtor Assets until the applicable Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.  Each of the Debtors shall file all monthly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Wind-Down Debtors shall file quarterly reports if and when they become due, in a form reasonably acceptable to the U.S. Trustee.  The U.S. Trustee shall not be required to file any Administrative Claim in the Chapter 11 Cases and shall not be treated as providing any release under the Plan in connection therewith.

### C.      Professional Fee Claims

### 1.      Professional Fee Escrow Accounts

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals (other than PSC, which shall be paid its Professional Fee Claims prior to the Effective Date) and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court or the Cash in the Professional Fee Escrow Account has been exhausted.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account

in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates or the Wind-Down Debtors; *provided* that the Plan Administrator shall be the designated Entity authorized to release funds from the Professional Fee Escrow Account in accordance with the governing escrow agreement.

The amount of Professional Fee Claims owing to the Professionals (other than PSC) shall be paid in Cash to such Professionals by the Wind-Down Debtors or the Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, Professional Fee Claims shall be paid (absent an agreement to the contrary) from the Professional Fee Escrow Account on a *pro rata* basis taking into consideration all payments previously made to Professionals, including during the Chapter 11 Cases, and any Professionals not paid in full (other than PSC) shall have an Allowed Administrative Claim in the amount equal to fifty percent (50%) of any deficiency (the "**Professional Fee Deficiency Claim**"), which shall be payable from Cash held by the Wind-Down Debtors, including from the proceeds of Retained Estate Claims and Causes of Action, as determined by the Plan Administrator; *provided* that the Committee's Professionals shall have an Allowed Administrative Claim in the full amount of any deficiency. Any Professional Fee Claims (other than claims in respect of Committee Professionals) in excess of the Professional Fee Deficiency Claim shall be disallowed.

### 2. Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed and served no later than thirty (30) days after the Effective Date. Holders of Professional Fee Claims who fail to timely file and serve final fee application shall be forever barred from asserting such Professional Fee Claim against the Debtors, the Estates, the Wind-Down Debtors or their respective property, and such Professional Fee Claim will be deemed discharged as of the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior applicable Bankruptcy Court orders.

### 3. Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors and the Wind-Down Debtors, as applicable, may employ and pay any professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court and any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or any prior order of the Bankruptcy Court governing compensation of Professionals in seeking retention or compensation for services rendered after such date shall terminate.

## D. Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed to by the Holder of an Allowed Priority Tax Claim and the Debtors or the Wind-Down Debtors, as applicable or unless otherwise assumed pursuant to the Going-Concern Agreements, each Holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors or the Wind-Down Debtors, as applicable, in full and final

satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Priority Tax Claim, (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (b) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  A Priority Tax Claim that becomes Allowed after the Effective Date shall receive such treatment in accordance with the Plan as soon as reasonably practicable after such Priority Tax Claim becomes Allowed.

## ARTICLE VII.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

**A.      Classification of Claims and Interests**

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article VI of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  The votes of each Class shall be tabulated on a Debtor-by-Debtor basis.

**B.      Treatment of Claims and Interests**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different or less favorable treatment is agreed to by the Debtors with the consent of the Committee, prior to the Effective Date, or the Wind-Down Debtors, on or after the Effective Date, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, (a) the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, and (b) the Holder of a Claim or Interest that is not Allowed as of the Effective Date shall receive such treatment as soon as reasonably practicable after such Claim or Interest becomes Allowed.

    1.      Class 1 – Priority Non-Tax Claims

        a.      *Classification*: Class 1 consists of any Priority Non-Tax Claims against any Debtor.

        b.      *Treatment*:  Each Holder of an Allowed Priority Non-Tax Claim shall receive, at the option of the Debtors with the consent of the Committee, prior to the Effective Date, or the Wind-Down Debtors, on or after the Effective Date:

(i)      payment in full in Cash in an amount equal to its Allowed Priority Non-Tax Claim; or

(ii)    such other treatment rendering such Holder's Allowed Priority Non-Tax Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Priority Non-Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 – ABL Loan Claims

a.    *Classification*: Class 2 consists of any ABL Loan Claims against any Debtor.

b.    *Treatment*: Each Holder of an Allowed ABL Loan Claim shall have received, in full satisfaction of all of their respective claims (including any deficiency claims):

(i)      a Cash payment equal to $54 million from the proceeds of the Going-Concern Transaction; or

(ii)    such other treatment (i) consistent with the terms and conditions of any agreements between the Debtor(s) and the Holder of such Class 2 Claim, (ii) as may be agreed to, in writing, by the Debtors and the Holder of such Class 2 Claim, or (iii) consistent with an order entered by the Bankruptcy Court prior to the Effective Date.

c.    *Voting*: Class 2 is Impaired under the Plan. Holders of Allowed ABL Loan Claims are entitled to vote to accept or reject the Plan.

3.    Class 3 – Caspian Loan Claims

a.    *Classification*: Class 3 consists of any Caspian Loan Claims against any Debtor.

b.    *Treatment*: Each Holder of an Allowed Caspian Loan Claim shall receive its Pro Rata share of Distributable Cash and Wind-Down Debtor Assets net of Wind-Down Debtor Expenses (which shall be distributed to all Holders of Allowed Class 3 and Class 4 Claims on a Pro Rata basis); *provided* that any distributions on account of the Wind-Down Debtor Assets shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Professional Fee Deficiency Claims.

c.    *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed Caspian Loan Claims are entitled to vote to accept or reject the Plan.

4.      Class 4 – General Unsecured Claims

     a.      *Classification*:  Class 4 consists of any General Unsecured Claims against any Debtor.

               *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of Distributable Cash and Wind-Down Debtor Assets net of Wind-Down Debtor Expenses (which shall be distributed to all Holders of Allowed Class 3 and Class 4 Claims on a Pro Rata basis); *provided* that any distributions on account of the Wind-Down Debtor Assets shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Professional Fee Deficiency Claims.

     b.      *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.      Class 5 – Intercompany Claims

     a.      *Classification*:  Class 5 consists of any Intercompany Claims against any Debtor.

     b.      *Treatment*:  On or after the Effective Date, each Allowed Intercompany Claim shall be reinstated.

     c.      *Voting*:  Class 5 is Unimpaired and is conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.      Class 6 – Intercompany Interest

     a.      *Classification*:  Class 6 consists of any Intercompany Interests.

     b.      Treatment:  On the Effective Date, all Intercompany Interests shall be reinstated.

     c.      Voting:  Class 6 is Unimpaired and is conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.      Class 7 – Interests in Parent

     a.      *Classification*:  Class 7 consists of any Parent Interests.

     b.      *Treatment*:   On the Effective Date, each Parent Interest shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors.

     c.      *Voting*:  Class 7 is Impaired under the Plan.  Holders of Parent Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Parent Interests are not entitled to vote to accept or reject the Plan.

**C.      Reservation of Rights Regarding Claims**

Except as otherwise provided in this Plan, nothing herein shall be deemed to affect, diminish, waive, relinquish, or impair the Debtors' or the Plan Administrator's Causes of Action, including any legal or equitable rights or defenses, with respect to any Claim or Interest, including any Impaired, Reinstated, or Unimpaired Claim or Interest.

**D.      Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court or otherwise entitled to vote under the solicitation and voting procedures approved by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E.      Voting Classes Where No Valid Votes Are Received**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, then such Class shall be deemed to have accepted the Plan.

**F.      Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.      Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, which may be on shortened notice, determine such controversy on or before the Confirmation Date.

**H.      Withdrawal of Plan; Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors, in consultation with the Committee, reserve the right, prior to the Confirmation Hearing, to withdraw the Plan with respect to any particular Debtor and seek confirmation of the Plan as to the remaining Debtors, pursue confirmation of the Plan with respect to any Debtor by providing alternative treatment to Holders of General Unsecured Claims at any such Debtor, or seek to substantively consolidate the Debtors.

The Debtors request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XIV of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to

32

a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VIII.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    The Wind-Down Debtors

One or more of the Debtors shall continue in existence after the Effective Date, each as a Wind-Down Debtor for purposes of (1) preserving the Retained Estate Claims and Causes of Action, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date, (3) resolving any Disputed Claims, (4) paying Allowed Claims for which there is not a Distribution Agent other than the Wind-Down Debtors, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner.  The Wind-Down Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.  Except as otherwise provided in the Plan, the Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Wind-Down Debtors or the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Except as otherwise provided in the Plan or the Plan Supplement, or any agreement, instrument, or other document incorporated therein, each Wind-Down Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

After the Effective Date, one or more of the Wind-Down Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 1.    Wind-Down Debtor Assets

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, pursuant to sections 1141(c) of the Bankruptcy Code, the Wind-Down Debtor Assets, including all Causes of Action (including all Retained Estate Claims and Causes of Action) that are not released, and any property acquired by any of the Debtors under the Plan shall vest in the applicable Wind-Down Debtor, free and clear of all Liens, Claims, Interests, charges, or other encumbrances.

### 2.    Recourse Solely to Wind-Down Debtor Assets

As of the Effective Date, each Claim against the Debtors shall be deemed satisfied, settled, and released as to the Debtors as provided with respect to each such Claim under this and, except as otherwise set forth in this Plan or other Final Orders of the Bankruptcy Court, any Holder of an Allowed or Disputed Claim against the Debtors will have recourse solely to the Wind-Down Debtor Assets net of Wind-Down Debtor Expenses, as applicable, for the payment of any such Claim that is Allowed or becomes Allowed in accordance with the Plan and the Plan Administrator Agreement; *provided*, *however*, the recovery provided to any Holder of a Claim that is Allowed or becomes Allowed shall be limited to and consistent with the terms of the Plan.

### 3.    The Wind-Down Director

On the Effective Date, the terms of the current members of the Debtors' Board of Directors shall expire.  For the avoidance of any doubt, no current director of the Debtors will remain a director or have any control over the Debtors or the Wind-Down Debtors unless explicitly provided herein or in the Plan Supplement.

The Wind-Down Debtors shall be governed by the Wind-Down Director in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Wind-Down Debtors shall be deemed to be terminated and such individuals shall be deemed to have resigned, and the Wind-Down Director shall be appointed as the sole director and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers.  As further described in the Plan Administrator Agreement, the Wind-Down Director shall oversee the actions taken by the Plan Administrator to facilitate the wind-down, including, among other things, the distribution of the Wind-Down Debtor Assets to the Wind-Down Debtor Beneficiaries and the prosecution of the Retained Estate Claims and Causes of Action.  From and after the Effective Date, the Wind-Down Director and the Plan Administrator shall be the sole representatives of, and shall act for, the Wind-Down Debtors.

### 4.    Appointment of Plan Administrator

The Plan Administrator shall be designated by the Required Wind-Down Debtor Beneficiaries, after consultation with the Debtors, and shall be identified in the Plan Supplement.  The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.  The Plan Administrator shall administer the distributions to the Wind-Down Debtor Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Retained Estate Claims and Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtors are dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve; provided, however, that in the event that a Plan Administrator resigns, is terminated, or is otherwise unable to serve, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtors, shall approve a successor to serve as a Plan Administrator.

### 5.    Responsibilities of Plan Administrator

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include, but are not limited to:

(a)  implementing the orderly wind-down of the Debtors' Estates and making distributions contemplated by the Plan;

(b)  marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets;

(c)  entering into a Litigation Reserve Transaction, if appropriate;

(d)  overseeing the accounts of the Debtors and the Wind-Down Debtors and the wind-down and dissolution of the Debtors and the Wind-Down Debtors;

(e)  receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtors to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtors to invest any moneys held as Wind-Down Debtor Assets;

(f)  opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtors, including, in the Plan Administrator's discretion, separating bank accounts for each of the Debtors;

(g)  entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder;

(h)  collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets;

(i)  protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Retained Estate Claims and Causes of Action) vested in the Wind-Down Debtors and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(j)  investigating any Wind-Down Debtor Assets, and any other potential Retained Estate Claims and Causes of Action;

(k)  reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind (other than Professional Fee Claims);

(l)  seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

(m) retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof;

(n) paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of the Wind-Down Debtor Assets;

(o) prosecuting and settling the Retained Estate Claims and Causes of Action and any causes of action not included in the Going-Concern Agreements or released under the Plan;

(p) retaining contingency counsel to pursue any Retained Estate Claims and Causes of Action that may be paid a percentage of recoveries of the proceeds of the Retained Estate Claims or Causes of Action;

(q) entering into any agreements for litigation financing with third party funding sources that may be paid a percentage of recoveries of the proceeds of the Retained Estate Claims or Causes of Action;

(r) reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Retained Estate Claims and Causes of Action;

(s) acquiring litigation and other claims related to the Debtors, and prosecuting such claims;

(t) reviewing and compelling turnover of the Debtors' or the Wind-Down Debtors' property;

(u) calculating and making all Distributions to the Holders of Allowed Claims against each Debtor, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement;

(v) establishing, administering, adjusting, and maintaining the Wind-Down Reserve, the Litigation Reserve, and the Disputed Claims Reserve;

(w) withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(x) in reliance upon the Debtors' Schedules and the official Claims Register maintained in the Chapter 11 Cases, and where appropriate, allowing or objecting to Claims, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims required to be administered by the Wind-Down Debtors;

(y) making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtors, and filing tax returns for the Debtors or the Wind-Down Debtors pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtors, as applicable; *provided, however*, that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity

36

whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

(z)    abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

(aa)   seeking a determination of tax liability or refund under section 505 of the Bankruptcy Code;

(bb)        establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtors as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtors;

(cc)   paying Wind-Down Debtor Expenses;

(dd)        purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

(ee)   undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtors', or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

(ff)   retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

(gg)   exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and

(hh)        taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtors.

**6.    The Litigation Reserve**

If a Litigation Reserve Transaction become effective, the Debtors or the Wind-Down Debtors shall fund the Litigation Reserve with the proceeds of such Litigation Reserve Transaction which shall vest in the Wind-Down Debtors free and clear of all Claims, Liens, encumbrances, and charges.  The Litigation Reserve shall be held separately from the other Wind-Down Debtor Assets and shall be used to fund any expenses incurred by the Plan Administrator in connection with investigating, prosecuting, settling, or otherwise enforcing the Retained Estate Claims and Causes of Action.  Any excess funds in the Litigation Reserve remaining after funding such expenses shall be available for Distribution to Wind-Down Debtor Beneficiaries in accordance with the Plan and Plan Administrator Agreement.

### 7. Expenses of Wind-Down Debtors

The Wind-Down Debtor Expenses shall be paid from the Wind-Down Debtor Assets subject to the establishment of a reasonable budget; *provided*, that, subject to the terms of Article VIII.A.6 of the Plan, if a Litigation Reserve is established, any expenses incurred by the Plan Administrator in connection with investigating, prosecuting, settling, or otherwise enforcing the Retained Estate Claims and Causes of Action shall be paid from the Litigation Reserve.

### 8. Insurance; Bond

The Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator under the Plan Administrator Agreement. The Plan Administrator shall serve with a bond and the cost and expense of which shall be paid by the Wind-Down Debtors.

### 9. Fiduciary Duties of the Plan Administrator

Pursuant hereto and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive Distributions pursuant to Plan.

### 10. Privilege; Immunity

Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Retained Estate Claims and Causes of Action held by the Debtors pursuant to applicable federal, state, and other law shall vest in the Wind-Down Debtors as of the Effective Date. The Debtors and the Wind-Down Debtors are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; *provided*, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of the Chapter 11 Cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided, further*, that notwithstanding the foregoing proviso, the Wind-Down Debtors may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties.

No action taken by the Debtors, the Committee, or the Wind-Down Debtors shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors, the Committee, or the Wind-Down Debtors, including any attorney-client privilege, joint interest privilege, or work product privilege attaching to any documents or communications (whether written or oral).

### 11. Liability of Plan Administrator; Indemnification

Neither the Debtors, the Wind-Down Director, the Plan Administrator, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "**Wind-Down Debtor Party**" and collectively, the "**Wind-Down Debtor Parties**") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Debtors or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties

be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence or actual fraud.  Subject to the Plan Administrator Agreement, the Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  The Plan Administrator may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, the Plan Administrator shall not be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and the Plan Administrator's determination not to do so shall not result in the imposition of liability on the Plan Administrator or its designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Wind-Down Debtors shall indemnify and hold harmless the Wind-Down Debtor Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the administration of the Wind-Down Debtors or the implementation of the Plan or the discharge of their duties hereunder; *provided, however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud.  Persons dealing or having any relationship with the Plan Administrator shall have recourse only to the Wind-Down Debtor Assets and shall look only to the Wind-Down Debtor Assets to satisfy any liability or other obligations incurred by the Wind-Down Debtors to such Person in carrying out the terms of the Plan Administrator Agreement, and the Plan Administrator shall not have any personal obligation to satisfy any such liability.  The Plan Administrator shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Plan Administrator Agreement against any of them.  The Wind-Down Debtors shall promptly pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party or otherwise is participating in connection with the Plan Administrator Agreement or the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs of the Wind-Down Debtors, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding or investigation or otherwise.  Each Wind-Down Debtor Party hereby undertakes, and the Wind-Down Debtors hereby accept, his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Plan Administrator Agreement.  The foregoing indemnity in respect of any Wind-Down Debtor Party shall survive the termination of such Wind-Down Debtor Party from the capacity for which they are indemnified.

### 12.    No Liability of the Wind-Down Debtors

On and after the Effective Date, the Wind-Down Debtors shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement.  All payments and all Distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

**B.**      **Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of the Going-Concern Transaction, and (ii) the Wind-Down Debtors from the Wind-Down Debtor Assets; *provided, however*, that Allowed Professional Fee Claims (other than Allowed Professional Fee Deficiency Claims) shall be paid from the Professional Fee Escrow Account or Distributable Cash, as applicable. The Wind-Down Debtor Assets shall be used to pay the Wind-Down Debtor Expenses (including the compensation of the Plan Administrator and any professionals retained by the Wind-Down Debtors), the Allowed Professional Fee Deficiency Clams, and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**C.**      **Wind-Down**

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve the Wind-Down Debtors' Estates and to wind-down and dissolve any of the non-Debtor subsidiaries.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) take any actions necessary to wind-down the Wind-Down Debtors' Estates; *provided* that the Wind-Down Debtors shall not be dissolved until all Causes of Action included in the Retained Estate Claims and Causes of Action Schedule are prosecuted and the conditions precedent to such dissolution are satisfied; and (2) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. From and after the Effective Date, except as set forth herein, the Wind-Down Debtors for all purposes (x) shall be deemed to have withdrawn their business operations from any state in which the Wind-Down Debtors were previously conducting, or are registered or licensed to conduct, their business operations, (y) shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

**D.**      **Corporate Dissolution**

Upon a certification to be filed with the Bankruptcy Court by the Plan Administrator of the Effective Date, all distributions having been made, completion of all of the Plan Administrator's duties under the Plan (including the conclusion of all litigation being pursued by the Plan Administrator), and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for each state in which the Wind-Down Debtors are formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

For the avoidance of doubt, notwithstanding the Wind-Down Debtors' dissolution on or after the Effective Date, the Wind-Down Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

To the extent the Wind-Down Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on

40

account of Allowed Claims and the Plan Administrator's compensation and reimbursement) and the conclusion of all litigation being pursued by the Plan Administrator, such Cash or other property shall be distributed Pro Rata to the Wind-Down Debtor Beneficiaries, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata or for any other reason such distributions cannot be effectuated, the Plan Administrator may contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code.

**E.      Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects.

All matters provided for in the Plan involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity holders, members, directors, managers, or officers of the Debtors or the Wind-Down Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors.   The authorizations and approvals contemplated by this Article VIII shall be effective notwithstanding any requirements under non-bankruptcy law.

**F.      Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which Distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a Distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan (including, without limitation, the Plan Administrator Agreement and the Sale Documents), all notes, bonds, indentures, certificates, securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

**G.      Effectuating Documents; Further Transactions**

On and after the Effective Date, the Debtors, and the directors, managers, partners, officers, authorized persons, and members thereof, the Wind-Down Debtors, the Wind-Down Director, and the Plan Administrator are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Plan Administrator Agreement, and the Sale Documents in the name of and on behalf of the Debtors and Wind-Down Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

41

#### H.      Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor or to any other Entity) of property under the Plan the Plan Administrator Agreement, and the Sale Documents or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Going-Concern Agreements, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

#### I.      Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, each Wind-Down Debtor shall retain, and the Plan Administrator may enforce, all rights to commence and pursue any Retained Estate Claims and Causes of Action, whether arising before or after the Petition Date, as set forth in the Retained Estate Claims and Causes of Action Schedule.  The rights of the Plan Administrator to commence, prosecute, or settle the Retained Estate Claims and Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

The Plan Administrator may pursue the Retained Estate Claims and Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtor Beneficiaries and in accordance with the Plan Administrator Agreement and the Plan.  To the extent standing to pursue any of the Retained Estate Claims and Causes of Action was transferred to the Committee during the Chapter 11 Cases for purposes of prosecuting the Complaint, such standing shall be transferred fully to, and vest in, the Wind-Down Debtors as of the Effective Date.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Estate Claims and Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors.  The Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce all Retained Estate Claims and Causes of Action.  The Wind-Down Debtors and the Plan Administrator, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Retained Estate Claims and Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**J.**     **Access to Going-Concern Purchasers' Books and Records and Personnel**

On and after the Effective Date, the Going-Concern Purchasers and their respective subsidiaries shall provide commercially reasonable access to any relevant documents, information, or personnel reasonably requested by the Wind-Down Debtors in connection with carrying out their responsibilities under the Plan and Plan Administrator Agreement, so long as such access is not disruptive to normal business operations.  The Going-Concern Purchasers shall preserve, for the benefit of the Wind-Down Debtors, all records and documents (including all electronic records or documents) related to any Retained Estate Claims and Causes of Action or Claims against the Debtors' Estates until such time as the Wind-Down Debtors notify the Going-Concern Purchasers in writing that such records are no longer required to be preserved or all necessary and available records and documents have been provided to the Wind-Down Debtors.

**K.**     **Closing the Chapter 11 Cases**

Upon the occurrence of the Effective Date, all of the Chapter 11 Cases shall be deemed closed without the need for further Order of the Court, except for the Remaining Case, which shall be designated as the lead case. All contested matters and adversary proceedings relating to any of the Debtors, including objections to Claims, shall be filed, administered and adjudicated in the Remaining Case without the need to reopen any of the other Chapter 11 Cases; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Remaining Case is closed.

The Plan Administrator shall be permitted to close the Remaining Case only after: (a) the Administrative Claims Bar Date and the Claims Bar Dates have expired; (b) all Disputed Claims have become Allowed or disallowed, withdrawn, or otherwise settled in accordance with the Plan; and (c) all Debtors and the Wind-Down Debtors have been dissolved in accordance with the Plan.

## ARTICLE IX.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code effective as of the Confirmation Date, unless such Executory Contract or Unexpired Lease: (a) is subject to a motion to reject, assume, or assume and assign pending as of the Effective Date; (b) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (c) is an Insurance Policy; or (d) is a Sale Document.

**B.**     **Claims Arising from the Rejection of Executory Contracts and Unexpired Leases**

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan, if any, must be filed within thirty (30) days after entry of the Confirmation Order.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to this Plan not filed within such time shall be disallowed, forever barred, estopped, and enjoined from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Wind-Down Debtors, or property of any of the foregoing, without the need for any objection by the Debtors or the Wind-Down Debtors or further notice to, or action, order, or approval**

43

**of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, and released, notwithstanding anything in the Schedules, if any, or in the Proof of Claim to the contrary**.  All Allowed Claims arising from the rejection of any Executory Contract and Unexpired Leases shall constitute and be treated as General Unsecured Claims.  Nothing herein shall constitute an extension of any Claims Bar Date otherwise applicable to a Claim arising from an Executory Contract or Unexpired Lease that was previously rejected by the Debtors.

**C.      Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into or assumed by the Debtors after the Petition Date that are not assigned to the Going-Concern Purchasers (or have not otherwise previously been assigned pursuant to a Final Order prior to the Effective Date) shall be considered repudiated by the Debtors as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must file a proof of Claim within thirty (30) days of the Effective Date in accordance with this Plan or have their rights forever satisfied, settled, released, and discharged.

**D.      Insurance Policies**

The majority of the Debtors' prepetition insurance policies were assumed and assigned to the Going-Concern Purchasers pursuant to the Sale Order and the Going-Concern Agreements. Notwithstanding the foregoing, as of the Effective Date, the D&O Liability Insurance Policies shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor and shall continue in full force and effect thereafter in accordance with their respective terms and vest in the Wind-Down Debtors.  Prior to the Petition Date, the Debtors obtained the D&O Liability Insurance Policies for their current and former directors, officers, and managers.  After the Effective Date, all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Liability Insurance Policies for the full term of such policy, subject to and in accordance with the terms and conditions of such D&O Liability Insurance Policies in all respects, and the Plan Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies, or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies.  All such Entities' respective rights and priorities are undisturbed by this Plan.

**E.      Warranties**

Notwithstanding the rejection of any of the Debtors' Executory Contracts under this Plan or by separate motion, the Debtors and the Wind-Down Debtors, as applicable, shall retain and be entitled to enforce any warranties provided to, or for the benefit of, the Debtors under applicable federal or state law; *provided*, however, for the avoidance of doubt, that the foregoing does not include any warranties provided to, or for the benefit of, the Debtors pursuant to any contract that has been assumed and assigned (other than to the Wind-Down Debtors) by order entered by the Bankruptcy Court on or before the Effective Date. For the avoidance of doubt, the Debtors are not assuming any warranty obligations of the Debtors or otherwise provided by the Debtors under any Executory Contract that is rejected pursuant to this Plan or otherwise rejected in the Chapter 11 Cases.

**F.      Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any

Debtor or Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Wind-Down Debtors shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE X.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in this Article X, Distributions to be made on the Effective Date to Holders of Allowed Claims shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable.  In the event a Distribution shall be due on a day other than a Business Day, such Distribution shall instead be made on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on Distributions, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### B.    Distribution Agent

All Distributions shall be made by the Distribution Agent.  The Distribution Agent may serve without bond.  The Distribution Agent shall be empowered to: (a) make all Distributions contemplated in this Plan; (b) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; (c) employ or contract with other entities to assist in or make the Distributions; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, the Plan Administrator Agreement, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation to the Distribution Agent for services rendered shall be paid in Cash by the Wind-Down Debtors from the Wind-Down Debtor Assets.

Except on account of gross negligence or willful misconduct, the Distribution Agent shall have no (a) liability to any party for actions taken in accordance with this Plan or in reliance upon information provided to it in accordance with this Plan, or (b) obligation or liability to any party who does not hold a Claim against the Debtors or who does not otherwise comply with the terms of this Plan.

### C.    Disputed Claims Reserves

The Wind-Down Debtors shall be empowered to establish and maintain one or more Disputed Claims Reserves in their sole discretion.  To the extent that the property placed in a Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account.  Property in the Disputed Claims Reserves shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed in each applicable Class.  Each Disputed Claims Reserve shall be closed by the Wind-Down Debtors when all Distributions required to be made under this Plan to the Holders of Claims in the applicable Class will have been made in accordance with the terms of this Plan.  Upon closure of a Disputed Claims Reserve, all Cash (including any investment yield on the Cash) and other property held in that Disputed Claims Reserve shall be distributed in accordance with this Plan or the Plan Administrator Agreement, as applicable.

**D.**     **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. When a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim shall thereupon become entitled to receive the Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

**E.**     **Delivery of Distributions**

Distributions to Holders of Allowed Claims will be made by a Distribution Agent: (a) at the addresses set forth on the respective Proofs of Claim filed by Holders of such Claims or request for payment of Administrative Claim, as applicable; (b) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim filed with the Bankruptcy Court; (c) at the addresses set forth in any written notice of address change filed with the Bankruptcy Court or delivered to the Distribution Agent after the date of filing of any related Proof of Claim; (d) at the addresses reflected in the Debtors' Schedules or otherwise in the Debtors' books and records if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last address directed by such Holder in writing after such Claim becomes an Allowed Claim.

**F.**     **Undeliverable and Unclaimed Distributions Held by Distribution Agent**

**1.**     **Holding of Undeliverable Distributions**

If any Distribution to a Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further Distributions will be made to such Holder unless and until the Distribution Agent is notified by written certification of such Holder's then-current address. Nothing contained in the Plan shall require the Distribution Agent to attempt to locate any Holder of an Allowed Claim.

**2.**     **After Distributions Become Deliverable**

On each Distribution Date, the Distribution Agent will make all Distributions that became deliverable to Holders of Allowed Claims after the most recent Distribution Date; *provided*, *however*, that the Distribution Agent, in its sole discretion, may establish a record date prior to each Distribution Date, such that only Claims Allowed as of the record date will participate in such periodic Distribution. Notwithstanding the foregoing, the applicable Distribution Agent reserves the right to postpone a Distribution Date, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable.

**3.**     **Failure to Claim Undeliverable Distributions**

Any Holder of an Allowed Claim that does not assert its right to an undeliverable Distribution prior to the date that is 90 days after the applicable Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Estates, the Wind-Down Debtors, and their respective property. In such cases, (a) the undeliverable Distributions shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and vest in the Wind-Down Debtors, (b) the Allowed Claims with respect to such Distributions shall be automatically cancelled, (c) the right of the Holders entitled to those

46

Distributions shall be discharged and forever barred, and (d) the undeliverable Distributions shall be reserved or distributed in accordance with the Plan and the Plan Administrator Agreement.

## G.  Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Wind-Down Debtors by the holder of the Allowed Claim to whom such check was originally issued.  If any Holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within 90 days after the date the check was mailed or otherwise delivered to the Holder, the entitlement of the Holder regarding such un-negotiated check and the funds represented thereby shall be released and the Holder thereof shall be forever barred, estopped and enjoined from asserting any claim with respect to such un-negotiated check and the funds represented thereby against any of the Debtors or the Wind-Down Debtors.  In such cases, any Cash held for payment on account of such un-negotiated check shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest in the Wind-Down Debtors and be deemed to be a Wind-Down Debtor Assets.

## H.  Manner of Payment

Unless a Holder of an Allowed Claim and the Distribution Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Distribution Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Distribution Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## I.  Fractional Distributions

Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

## J.  Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

## K.  *De Minimis* Distributions

No distributions shall be made to a Holder of an Allowed Claim if such Distribution is less than $100.00 in the aggregate.

## L.  No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, including any Disputed Claims, against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

47

**M.**     **Allocation Between Principal and Accrued Interest**

To the extent that any Allowed Claim entitled to a Distribution from Wind-Down Debtor Assets consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts, if any.

**N.**     **Single Satisfaction**

In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

**O.**     **Compliance with Tax Requirements**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all Tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Distribution Agent believes are reasonable and appropriate. The Distribution Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

The Distribution Agent may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim provide any information necessary to allow the Distribution Agent to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority. If the Distribution Agent makes such a request and the Holder fails to comply before the date that is 90 days after the request is made or such later date agreed to by the Distribution Agent in writing in its discretion, then the Distribution Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding, or (b) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Debtors or the Wind-Down Debtors, as applicable, for Distribution on account of other Allowed Claims and the Claim of the Holder originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

**P.**     **Claims Paid or Payable by Third Parties**

    **1.**     **Claims Paid by Third Parties**

To the extent that the Holder of an Allowed Claim receives payment on account of such Claim by an Entity other than the Distribution Agent, the Wind-Down Debtors shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of such third-party payment

(including the Going-Concern Purchasers), and such Claim shall be disallowed or deemed satisfied, as applicable, to the extent of such third-party payment without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.  Any Holder of a Claim that receives full or partial payment on account of such Claim from an Entity that is not the Distribution Agent shall provide notice of the date and amount of such payment to the Wind-Down Debtors within five (5) Business Days of receipt of such payment.  Such Holder shall repay, return, or deliver to the Wind-Down Debtors any Distribution received on account of the portion of its Claim that was satisfied by such third-party payment.

**2.**     **Claims Payable by Insurance Carriers**

Except as otherwise set forth herein, no Distribution shall be made on account of an Allowed Claim that is payable pursuant to one of the Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Insurers agrees to satisfy in full or in part a Claim, then immediately upon such Insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Noticing Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**3.**     **Applicability of Insurance Policies**

Except as otherwise provided herein, payments on account of Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy and applicable law.  Except as otherwise expressly provided herein, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Wind-Down Debtors, or any Entity may hold against any other Entity, including Insurers, under any Insurance Policy, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

To the extent that any creditor or party-in-interest has a Claim against the Debtors that may be covered by an Insurance Policy, and to the extent that such Insurance Policy has a self-insured retention or deductible amount, in the sole discretion of the Plan Administrator, in full and final satisfaction of such Claim, the creditor shall have a General Unsecured Claim, against the Estates up to the amount of such self-insured retention.  Nothing herein relieves any creditor from being required to file a Claim by the applicable Claims Bar Date to receive a payment or distribution from the Debtors' Estates.  Nothing herein waives the rights of any Insurer under any Insurance Policy or is a determination that insurance coverage under any Insurance Policy is available.

**Q.**     **Setoffs and Recoupments**

Except as otherwise expressly provided herein, the Debtors and the Wind-Down Debtors may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Debtors or the Wind-Down Debtors may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Wind-Down Debtors of any such Claim they may have against the Holder of such Claim.  In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or the Wind-Down Debtors, as applicable, unless (a) the Debtors and the Committee, prior to the Effective Date, or the Wind-Down Debtors, on or after the Effective Date, have consented; or (b) notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise, such Holder has filed a motion with the

Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date and a Final Order granting such Motion has been entered.

**R.      Securities Law Matters**

The offering, issuance, or distribution of the Wind-Down Debtor Assets or any units or other beneficial interests in the Wind-Down Debtors in accordance with the Plan is exempt from the provisions of Section 5 of the Securities Act and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code.

**S.      Administration of Taxes**

The Wind-Down Debtors shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "**Tax Returns**") required to be filed or that the Wind-Down Debtors otherwise deem appropriate, including the filing of amended tax returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date.

Subject to the Plan Administrator Agreement, the Wind-Down Debtors shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for taxes of the Debtors and shall be authorized to respond to any tax inquiries relating to the Debtors.

**ARTICLE XI.**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**

**A.      Allowance of Claims**

After the Effective Date, the Wind-Down Debtors shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or satisfied, settled, released, and discharged under this Plan. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no proof of Claim has been timely filed by the applicable Claims Bar Date, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

**B.      Prosecution and Settlement of Disputed Claims**

Except as otherwise specifically provided in this Plan, the Debtors in consultation with the Committee, before the Effective Date, and the Wind-Down Debtors, after the Effective Date, subject to the Plan Administrator Agreement, shall have the sole authority to: (a) file, withdraw or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court (other than a Professional Fee Claim); and (c) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order, or approval by the Bankruptcy Court.

Objections to Claims and Interests must be filed and served by no later than the Claims Objection Deadline (subject to such being extended by an order of the Bankruptcy Court). For the avoidance of doubt, the Claims Objection Deadline may be extended on multiple occasions.

## C.    Pending Objections

To the extent the Debtors have filed objections to Claims that remain pending as of the Effective Date, the Wind-Down Debtors shall be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.

## D.    Claims Assumed by Purchaser

Any Proof of Claim or request for payment of any claim, including an Administrative Claim, that has been filed with respect to a claim that is assumed by the Going-Concern Purchasers pursuant to the Going-Concern Agreements shall be deemed to be an asserted obligation of the Going-Concern Purchasers and disallowed as against the Debtors, the Estates and the Wind-Down Debtors without further action of the parties or the Bankruptcy Court. Notwithstanding anything to the contrary in this Plan, the Going-Concern Purchasers shall have (a) any and all rights and defenses that the Debtors had with respect to any such claim immediately prior to the closing date of the applicable sale, and (b) the sole authority to (i) file, withdraw or litigate to judgment objections to such claims; *provided*, that the Debtors and the Wind-Down Debtors, as applicable, shall be authorized to file objections to any claims that are assumed by the Going-Concern Purchasers pursuant to the Going-Concern Agreements on the basis that such liabilities are not obligations of the Debtors or the Wind-Down Debtors, and (ii) settle or compromise any claims that are assumed by the Going-Concern Purchasers pursuant to the Going-Concern Agreements without any further notice to or action, order or approval by the Bankruptcy Court.

## E.    Adjustment to Claims Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Debtors, prior to the Effective Date, or the Wind-Down Debtors, on or after the Effective Date, without having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

## F.    Estimation of Claims

The Debtors, prior to the Effective Date, and the Wind-Down Debtors, on or after the Effective Date, may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any Party previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distribution) until the resolution of any such Disputed Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## G.    Disallowance of Claims and Interests

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed disallowed and expunged without any further notice to**

or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless such late filed Claim has been deemed timely filed by a Final Order.

## ARTICLE XII.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A.     General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan. Notwithstanding any other provision of this Plan, the Debtors shall not receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code.

### B.     Releases by the Debtors

**Except as otherwise specifically provided in the Plan, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors and their Estates, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Debtors or their Estates, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and Disclosure Statement, the Going-Concern Transaction, the Sale Documents, or any contract, instrument, release, or other Plan Document, the Plan and Disclosure Statement, the Chapter 11 Cases, the Going-Concern Transaction, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this __Article__**

**XII.B** do not release: (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (c) any rights or obligations under any Sale Document.

C.    **Releases by the Releasing Parties**

Except as otherwise specifically provided in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Releasing Parties, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, that such Entity would have been legally entitled to assert, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and Disclosure Statement, the Going-Concern Transaction, the Sale Documents, or any contract, instrument, release, or other Plan Document, the Plan and Disclosure Statement, the Chapter 11 Cases, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date; provided, that, with respect to Claims against the Debtors, this section shall only apply to Claims arising from any act or omission, transaction, agreement, event, or other occurrence taking place from and including the Petition Date through the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article XII.C do not release: (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (c) any rights or obligations under any Sale Document. Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever relating to their regulatory functions, including but not limited to criminal and environmental matters.

D.    **Exculpation**

Except as otherwise specifically provided in the Plan, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission occurring on or after the Petition Date and before the Effective Date in connection with, relating to, or arising out of, in whole

or in part, the Chapter 11 Cases before the Effective Date, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and Disclosure Statement, the Going-Concern Transaction, or any contract, instrument, release or other Plan Document, agreement, or document created or entered into in connection with the Plan and Disclosure Statement, the Chapter 11 Cases, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or after the Petition Date and before the Effective Date, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and Distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### E.    Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.

**F.     Reimbursement or Contribution**

If the Bankruptcy Court Allows or disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (a) such Claim has been adjudicated as non-contingent; or (b) the relevant Holder of a Claim has filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**G.     Release of Liens**

**Except (a) with respect to Liens securing an Allowed Secured Claim, to the extent elected by the Debtors or the Wind-Down Debtors, and (b) as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, (i) all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, (ii) each of the Debtors, the Wind-Down Debtors, or their delegates are authorized to file such documents as may be necessary to effectuate, or reflect in the public record, the release and discharge such Liens and interests, (iii) the Holders of any such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Wind-Down Debtors, as applicable, to reflect or effectuate such releases and discharges, and (iv) all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests to be released shall revert to the Wind-Down Debtors.  The Holder (and any other Person) of any mortgages, deeds of trust, Liens, pledges, or other security interests that are to be released is entitled to rely on this <u>Article XII.G</u> for the purpose of executing and delivering any documentation related to, or otherwise assisting with, the release or discharge of any such mortgages, deeds of trust, Liens, pledges, or other security interests.**

**ARTICLE XIII.**
**CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE**

**A.     Conditions Precedent to Confirmation**

The following are conditions precedent to confirmation of the Plan:

1.     the Bankruptcy Court shall have entered an order or orders: (a) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (b) authorizing the solicitation of votes with respect to the Plan; (c) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan; (d) confirming and giving effect to the terms and provisions of the Plan; (e) determining that all applicable tests, standards and burdens in connection with confirmation of the Plan have been duly satisfied and met by the Debtors and the Plan; (f) approving the Plan Documents; and (g) authorizing the Debtors to execute, enter into and deliver the Plan Documents, and to execute, implement and to take all actions otherwise necessary or appropriate to give effect to the transactions and transfer of assets contemplated by the Plan and the Plan Documents; and

2.     the Confirmation Order, the Plan Documents and the Plan shall each be in form and substance reasonably acceptable to the Debtors and the material provisions of each shall be reasonably acceptable to the Committee.

55

**B.      Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to <u>Article XIII.C</u> of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably acceptable to the Debtors and the Committee, and such order shall not be subject to a stay nor have been rescinded, vacated, or reversed on appeal;

2.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan and shall be in form and substance acceptable to the Debtors and the material provisions of each shall be reasonably acceptable to the Committee;

3.      the Plan Administrator shall have been appointed;

4.      the Professional Fee Escrow Account shall be created and funded as set forth herein;

5.      all statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full; and

6.      no orders, decisions, or injunctions have been issued by a Governmental Unit prohibiting, modifying, or conditioning any transaction contemplated herein.

**C.      Waiver of Conditions Precedent**

The Debtors, subject to consent of the Committee, which consent shall not be unreasonably withheld or conditioned, at any time, may waive any condition precedent to Confirmation or the occurrence of the Effective Date set forth herein, without notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court and without any formal action other that proceeding to consummate the Plan.

**D.      Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, then (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE XIV.**
**MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**

**A.      Modification of Plan**

The Debtors reserve the right, with the consent of the Committee (such consent not to be unreasonably withheld), to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain

56

restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**B.      Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.      Withdrawal of Plan**

The Debtors reserve the right to withdraw the Plan before the Confirmation Date and to file subsequent Chapter 11 plans.  If the Debtors withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XV.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests, notwithstanding any arbitration or similar provision in any contract to the contrary; *provided* that, in the case of a claim assumed by the Going-Concern Purchasers pursuant to the Going-Concern Agreement, the Bankruptcy Court's jurisdiction shall be non-exclusive;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to Distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any adversary proceedings, motions, cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases or the management of the Debtors, including: (a) with respect to the releases, injunctions, and other provisions contained in Article XII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (b) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; (c) related to section 1141 of the Bankruptcy Code; or (d) with respect to Retained Estate Claims and Causes of Action that may be instituted by the Wind-Down Debtors;

11.     hear, determine, and resolve all adversary proceedings, motions, cases, matters, controversies, suits, disputes, or Causes of Action that may relate to, impact upon or arise in connection with the Plan Documents or their interpretation, implementation, enforcement or consummation (including, but not limited to, any disputes concerning the Wind-Down Debtors);

12.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

13.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

15.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

58

16.    hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

17.    enter an order closing the Chapter 11 Cases, including the Remaining Case;

18.    enforce all orders previously entered by the Bankruptcy Court; and

19.    hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XVI.
## MISCELLANEOUS PROVISIONS

**A.    Immediate Binding Effect**

Subject to Article XIII hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, and any and all Holders of Claims or Interests, parties in interest, Entities, and their respective successors and assigns.

**B.    Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Wind-Down Debtors, and all Holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.    Dissolution of Official Committee**

Upon the Effective Date: (a) the Committee shall be dissolved except with respect to the matters set forth in clause (c) of this sentence; (b) the current and former members of the Committee and their respective representatives shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases except with respect to the matters set forth in clause (c) of this sentence; and (c) the Professionals retained by the Committee will not be entitled to assert any Professional Fee Claims for any services rendered or expenses incurred after the Effective Date in their capacity as Professionals for the Committee, except to the extent necessary to (i) participate with respect to any appeals of the Confirmation Order, (ii) prepare, file and, if necessary, litigate final applications for compensation, and (iii) object to final fee applications filed by other Professionals.

**D.    Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan and the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### E. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### F. Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Wind-Down Debtors shall be served on:

| Counsel to the Wind-Down Debtors | **White & Case LLP**<br>Charles R. Koster<br>609 Main Street, Suite 2900<br>Houston, Texas 77002<br>Telephone:   (713) 496-9700<br>Email:        charles.koster@whitecase.com |
| --- | --- |
| | Roberto Kampfner<br>Patrick Wu (Texas Bar No. 24117924)<br>555 South Flower Street, Suite 2700<br>Los Angeles, California 90071<br>Telephone:   (213) 620-7700<br>Email:        rkampfner@whitecase.com<br>                  patrick.wu@whitecase.com |
| | Fan B. He<br>Kristin Schultz<br>200 South Biscayne Boulevard, Suite 4900<br>Miami, Florida 33131<br>Telephone:   (305) 371-2700<br>Email:        fhe@whitecase.com<br>                  kristin.schultz@whitecase.com |
| **United States Trustee** | **Office of the United States Trustee for the Southern District of Texas**<br>515 Rusk Street, Suite 3401<br>Houston, Texas 77002 |

### G. Term of Injunctions or Stays

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

60

## H. Entire Agreement

Except as otherwise indicated, and without limiting the effectiveness of the Sale Order, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## I. Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to Debtors' counsel or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.stretto.com/WorldwideMachinery, or the Bankruptcy Court's website, available via PACER.

## J. Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; *provided*, that at the request of the Debtors, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without consent from the Debtors; and (c) nonseverable and mutually dependent.

## K. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their representatives will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

## L. Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan and Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

**M.**    **No Waiver**

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, CONFIRMATION OF THE PLAN SHALL NOT RELEASE, NOR BE DEEMED TO RELEASE, ANY CLAIM OR CAUSE OF ACTION (INCLUDING ANY DEFENSES) THAT ANY DEBTOR OR WIND-DOWN DEBTOR MAY HOLD AGAINST ANY PERSON OR ENTITY (INCLUDING ANY RELEASED PARTY) RELATED TO, ARISING UNDER, OR IN ANY WAY WITH RESPECT TO ANY OF THE RETAINED ESTATE CLAIMS AND CAUSES OF ACTION.

**ARTICLE XVII.**
**CONFIRMATION OF THE PLAN**

**A.**    **Voting Procedures and Acceptance**

The Debtors are providing copies of this Plan and Disclosure Statement and Ballots to all known Holders of Impaired Claims who are entitled to vote on the Plan. The procedures for voting on the Plan were approved the Bankruptcy Court by Order entered on December 1, 2025. [Docket No. 315]

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a chapter 11 plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest, each as more specifically set forth in section 1124 of the Bankruptcy Code.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims and Interests in Classes 1, 5, and 6 are Unimpaired under the Plan, and, as a result, the Holders of such Claims and Interests are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and their votes will not be solicited.

Claims in Classes 2, 3, and 4 are Impaired under the Plan. Such Class (with respect to each applicable Debtor) will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims in such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Interests in Class 7 are Impaired and will not receive a Distribution under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, the Holders of Interests in Class 7 are deemed to reject the Plan and their votes will not be solicited.

62

**B.** **Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (a) the Plan satisfies or will satisfy all of the applicable requirements of chapter 11 of the Bankruptcy Code; (b) the Debtors have complied or will have complied with all of the applicable provisions of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.  The confirmation requirements under section 1129 of the Bankruptcy Code include the following:

1. The Plan complies with the applicable provisions of the Bankruptcy Code.

2. The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3. The Plan has been proposed in good faith and not by any means forbidden by law.

4. Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5. Each Holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

6. Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

7. Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full, in cash, on the Effective Date, or as soon as reasonably practical thereafter, and Priority Tax Claims will be paid in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claims.

8. At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

9. Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan except to the extent contemplated under the Plan.

10. All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

**C.** **The Best Interest of Creditors Test**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires, as a condition to confirmation, that each holder of a claim or an equity interest in an impaired class either (a) vote to accept or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that

63

is not less than the value that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to Holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the Debtors' Chapter 11 Cases were converted to a chapter 7 case and the assets of such Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of an Impaired Claim or Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the Distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In these cases, notwithstanding the difficulty in quantifying recoveries to Holders of Allowed Claims, as described below, the Debtors believe that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. On October 28, 2025, the Debtors consummated the Going-Concern Transaction, thereby selling substantially all of their assets as provided by the Going-Concern Agreements and approved by the Sale Order. The Plan provides that all of the Wind-Down Debtor Assets will vest in and be transferred to the Wind-Down Debtors. The Wind-Down Debtors will distribute the proceeds from the Wind-Down Debtor Assets to the Holders of Allowed Claims in accordance with the priorities set forth in the Plan and the Plan Administrator Agreement. Attached as **Exhibit A** to this Plan and Disclosure Statement is a Liquidation Analysis. Importantly, due to the difficulty in estimating recoveries from litigation claims, the Liquidation Analysis does not include any amounts that may be recovered from the prosecution of the Retained Estate Claims and Causes of Action or the cost of prosecuting the Retained Estate Claims and Causes of Action.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is similar to the estimates of the liquidation contemplated by the Plan. However, the Debtors and the Committee believe this Plan provides at least three benefits that will increase the value realized by unsecured creditors as compared to a chapter 7 liquidation. First, the Debtors and the Committee anticipate there would be additional costs, expenses, and time that would be incurred replacing existing management and professionals in a chapter 7 case, which would further diminish Estate assets, delay the prosecution of the Retained Estate Claims and Causes of Action, and delay distributions to creditors. Second, the Debtors and the Committee believe the prosecution of Retained Estate Claims and Causes of Action in a focused and effective manner by the Wind-Down Debtors will maximize the value of the Retained Estate Claims and Causes of Action. Moreover, the Wind-Down Debtors will likely have more flexibility to construct fee arrangements with professionals designed to maximize the value of the Retained Estate Claims and Causes of Action. Notably, because the benefits of the points above are difficult to quantify, the Debtors have not accounted for such benefits or ascribed any value to the Retained Estate Claims and Causes of Action in the Liquidation Analysis attached hereto as **Exhibit A**. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

### D.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the Debtors' liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan clearly complies with this requirement because all of the Debtors' remaining assets will be distributed pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the Debtors' Estates will no longer exist to be subject to future reorganization or liquidation.  Since the Plan contemplates a liquidation and provides for a waterfall in accordance with the priority of Allowed Claims, the feasibility requirement is satisfied.  The Debtors believe that sufficient funds will exist to make all payments required by the Plan.

### E.      Eligibility to Vote on the Plan

Unless otherwise ordered by the Bankruptcy Court, only holders of Allowed Claims in Classes 2, 3, and 4 may vote on the Plan.  Further, subject to the tabulation procedures that were approved pursuant to the DS Order, in order to vote on the Plan, you must hold an Allowed Claim in Class 2, 3, or 4, or be the holder of a Claim that has been temporarily *Allowed* for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

### F.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it if the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

#### 1.      No Unfair Discrimination

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.      Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured

65

claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (b) each holder of a secured claim receive the indubitable equivalent of its secured claim.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirements that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior equity interest.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in such class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

Since Class 7 is deemed to reject the Plan, the Debtors seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. The Debtors believe that the Plan satisfies the foregoing requirements for nonconsensual confirmation of the Plan. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan and any exhibits thereto or the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

## ARTICLE XVIII.
## PLAN-RELATED RISK FACTORS

### A.   General Bankruptcy Law and Plan Related Considerations

#### 1.   Parties in Interest May Object to the Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created certain Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.   Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or may be forced to liquidate under chapter 7 of the Bankruptcy Code. The terms of any such alternative chapter 11 plan would likely not provide treatment as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3. The Debtors May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of the Disclosure Statement or whether the solicitation procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the solicitation procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

The Confirmation and Consummation of the Plan also are subject to certain other conditions. No assurance can be given that these conditions will be satisfied.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented through an alternative mechanism or plan and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. Any alternative would likely provide Holders of Claims with less than they would have received pursuant to the Plan. Moreover, an inability to confirm the Plan could result in an extended chapter 11 proceeding with greater administrative costs.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.

### 4. Nonconsensual Confirmation – "Cramdown"

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the Debtors' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

### 5. Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors and the Wind-Down Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Plan and Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

### 6. Conversion into Chapter 7 Cases

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### 7. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article XII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 8. Risk of Nonoccurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, as to whether all of the conditions precedent to the Effective Date will be satisfied or waived, or as to whether the Effective Date will, in fact, occur.

### 9. Risks Affecting Potential Recoveries of Holders of General Unsecured Claims

The Debtors cannot state with any degree of certainty what recovery will be available to Holders of General Unsecured Claims. Several unknown factors make certainty impossible. First, the Claims Bar Date applicable to General Unsecured Claims is January 14, 2026. The universe of potential General Unsecured Claim will not be known until that date has passed and all General Unsecured Claims have been filed and adjudicated. Second, it is possible that the number and amount Allowed Claims senior to the General Unsecured Claims will exceed the Debtors' estimates. The Claims Bar Date applicable to Governmental Units is March 10, 2026. The universe of potential senior claims will not be known until that date has passed and all claims of Governmental Units have been filed and adjudicated. Accordingly, the Debtors cannot know with certainty, at this time, the number or amount of Claims senior to the General Unsecured Claims that will ultimately be Allowed. Third, the Debtors cannot know with certainty, at this time, the value of the Retained Estate Claims and Causes of Action or estimate the costs and time required for the prosecution of the Retained Estate Claims and Causes of Action, which costs may reduce the projected recoveries for General Unsecured Claims. Further, the collectability of a judgment awarded to the Wind-Down Debtors on any of the Retained Estate Claims and Causes of Action is uncertain. Fourth, the Debtors cannot know, at this time, how much money will remain after paying all Allowed Claims which are senior to the General Unsecured Claims.

### 10. Risks Relating to Litigation Reserve Funding

The Debtors intend to obtain financing to fund the Litigation Reserve for purposes of funding the Plan Administrator's prosecution of the Retained Estate Claims and Causes of Action for the benefit of the Wind-Down Debtor Beneficiaries. The Debtors have obtained a non-binding Litigation Reserve Term Sheet, attached hereto as **Exhibit C**, however, the Litigation Reserve Term Sheet remains subject to negotiation and the Debtors are continuing to engage in discussions with other parties regarding a potential alternative Litigation Reserve Transaction. Accordingly, the Debtors cannot state with certainty (i) whether the Debtors or the Wind-Down Debtors will ultimately enter into a Litigation Reserve Transaction, (ii) the terms of any such Litigation Reserve Transaction, (iii) whether the Litigation Reserve will be funded, and

(iv) the impact of the establishment or non-establishment of the Litigation Reserve on the recoveries of Wind-Down Debtor Beneficiaries.

**B.      Financial Information Disclaimer**

The financial information contained in this Plan and Disclosure Statement has not been audited.  In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Plan and Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**C.      Disclosure Statement Disclaimer**

**1.      Information Contained Herein Is for Soliciting Votes**

The information contained in this Plan and Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

**2.      This Plan and Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchange Commission**

This Plan and Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Plan and Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

**3.      This Plan and Disclosure Statement May Contain Forward Looking Statements**

This Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analysis, Distribution projections or other information contained herein and attached hereto are estimates only, and the timing and amount of actual Distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**4.      No Legal or Tax Advice Is Provided to You by this Plan and Disclosure Statement**

This Plan and Disclosure Statement is not legal or tax advice to you.  The contents of this Plan and Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest.  This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5. **No Admissions Made**

The information and statements contained in this Plan and Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors and the Committee) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Committee, the Wind-Down Debtors, Holders of Allowed Claims or Interest or any other parties in interest.

6. **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim, cause of action, avoidance action or projected objection to claim is, or is not, identified in this Plan and Disclosure Statement. Moreover, the Wind-Down Debtors may seek to investigate, file and prosecute litigation claims, causes of action, and avoidance actions and projected objections to claims after the Confirmation or Effective Date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such claims or objections to claims.

7. **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims, or rights of the Debtors or the Wind-Down Debtors (or any party-in-interest, as the case may be) to object to that Holder's Allowed Claim, assert any defenses, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

8. **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Plan and Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Plan and Disclosure Statement, they have not verified independently the information contained herein.

9. **Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Plan and Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Plan and Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Plan and Disclosure Statement, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Plan and Disclosure Statement. Further, although the Debtors may subsequently update the information in this Plan and Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10. **No Representations Outside the Plan and Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Plan and Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of

the Plan other than as contained in, or included with, this Plan and Disclosure Statement, should not be relied upon by you in arriving at your decision.

## D.     Alternatives to Confirmation and Consummation of the Plan

The Debtors believe that the Plan affords the Holders of Claims the potential for a better realization on the Debtors' assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders. If, however, the Plan is not confirmed, the theoretical alternatives include (a) formulation of an alternative plan or plans of liquidation under chapter 11, (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Cases.  Each of these possibilities is discussed in turn below.

### 1.     Alternative Plan(s) of Liquidation

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans of liquidation.

With respect to an alternative liquidation plan, the Debtors have explored various other alternatives in connection with the formulation and development of the Plan. The Debtors believe that the Plan enables creditors to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated and will maximize recoveries of unsecured creditors.

### 2.     Liquidation under Chapter 7

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In a case under chapter 7 of the Bankruptcy Code, a trustee would be appointed to promptly liquidate the assets of the Debtors.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against the Debtors.

The Debtors believe that in a liquidation under chapter 7 of the Bankruptcy Code, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, would cause a substantial diminution in the value of the Estates.  The assets available for distribution to Holders of Claims would be reduced by such additional expenses.

### 3.     Dismissal of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors or other parties-in-interest may seek dismissal of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code.  Without limitation, dismissal of the Chapter 11 Cases would terminate the automatic stay and might allow certain creditors to attempt to collect on their Claims or otherwise foreclose on the assets of the Debtors.  Moreover, the dismissal of the Chapter 11 Cases would severely impair the Debtors' ability to liquidate their largest remaining assets, the Retained Estate Claims and Causes of Action, for the benefit of creditors.  Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' remaining assets.

**ARTICLE XIX.**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.      General Tax Considerations**

The following discussion is a summary of certain material U.S. federal income tax consequences expected to result from the consummation of the Plan for a Holder of a Claim in Class 3, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations. This discussion does not address aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim or Interest subject to special treatment under U.S. federal income tax laws (such as broker dealers; traders in securities that elect to use a mark-to-market method of accounting for securities holdings; banks; thrifts; insurance companies; financial institutions; regulated investment companies; real estate investment trusts; pension plans; partnerships (or other entities or arrangements treated as a partnership for U.S. federal income tax purposes) or a partner, member or owner therein; persons that hold a Claim or Interest as part of a straddle or a hedging, conversion or constructive sale transaction; persons whose functional currency is not the U.S. dollar and other tax exempt investors). This summary does not discuss any aspects of state, local or foreign tax laws or any U.S. federal estate or gift tax considerations. Furthermore, this summary does not address all of the U.S. federal income tax consequences that may be relevant to a Holder of a Claim or Interest, such as the potential application of the alternative minimum tax.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan.

No ruling has been or will be requested or obtained from the Internal Revenue Service (the "**IRS**") with respect to any tax aspects of the Plan and no opinion of counsel has been or will be sought or obtained with respect thereto. No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      U.S. Federal Income Tax Consequences to the Debtors**

For U.S. federal income tax purposes each of the Debtors is (i) a member of an affiliated group of corporations of which Worldwide Machinery Group, Inc. is the common parent and files a single consolidated U.S. federal income tax return (the "**Tax Group**"), or (ii) an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Tax Group.

72

In the Going-Concern Transaction, which was consummated prior to the date hereof, the Debtors sold certain assets to purchasers in taxable transactions. In connection therewith, the Debtors' realized gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax bases in such assets. Although subject to further analysis, the Debtors believe that such sales resulted in a taxable losses, and therefore that they will not have any cash tax obligation as a result of such sales. In the event that such sales resulted in taxable gain, such gain would be reduced by the amount of tax attributes available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation.

**C.     U.S. Federal Income Tax Consequences to Holders of Claims and Interests**

**1.     Consequences to U.S. Holders of Claims**

For purposes of this discussion, a "**U.S. Holder**" is a beneficial owner of a Claim that is, for U.S. federal income tax purposes:

a.     an individual citizen or resident of the United States;

b.     a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States, any state therein or the District of Columbia;

c.     an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

d.     a trust if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all substantial decisions of the trust or otherwise if the trust has a valid election in effect under current Treasury regulations to be treated as a United States person.

A "Non-U.S. Holder" is any Holder that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes). If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The federal income tax consequences of the implementation of the Plan to a U.S. Holder of Claims in Classes 3 and 4 will depend, among other things, upon the origin of the Holder's Claim, when the Holder receives payment in respect of such Claim, whether the Holder reports income using the accrual or cash method of tax accounting, whether the Holder acquired its Claim at a discount, whether the Holder has taken a bad debt deduction with respect to such Claim, and whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for federal income tax purposes.

Generally, a U.S. Holder of Claims Classes 3 and 4 will realize gain or loss on the exchange under the Plan of its Claim for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the Holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Claim exchanged therefor (other than basis attributable to accrued but

unpaid interest previously included in the Holder's taxable income).  With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, see Section C.1.a — "Accrued but Unpaid Interest" below.  It is possible that any loss, or a portion of any gain, realized by a Holder of a Claim may have to be deferred until all of the distributions to such Holder are received.

When gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the U.S. Holder and has been held for more than one year (subject to the rules discussed below in Section C.1.b. — "Market Discount").  Each U.S. Holder of a Claim should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

### a.    Accrued but Untaxed Interest

Pursuant to <u>Article IX.N</u> of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes.  In general, to the extent any amount received (whether cash or other property) by a U.S. Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income under the Holder's normal method of accounting).  Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each U.S. Holder of Claims in Classes 3 and 4 is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### b.    Market Discount

U.S. Holders of Claims in Classes 3 and 4 who receive Cash or other property in respect of their Claims may be affected by the "market discount" provisions of the sections 1276 through 1278 of the IRC.  Under these rules, some or all of the gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount).

Any gain recognized by a U.S. Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by a U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### 2.    Consequences to Non-U.S. Holders of Claims

The following discussion addresses some of the U.S. federal income tax consequences to a beneficial owner of a Claim that is a Non-U.S. Holder.  The following discussion includes only certain U.S.

federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder.

        **a.**        **Gain Realized / Income Allocated to Non-U.S. Holders**

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

        **b.**        **Gain / Income Recognition by Non-U.S. Holders**

Any gain realized by a Non-U.S. Holder on the exchange of its Class 3 Claim generally will not be subject to U.S. federal income taxation unless: (a) except as otherwise covered by clause (b) below, (i) with respect to capital gains, the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Plan becomes effective and certain other conditions are met or (ii) with respect to income other than capital gains, the income is otherwise deemed to be derived from U.S. sources, or (b) such gain and/or income is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a "branch profits tax" equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

        **c.**        **Accrued Interest**

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest with respect to the Claims generally will not be subject to U.S. federal income or withholding tax; provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

        a.        the Non-U.S. Holder actually or constructively owns 10 percent or more of the capital or profits interest in the Owner;

        b.        the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Owner (each, within the meaning of the IRC);

        c.        the Non-U.S. Holder is a bank receiving interest described in IRC Section 881(c)(3)(A); or

d.        such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate (or such lower rate provided by an applicable income tax treaty) on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### d.        FATCA

Under the Foreign Account Tax Compliance Act ("**FATCA**"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."

For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.  Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's exchange of its Claim.

### D.        Information Reporting and Backup Withholding

Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to Distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the IRC.

**The foregoing discussion is intended only as a summary of certain income tax consequences of the plan and is not a substitute for careful tax planning with a tax professional.  The above discussion is for informational purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a Claim Holder's particular circumstances. Accordingly, Claim Holders are urged to consult their tax advisors about the United States federal, state and local, and applicable foreign income and other tax consequences of the Plan.**

**E.**     **Reservation of Rights**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XIX and the other tax related sections of the Plan prior to the date by which objections to Confirmation of the Plan must be filed and served.

**CONCLUSION, RECOMMENDATION, AND CONFIRMATION REQUEST**

**The Debtors and the Committee believe that Confirmation of the Plan is in the best interests of all holders of Claims and Interests.  The Debtors and the Committee urge you to vote to accept the Plan and to evidence such acceptance by returning your Ballot so it will be received by the Voting Deadline.**

The Debtors request Confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

Respectfully submitted,

Worldwide Machinery Group, Inc., *et al.*
on behalf of itself and all other Debtors

By:      /s/ *Scott Avila*

Name:    Scott Avila
Title:    Chief Restructuring Officer

77